TIMOTHY B. McCAFFREY, JR. (S.B. #192114)
NATASHA CHESLER (S.B. #227540)
THE LAW OFFICES OF TIMOTHY B. McCAFFREY, JR.
A Professional Corporation
11377 West Olympic Boulevard, Suite 500
Los Angeles, California 90064-1683
Telephone: (310) 882-6407
Facsimile: (310) 882-6359
E-Mail: tmccaffrey@tbmlaw.net
E-Mail: nchesler@tbmlaw.net

Attorneys for Plaintiff and Class
Representative Miguel de la Cueva

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MIGUEL DE LA CUEVA, on behalf of himself and those similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALTA DENA CERTIFIED DAIRY, LLC, a Delaware Limited Liability Company, ALTA-DENA CERTIFIED DAIRY, INC., a Delaware Corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. CV 12-1804-GHK (CWx)<br><br>**DECLARATION OF NATASHA R. CHESLER IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT OR, IN THE ALTERNATIVE, FOR LEAVE TO FILE MOTION ON SHORTEN TIME TO FILE FIRST AMENDED COMPLAINT**<br><br>Date:          February 5, 2013<br><br>Trial Date:   None Set |

## DECLARATION OF NATASHA CHESLER

I, Natasha Chesler, declare as follows:

1.      I am an attorney of record for plaintiff Miguel de la Cueva ("Plaintiff" or "Mr. de la Cueva").  If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief.

2.      Plaintiff filed the instant action on February 1, 2012 in California Superior Court.  Defendant removed the action to Federal Court on March 2, 2012.  On April 9, 2012, Defendant moved to dismiss the class claims.  The parties agreed to wait until the Court's ruling on Defendant's motion to dismiss before engaging in the early meeting of counsel (and then conducting discovery).[1]  On May 7, 2012, the Court denied Defendant's motion to dismiss.  On May 22, 2012, the parties held their early meeting of counsel.[2]  On June 12, 2012, the parties exchanged initial disclosures.  On June 19, 2012, Plaintiff propounded written discovery, as well as noticed depositions of several individuals and Defendant pursuant to FRCP 30(b)(6).

3.      On August 3, 2012, the Court issued the current Scheduling Order, which included a deadline of September 4, 2012 to amend as to any claims, defenses, and/or parties. At the time the Order was issued, Plaintiff anticipated being able to comply.

4.      Defendant requested two extensions of time to respond to the written discovery and ultimately provided written responses on August 23, 2012.  Defendant, however, produced no documents and made numerous objections – including refusing discovery because Plaintiff allegedly was an inadequate class representative for current employees (since he no longer was employed there).  Thus, we researched the multitude of objections and sent opposing counsel a meet and confer letter on September 18, 2012.  Defendant did not respond until October 4, 2012.

---

[1] Plaintiff initially served written discovery prior to removal, on February 15, 2012.
[2] Plaintiff initiated the scheduling of this conference on May 9, 2012, but May 22, was the first day upon which both sides were available.

5.      On October 5, 2012, Defendant began slowly producing documents on a "rolling basis."  The first production was deficient and missing essential items such as Plaintiff's paystubs.[3]  On October 18, 2012, Plaintiff served an amended FRCP 30(b)(6) deposition notice, setting the deposition for November 13, 2012, believing that documents would be produced by then and discovery issues worked out.

6.      At one point, Defendant claimed documents were late to come because Plaintiff did not timely respond regarding ESI search terms.  But the documents that were missing were plainly responsive to requests and did not require an "ESI" search – such as Plaintiff's paystubs and reports regarding hours worked and breaks taken.

7.      Despite meet and confer efforts, Plaintiff was forced to file a motion to compel on November 13, 2012.  The Magistrate Judge ruled on the motion on December 4, 2012, ordered Defendant to produce further documents post-dating Plaintiff's termination, and ordered the parties to use a third-party administrator to send out opt-out notices, with the putative class members' contact information to be produced to Plaintiff by January 7, 2013.

8.      Plaintiff thereafter sent a Second Amended FRCP 30(b)(6) Deposition Notice, setting the deposition for December 18, 2012.  Then, the Friday before the deposition, Defendant produced 10,000 pages of documents.  The parties then participated in a call with the Magistrate, during which Defendant indicated the production would be complete by December 31.  Thus, Plaintiff scheduled the FRCP 30(b)(6) Deposition for January 16, 2013 to allow time to review documents produced.

9.      Defendant continued producing documents through December, and even as recently as January 22, 2013 (producing Plaintiff's paystubs because those previously produced were only summary versions and not the actual paystubs). All told, between <u>October 5, 2012 through January 22, 2013</u>, Defendant produced on a

_____

[3] In fact, Plaintiff's actual paystubs were not produced until January 2013.

1   "rolling basis" through 16 separate productions 42,296 pages of documents, which
2   Plaintiff has been diligently reviewing.
3        10.    The deposition of Defendant's FRCP 30(b)(6) witness regarding meal and
4   rest breaks policies and practices proceeded on January 16, 2013. (A true and correct
5   copy of the relevant portions of that deposition transcript is attached hereto as Exhibit
6   A.) The deposition of Defendant's FRCP 30(b)(6) witness regarding payroll policies
7   and practices proceeded on January 23, 2013. (The court reporter has not yet finalized
8   this deposition. Thus, a true and correct copy of the relevant portions from the "rough
9   transcript" is attached hereto as Exhibit B.) During these depositions, Plaintiff learned
10  that the putative class members had their "employer" changed approximately two years
11  ago from Alta Dena Certified Dairy, LLC to Dean Transportation, Inc. (Ex. B at
12  27:23-28:7.) This appears to be a change in form and not substance as the drivers
13  continue in the same job, at the same locations, same duties, same policies and
14  procedures, just the "name" of the employer has changed. It was not until these
15  depositions that Plaintiff became aware of the existence of Dean Transportation, Inc.
16  Defendant did not list this entity on its Notice of Interested Parties. Nor did Defendant
17  identify Dean Transportation, Inc. in any discovery responses. Indeed, Plaintiff's
18  motion to compel was in part focused on refusal to produce information related to
19  policies/practices post-dating Plaintiff's termination. Defendant argued only standing
20  to the Magistrate and at no time indicated that the entity no longer existed. And the
21  Magistrate ultimately overruled Defendant's objection and ordered it to produce
22  information post-dating Plaintiff's termination. But Defendant still did not notify
23  Plaintiff – or produce any documentation showing – that Dean Transportation, Inc.
24  took over after Plaintiff's termination.[4] Instead, Defendant apparently lay in wait
25
26  _____
27  [4] Nor does it appear Defendant sent the opt-out letter ordered by the Magistrate to the
    employees of Swiss and/or Heartland Farms that were merged with Alta Dena in 2010.
28

1  knowing full well the putative class members' had their employment technically
2  switched to a sister company.

3      11.    The FRCP 30(b)(6) deponents explained the corporate structure as
4  follows.  The parent company is Dean Foods.  (Ex. B at 12:16-18.)  Dean Foods'
5  subsidiaries include FDD So Cal.  (Ex. B at 26:8-19.)  From approximately 2008-2010,
6  FDD So Cal had several subsidiaries, including Alta Dena, Swiss Dairy and Heartland
7  Farms.[5]  Swiss Dairy and Heartland Farms merged into Alta Dena in 2010.  (Ex. B at
8  14:15-16:14.)  Then in approximately 2011 (until the present), the drivers at Alta Dena
9  were transferred over to Dean Transportation, Inc.  (Ex. B at 27:23-28:7.)  But
10  according to the company's FRCP 30(b)(6) witness, notwithstanding these corporate
11  changes, from 2008 until the present, all of the drivers under FDD So Cal – including
12  Alta Dena, Swiss Dairy, Heartland Farms, and Dean Transportation, Inc. – were
13  subject to the same policies at issue relating to meal and rest breaks.  (Ex. A. at 22:13-
14  25; 44:18-45:11; 66:25-67:9, 93:25-94:9; 99:4-20109:7-23; 155:20-156:8.)  Indeed,
15  from 2008 until the present the same "Standard Operating Procedures" applied to all
16  drivers in all of these locations.  (Ex. A at 163:15-19.)  And since at least 2010, they
17  shared the same general manager and the same operations distribution manager.  (Ex.
18  A at 32:5-14, 37:7-13.)

19      12.    Plaintiff's counsel further learned at these depositions that all of these
20  entities automatically deducted 30 minutes of time (that is not reflected on the paystub)
21  and that Defendant had a consistent policy and practice during the relevant time period

22

23  _____

24  [5] In *Ikeda v. Alta Dena Certified Dairy, LLC*, which Defendant failed to notify the
    Court of despite simultaneously pending at one point in the same Court, Defendant
    represented that Swiss II, LLC had merged into Alta Dena Certified Dairy, LLC.
25  (Case No. CV12-03034, Docket No. 1 at 1:27-2:3; Docket No. 9 at 1, fn. 1.)  And the
    plaintiff in that case, based on Defendant's representation, dismissed Swiss from the
26  case.  (Docket No. 2-6 at p. 46.)  (The *Ikeda* matter was subsequently dismissed.)
    Plaintiff believes similarly here that Alta Dena is the appropriate defendant for claims
27  attributable to Heartland Farms.  But Defendant has failed to provide Plaintiff with an
    answer to this issue.  (See Ex. C.)

28

1  of making such deduction from putative class members wages for the meal break –

2  regardless of whether a break was actually taken – when an employee worked over

3  his/her regular shift.  (Ex. A at 22:13-25, 44:18-45:11, 109:7-23, 155:20-156:8; Ex. B.

4  at 41:22-25, 42:20-21, 44:9-11, 45:14-23, 135:11-17.)  The deduction does not show

5  up on Plaintiff's or anyone else's paystubs (Ex. B at 44:9-11).  Furthermore, neither

6  Plaintiff nor his counsel obtained the internal XATA, Kronos, and paystub records

7  necessary to ascertain whether or not defendant actually engaged in this policy and/or

8  practice until December 2012 – January 2013.  In fact, it was not until January 2013

9  that Defendant's production was complete and it consisted of more than 40,000 pages

10  of documents.  And Defendant did not produce the paystubs until January 22, 2013.

11  Moreover, even the records Defendant has produced thus far are not self-explanatory

12  on this issue, but instead require computation and/or explanation for a clear

13  understanding of Defendant's policies and/or practices.  Thus, it was not until

14  Defendant's corporate representatives were asked about the 30-minute deduct at

15  deposition on January 16 and 23, 2013 respectively, that it was clear that Defendant

16  followed this uniform policy and/or practice with respect to all drivers (*i.e.*, Plaintiff

17  and putative class members).1

18        13.     Finally, while Plaintiff was aware that he may not be an adequate class

19  representative with respect to penalties under California Labor Code § 226, (he is

20  adequate regarding damages or return of unpaid wages on all claims plead in the

21  complaint) it was not until January 31, 2013, that a suitable additional class

22  representative was found.  On January 7, 2013 Defendant turned over putative class

23  members contact information, which contained over 100 names.  Thus, it took Plaintiff

24  some time to interview those on the list.  Plaintiff's counsel did not solicit Mr. Parker

25  or anyone else.  As a result of the opt-out letter, Mr. Parker contacted us, retained us,

26  and sought to pursue his claims in his case.  Mr. Parker confirmed his desire and

27  ability to join as class representative on January 31, 2013.  Mr. Parker originally

28  worked for Heartland Farms, which then turned into Alta Dena Certified Dairy, Inc.,

1   and then turned into Dean Transportation, Inc.  He was terminated in approximately

2   March 2012.

3          14.    Given the foregoing, Plaintiff submits that there has been no undue delay

4   in addressing these issues, which only recently came to light despite reasonable

5   diligence on Plaintiff's part.  Plaintiff is not acting in bad faith in attempting to add

6   these parties and claims.  Instead, Plaintiff is merely acting in light of what discovery

7   has revealed.  Nor is Plaintiff seeking any other modification of the scheduling order,

8   such as to obtain more time to file his motion for class certification.  Plaintiff believes

9   even with these amendments the parties may still comply with the rest of the Court's

10  scheduling order.  This is the first time Plaintiff has sought to amend the complaint.

11         15.    The discovery cut-off is August 6, 2013.  Plaintiff's class certification

12  motion is due on February 19, 2013.  Defendant's opposition thereto is due on March

13  11, 2013.  Defendant has not yet taken any depositions.  Defendant recently scheduled

14  Plaintiff's deposition for February 15, 2013.  Plaintiff believes that both parties can

15  continue to comply with the remainder of the Court's scheduling order and requests no

16  further modification other than with respect to filing the amended complaint.  Plaintiff

17  is willing to provide all documentation that Mr. Parker has within one-week of the

18  amendment, and willing to produce Mr. Parker for deposition upon Defendant's

19  request.  Thus, allowing leave to file the amended complaint will not unduly prejudice

20  Defendant.

21         16.    Plaintiff further notes that the of limitation has not run on the 30-minute

22  deduction claim for plaintiff Miguel de la Cueva.  Nor have the statute of limitations

23  run on any of Mr. Parker's claims. Thus, these plaintiffs could bring a separate action

24  and also name Dean Transportation, Inc., FDD So Cal, and Dean Foods Company.

25  But Plaintiff believes that would be an unnecessary waste of judicial resources.

26         17.    On Wednesday January 30, 2013, my co-counsel, Timothy B. McCaffrey,

27  sent an email to defense counsel regarding amending the complaint to add the 30-

28  minute automatic deduction allegation.  On January 31, 2013, Mr. McCaffrey followed

1   up with defense counsel and explained that Plaintiff further sought to add the other

2   corporate entity defendants and an additional named Plaintiff.  We offered to have a

3   telephonic meet and confer.  In response, defense counsel asked for a copy of the

4   proposed First Amended Complaint, which we sent on February 1, 2013.  (The only

5   change from the draft provided was to add defendants Heartland Farms, Dean Foods,

6   and FDD So Cal, although that had been discussed prior.  It was only after defense

7   counsel seemed to backtrack on the representations made in the *Ikeda* matter as to the

8   appropriate corporate defendant that Plaintiff added those parties as previously

9   discussed with defense counsel.)  We explained that we would wait until the close of

10  business February 4, 2013 before filing this ex parte to give defense counsel time to

11  review the proposed amendment and discuss.  And on February 5, 2013, I again

12  reached out to defense counsel to confirm which corporate entities were appropriate.

13  As of the filing of this application, however, we have not heard back from defense

14  counsel on this issue.  True and correct copies of the relevant (excerpted) portions

15  copied from our email communications on these topics, including the date, time,

16  sender, and recipient, is attached hereto as Exhibit C.

17      I declare under penalty of perjury under the laws of the State of California, and

18  the United States of America, that the foregoing is true and correct.

19      Executed February 5, 2013, at Los Angeles, California

20

21                              /s Natasha Chesler

22                              Natasha Chesler

23

24

25

26

27

28

DECLARATION OF NATASHA R. CHESLER IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION

**EXHIBIT A**

UNITED STATE DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MIGUEL DE LA CUEVA, on )
behalf of himself and those )
similarly situated, )
                    )
        Plaintiff, )
                    )
   vs. )
                    )
ALTA DENA CERTIFIED DAIRY, )
LLC, a Delaware Limited )
Liability Company, et al., )
                    )
        Defendants. )
                    )

**CERTIFIED COPY**

CASE NO. CV 12-01804 GHK
                  (CWx)

30(B)(6) DEPOSITION OF

JOSE LLAMAS

LOS ANGELES, CALIFORNIA

WEDNESDAY, JANUARY 16, 2013

Reported by:
CAROL LYNN COX
CSR No. 5128
13-23855


KARYN ABBOTT
& ASSOCIATES
COURT REPORTERS
420 North McCadden Place
Los Angeles, California 90004
Phone 213.419.1274 | Fax 213.741.0644

EXHIBIT 24, PAGE 49

PAGE 8

```
 1      Q    Okay.  The entire time that you were an
 2   assistant district manager, did you report to
 3   Mr. Rodriguez?
 4      A    Yes.
 5      Q    No other distribution manager while you were an
 6   assistant --
 7      A    No.
 8      Q    -- correct?
 9      A    Correct.
10      Q    Sorry.  I do that a lot.  It becomes a double
11   negative.  So, I'll try and watch it.
12           Is there -- well, let me take a step back.
13           How many locations does Alta Dena have?
14      A    Currently?
15      Q    Currently, in California.
16           MS. BONN:  Objection.  Outside the scope of
17   the 30(b)(6).
18           But you can answer in your individual
19   capacity.
20           THE WITNESS:  Currently, with the new
21   reorganization we have, which there used to be Swiss in
22   Riverside, Alta Dena in Highland, Alta Dena in San
23   Diego, Heartland in City of Industry, Alta Dena in City
24   of Industry, Swiss in Commerce, Swiss in Palm Springs,
25   and Swiss in Oxnard.
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - A, PAGE 2
PAGE 9

1      Q    The longer list or just --

2      A    All of them.

3      Q    Including Swiss Riverside --

4      A    Yes.

5      Q    Okay.  Just so the record is clear, including:

6    Swiss Riverside, Alta Dena Highland, Alta Dean San

7    Diego, Alta Dena City of Industry, Heartland City of

8    Industry, Swiss Commerce, Swiss Palm Springs, and Swiss

9    Oxnard; is that correct?

10     A    Yes.

11     Q    From mid-2010 until approximately a month ago,

12   did the general manager also oversee those locations I

13   just listed?

14     A    Yes.

15     Q    And prior to 2010, did the general manager

16   oversee all those locations I just listed?

17     A    No.

18     Q    What was it prior to 2010?

19     A    Prior to 2010, Alta Dena had their own general

20   manager, which was John Keith, and Heartland had their

21   own and Swiss had their own.

22     Q    So prior to 2010, John Keith oversaw Highland

23   and San Diego and City of Industry Alta Dena branches?

24     A    Correct.

25     Q    Then mid-2010 until about a month ago, the

KARYN ABBOTT & ASSOCIATES

```
 1       Q     Who is currently the operations distribution
 2   manager?
 3       A     That would be Sean Bressler.
 4       Q     How long has he had that position?
 5       A     Since about mid-2010 when we did the FDD
 6   reorg.
 7       Q     Then am I correct in assuming that since
 8   mid-2010 to the present, he has been the operations
 9   distribution manager for all locations that you listed,
10   including the Swiss and Heartland locations?
11             MS. BONN:  Object.  Outside the scope.
12             You can answer as an individual.
13             THE WITNESS:  Yes.
14   BY MS. CHESLER:
15       Q     Prior to 2010, was he the operations
16   distribution manager for a different set of divisions or
17   locations?
18       A     I don't remember his exact hire date, but no.
19   I don't remember when he came on board.  But I don't
20   think he was on board.  I think it was very shortly
21   after we did the reorg.
22       Q     Okay.  Do you recall who it was before him?
23       A     I believe that position didn't exist.
24       Q     Then is it the same for all the other locations
25   you listed, that each one has their own area manager and
```

1    delivery, and the shipping delivery, none of them are

2    delivering any products that Dean Foods does not sell,

3    right?

4            MS. BONN:  Object to form.  Object.  Outside

5    the scope of the 30(b)(6).

6            You can answer as an individual.

7            THE WITNESS:  That it does not sell, correct.

8    BY MS. CHESLER:

9        Q    Are all these drivers full time?

10       A    Yes.

11       Q    So there are no drivers that work or are

12   scheduled to work less than eight hours a day, correct?

13       A    To be more specific, there's no part-time

14   drivers.

15       Q    So everyone works -- all drivers are expected

16   to work at least 40 hours a week; is that correct?

17       A    Correct.

18       Q    Just moving forward in the deposition, just so

19   I'm clear, as we talk about policies and things like we

20   just went over for the hours, when I say "all drivers,"

21   I'm referring to all drivers within the organization.

22   Do you understand that?

23           MS. BONN:  I'm going to object to form.  I

24   don't think "the organization" is clear.  And just for

25   the record, Mr. Llamas has been prepared to testify as

KARYN ABBOTT & ASSOCIATES

```
 1    a corporate representative for Alta Dena Certified
 2    Dairy, LLC, and not for any other entities, such as
 3    Dean Foods, Swiss, et cetera.
 4          MS. CHESLER:  I understand you've made that
 5    objection for the record, but we disagree.
 6       Q    Do you understand what I'm saying?  I'm
 7    referring to all them.  I'm referring to transport/relay
 8    drivers, wholesale delivery drivers, shipping delivery
 9    drivers at any of the locations in all of California
10    that you just identified.  Do you understand that?
11       A    I understand.
12          MS. BONN:  I'm just going to lodge an
13    objection for the record, that our position is that
14    this notice has been served on Alta Dena Certified
15    Dairy, LLC.  Mr. Llamas has been designated to testify
16    on certain topics for Alta Dena Certified Dairy, LLC,
17    which includes the Alta Dena City of Industry branch,
18    the Highland branch, and --
19          MS. CHESLER:  This is a speaking objection.
20    Just state your objection.  Don't lead the witness.
21          MS. BONN:  My objection is to the extent you
22    ask any questions that seek answers for other branches
23    in California, he is going to answer in his individual
24    capacity, not for Alta Dena Certified Dairy.
25          MS. CHESLER:  Just state your objection.
```

KARYN ABBOTT & ASSOCIATES

```
 1        A     Yes.

 2        Q     Did that change at all between 2008 to the

 3   present?

 4        A     No.

 5        Q     For the drivers that are given routes, are they

 6   allowed to deviate from the route?

 7        A     No.

 8        Q     For any reason?

 9        A     You can for a reason.  It's you must notify

10   supervisor and explain why or if it's directed by one

11   of us.  But if not, we ask you stay, I think, within a

12   half mile of the radius of your route.

13        Q     Did that change at one point to a mile within

14   the route?

15        A     I think -- I think it changed to a mile.  I

16   don't remember the exact date, but I believe so.

17        Q     Currently, is it a mile or a half mile; do you

18   know?

19        A     Currently, I believe it's a mile.

20        Q     Was that in place from 2008 to the present?

21        A     I don't remember about 2008.  It might have

22   changed when we went FDD, I think, to a mile.

23        Q     But always at least half a mile?

24        A     Yeah.

25        Q     So between 2008 to the present, am I correct,
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - A, PAGE 7
PAGE 14

```
 1   then, that all drivers had to stay within route limits
 2   within half a mile to a mile?
 3       A    That's correct.
 4       Q    Can't deviate from that at any time unless you
 5   contact a supervisor, correct?
 6            MS. BONN:  Object to form.
 7            THE WITNESS:  Well, I mean the driver can
 8   deviate, but there's probably going to be
 9   repercussions.
10   BY MS. CHESLER:
11       Q    Fair enough.  What are the repercussions?
12       A    It depends.
13       Q    What could they be?
14       A    It depends what he deviated for.
15       Q    I understand.  So it's a policy then --
16       A    That's correct.
17       Q    -- the radius, a half mile to mile, yes?
18       A    Yes.
19       Q    If you break it, you're considered, at least
20   initially, to be in violation of company policy?
21       A    That's correct.
22       Q    Depending on the nature and the reason, it may
23   lead to discipline up to and including termination?
24            MS. BONN:  Object to form.  Object.  Outside
25   the scope.
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - A, PAGE 8
PAGE 15

1      A     Correct.

2      Q     So what was communicated to the drivers between

3    2008 and 2010 with regard to the availability of a meal

4    break?  Take it at your discretion, but before the tenth

5    hour?

6      A     The first one, yes.  If you wish to take the

7    unpaid after the tenth hour, you know -- the first one

8    must be taken.  Then, like you said, you had a third

9    one after 12 hours.

10     Q     Let's focus on the first one.

11           Am I correct, then, that what was communicated

12   to all drivers by the company between 2008 and 2010 with

13   respect to just the first meal break was you can take it

14   whenever you want as long as you take it before the

15   tenth hour; is that right?

16           MS. BONN:  Object.  Outside the scope.

17           THE WITNESS:  I wouldn't -- okay.  I don't

18   think those were exact words.  But when the literature

19   started coming out in 2008, that's when we were making

20   them aware of the potential second and third lunch

21   break.

22           Before that, they knew they had 30 minutes of

23   break, 30 minutes of lunch to use at their discretion.

24   BY MS. CHESLER:

25     Q     With respect to the first meal break, what was

1    the company policy for all drivers between 2008 and

2    2010?

3        A     Between 2008 and 2010?

4        Q     Yes.

5        A     The company policy, without having the

6    document in front of me, but 2008, the drivers knew

7    that they had 30 minutes available to them to use at

8    their discretion and they had 30 minutes of break

9    available to use at their discretion as well.

10       Q     So 30 minutes for lunch and 30 minutes for

11   breaks between 2008 and 2010; is that right?

12       A     And when we started getting the --

13       Q     I'm just talking about the first lunch break.

14       A     Okay.  Yeah.  Yes.

15       Q     Correct?

16       A     Correct.

17       Q     Was there any policy in place between 2008 to

18   2010 as to when the first lunch should be taken?

19       A     There was a policy that came down 2008 with

20   time frames as to when to take your lunches, but that

21   was never the practice.

22       Q     What was the policy as to time frames between

23   2008 to 2010?

24       A     Without having the documents in front of me, I

25   believe it stated you must take your first lunch

KARYN ABBOTT & ASSOCIATES

1      A     That's correct.

2             MS. BONN:   Object to form.

3    BY MS. CHESLER:

4      Q     Did that policy, the policy now, change between

5    2010 to the present?

6      A     Yes.

7      Q     How did it change?

8      A     So in 2011, they rolled out another meals and

9    breaks policy.   That one, we were asked -- when we met

10   with all drivers, we had waiver forms, which at that

11   point they had the ability to waive the lunch after the

12   tenth hour.

13            But at that point, we did instruct every

14   driver to try and stick to the time frame that was

15   provided by the State of California for the meal

16   breaks.

17            At that point, we told them if you also work

18   more than 12 hours, you have a mandatory

19   30-minute unpaid meal break that you need to take

20   before you clock out.

21     Q     Let me back up for one second.   Sorry.

22            Between 2008 and 2010, you had made reference

23   to a second and possibly a third meal period.   Do you

24   recall that?

25     A     Yes.

1            But it wasn't till 2011 that the actual

2    language said you must take your first one if you wish

3    to skip the second one, which is the tenth hour, but

4    you may still, even signing the waiver, still take the

5    second one, if you wish to, because they're all unpaid.

6    BY MS. CHESLER:

7        Q    You say they're all unpaid.  From 2008 to the

8    present, has the company automatically deducted 30

9    minutes for lunch?

10       A    Yes.

11       Q    And that's stayed consistent from 2008 to the

12   present for all drivers?

13       A    That's correct.

14       Q    In all locations we mentioned?

15            MS. BONN:  Object to form.  Object.  Outside

16   the scope.

17            THE WITNESS:  Yes.

18   BY MS. CHESLER:

19       Q    And the deduction of the 30 minutes happens,

20   regardless of whether or not the driver has actually

21   taken a lunch break; is that right?

22            MS. BONN:  Object to form.

23            THE WITNESS:  It's an automatic deduction.

24   BY MS. CHESLER:

25       Q    Meaning that it's automatically deducted

```
 1                    (At the time of 2:31 p.m., the
 2              deposition of JOSE LLAMAS was resumed at
 3              the same location, the same parties being
 4              present.)
 5                              *
 6                    EXAMINATION (Resumed)
 7   BY MS. CHESLER:
 8       Q    Are you ready to go forward?
 9       A    Yes.
10       Q    Did you have a good lunch?
11       A    It was good.
12       Q    Did you consume anything that would affect your
13   ability to give your best testimony?
14       A    No.
15       Q    Any other reason you can't continue to give
16   your best testimony?
17       A    No.
18       Q    Earlier, we talked about how between 2008 and
19   2012, the 30 minutes were -- sorry.  Strike that.
20            Am I correct that between 2008 and 2012, for
21   all drivers in all locations, the meal break policy
22   included that 30 minutes would be deducted from pay
23   automatically, regardless of whether you clocked out for
24   lunch?  Is that correct?
25            MS. BONN:  Object to form.  Object.  Outside
```

1  the scope.

2          THE WITNESS:  It was an automatic deduction in

3  Kronos, correct.

4  BY MS. CHESLER:

5      Q     So my statement was correct?

6      A     Correct.

7      Q     And that continues to today, correct?

8      A     Correct.

9      Q     Then my other question for you is:  When you do

10  have someone who is combining breaks, let's say they log

11  out of XATA for an hour because they've combined their

12  two fifteen minutes and their lunch, as part of the

13  company's meal break policy, are they compensated for

14  part of that hour or is it the entire hour deducted?

15          MS. BONN:  Object to form.

16          THE WITNESS:  It's only the half hour that's

17  deducted.

18  BY MS. CHESLER:

19      Q     How does the company know to do that?

20          MS. BONN:  Objection.  Outside the scope.

21          THE WITNESS:  Because you're given the breaks.

22  It's only a meal that's deducted.

23  BY MS. CHESLER:

24      Q     Okay.  Are they paid based on the hours worked

25  as reflected in XATA?

KARYN ABBOTT & ASSOCIATES

```
 1    BY MS. CHESLER:
 2        Q    Sorry.  If you look back on Exhibit 61, just
 3    moving back for a second, Ms. Jimenez said, "At this
 4    point the following drivers will receive a corrective
 5    action notice for not following the meal policy."  Do
 6    you see that?
 7        A    "At this point the... will receive..." Okay.
 8        Q    So am I right, then, that the company policy
 9    was that drivers who do not log a meal break or take
10    less than 30 minutes receive a corrective action notice?
11        A    Based on this, I believe, she's referring to
12    the SOP.
13        Q    Standard operating procedures?
14        A    Standard operating procedures, uh-huh.
15        Q    And the standard operating procedures apply to
16    all locations?
17        A    Correct.
18        Q    From 2008 to the present?
19        A    Correct.
20        Q    And the SOP policy is that any driver who does
21    not take a meal break or takes less than 30 minutes is
22    supposed to receive a corrective action notice?
23             MS. BONN:  Object to form.
24             THE WITNESS:  That's not what it states.  It
25    just states that you should document all lunch breaks
```

KARYN ABBOTT & ASSOCIATES

```
1   STATE OF CALIFORNIA     )
                            )    SS.
2   COUNTY OF LOS ANGELES   )

3

4

5         I, CAROL LYNN COX, CSR 5128, a Certified

6   Shorthand Reporter in and for the County of Los

7   Angeles, State of California, do hereby certify;

8         That JOSE LLAMAS, the witness named in the

9   foregoing deposition, was, before the commencement of

10  the deposition, duly administered an oath in accordance

11  with CCP 2094;

12        That said deposition was taken down in

13  stenograph writing by me and thereafter transcribed

14  into typewriting under my direction.

15        I further certify that I am neither counsel

16  for nor related to any party to said action, nor in

17  anywise interested in the outcome thereof.

18        DATED THIS 29TH DAY OF JANUARY, 2013.

19

20

21
                        Carol Lynn Cox
22                 CERTIFIED SHORTHAND REPORTER
                    IN AND FOR THE COUNTY OF
23                        LOS ANGELES
                       STATE OF CALIFORNIA
24

25
```

KARYN ABBOTT & ASSOCIATES

**EXHIBIT B**

**Kevin McCaffrey**

| | |
|---|---|
| **From:** | Carol L. Cox [carollynncox@aol.com] |
| **Sent:** | Friday, February 01, 2013 10:32 AM |
| **To:** | Tim McCaffrey; Natasha Chesler |
| **Cc:** | Kevin McCaffrey |
| **Subject:** | ROUGH TRANSCRIPT 1/23/13 |

**Attachments:** 012313-rough.txt

Please find attached the rough transcript of the Alfaro depo taken in the matter of De La Cueva vs. Alta Dena Certified Dairy, as you've requested.

THANKS,

**Carol Lynn Cox, CSR 5128**

c/o *Karyn Abbott & Associates*
*420 N. McCadden Place*
*Los Angeles, California 90004*
*213.749.1234*

### *Disclaimer*

*This real-time rough draft transcript is being provided pursuant to*
*Code of Civil Procedure Section 273(b):*
*"The report of the official reporter, or official reporter pro tempore,*
*of a court, duly appointed and sworn, when prepared as a rough draft*
*transcript, shall not be certified and cannot be used, cited or transcribed*
*as the official certified transcript of the proceedings. A rough draft*
*transcript shall not be cited or used in any way or at any time to rebut*
*or contradict the official certified transcript of the proceedings as*
*provided by the official reporter or official reporter pro tempore. The*
*production of a rough draft transcript shall not be required."*

EXHIBIT - B, PAGE 1
PAGE 24

1          ROUGH TRANSCRIPT

2     Los Angeles, California; Wednesday, January 23, 2013

3              10:09 a.m.

4                *

5              witness sworn,

6                *

7              EXAMINATION

8     BY MR. McCAFFREY:

9     Q    Good morning.  We met off the record, but

10    I'm Tim McCaffrey and I represent Miguel De La Cueva

11    in this lawsuit.

12         If you will please state and spell your

13    full name for the record?

14    A    *Genoveva last name Alfaro.

15    Q    Have you ever had your deposition taken

16    before?

17    A    No.

18    Q    Do you understand that you are under oath

19    as if testifying in a court of law?

20    A    Yes.

21    Q    Subject to penalty of perjury?

22    A    Yes.

23    Q    Throughout the day I'm going to ask you

24    questions.  One of the ground rules is please try to

25    let me finish even though you know exactly what I'm

1

ROUGH TRANSCRIPT

2    Dairy in 2010, how many affiliated entities were

3    there?

4        MS. BONN:  Object to form.

5        THE WITNESS:  Can you restate that?  I'm

6    not understanding the question.

7    BY MR. McCAFFREY:

8      Q    Sure.  I understand there's a bunch of

9    different entities out there.  I'm not sure exactly

10   when they started or how they started but there is

11   Dean related entities , there's Swiss related

12   entities, Alta Dena, and there may be others?

13     A    Under dean food company you have several

14   different subsidiaries nationwide.

15     Q    Is dean the parent?

16     A    Yes, that's the parent to dean

17   transportation Inc. As well as Alta Dena Certified

18   Dairy.

19     Q    Is dean food company public re traded?

20     A    Yes.

21     Q    How long has it been publicly traded?

22     A    I don't know.

23     Q    Has it been publicly traded since 2010?

24     A    Yes.

25     Q    Was it publicly traded in the time period

12

ROUGH TRANSCRIPT

2   2000 and 2005?

3       MS. BONN:  Objection outside the scope of

4   the 30(b)(6).

5   BY MR. McCAFFREY:

6    Q   So dean food company is the parent company?

7    A   Our parent company, yes.

8    Q   Underneath dean food company is which

9   entities?

10    A   That I know of currently today.

11    Q   Yes?

12    A   That I can read off, it is Alta Dena

13   Certified Dairy.

14       MR. McCAFFREY:  Is that Inc. Or LLC.

15       THE WITNESS:  Inc. I'm sorry I a pop guys.

16   LLC.

17    Q   At one point it was Inc. And now it is LLC?

18    A   That's my understanding.

19    Q   All right I didn't mean to interrupt.  Go

20   ahead?

21    A   We also have dean transportation

22   incorporated as well as other subsidiaries outside

23   the state.

24    Q   What about the Swiss entities?

25       MS. BONN:  Object.  Outside the scope of

13

1      ROUGH TRANSCRIPT

2    the 30(b)(6).  You can answer.

3    BY MR. McCAFFREY:

4        Q    Are they underneath dean food company?

5        A    Yes.  Today.

6        Q    Yes.

7        A    2012 -- 13.  What is today?  January --

8        Q    22, 23.

9        A    Whatever it is, that's under Alta Dena.  So

10   Swiss Dairy technically is legally under the entity

11   of Alta Dena Certified Dairy LLC.

12       Q    And dean transportation is a separate

13   entity from Alta Dena Certified Dairy LLC?

14       A    Yes.

15       Q    What about Heartland farms?

16          MS. BONN:  Okay outside the scope of the

17   30(b)(6) you can answer.

18   BY MR. McCAFFREY:

19       Q    Is that an entity or dba you are familiar

20   with?

21       A    Yes.

22       Q    Is it an actual entity or?

23       A    It used to be an entity now it is

24   underneath Alta Dena Certified Dairy.

25       Q    Is it basically in the same if you are

14

1                    ROUGH TRANSCRIPT

2      doing like an org chart is it sort of equal or pier

3      to Swiss Dairy?

4           MS. BONN:  Object to form.  Object outside

5      the scope of the 30(b)(6).

6           THE WITNESS:  I don't know the answer to

7      that.

8      BY MR. McCAFFREY:

9        Q    But it is an entity that your understanding

10     is reports or is under the control of Alta Dena

11     Certified Dairy LLC?

12       A    Yes and so is Swiss Dairy.

13       A    Yes.

14       Q    Are there any other entities under Alta

15     Dena Certified Dairy LLC?

16          MS. BONN:  Object.  Outside the scope of

17     the 30(b)(6).

18          THE WITNESS:  We've got another division in

19     Buena Park Dean Foods of California.

20     BY MR. McCAFFREY:

21       Q    Any other entities that you are aware of?

22       A    No.

23          MS. BONN:  Object.  Outside the scope.

24     BY MR. McCAFFREY:

25       Q    This is obviously as of today January 23?

                            15

1          ROUGH TRANSCRIPT

2     A    Your area looking at your phone you tell

3    me.

4     Q    I'll tell you right now.  Yes.

5     A    Okay.

6     Q    Is it structure something that has come

7    about in like the last year?

8          MS. BONN:  Object.  Outside the scope of

9    the 30(b)(6).

10          THE WITNESS:  It is a transition that took

11    place in 2010.

12    BY MR. McCAFFREY:

13    Q    In 2010?

14    A    Correct.

15    Q    Prior to this transition in 2010, did Dean

16    Foods company own or was it the parent company for

17    Alta Dena Certified Dairy?

18    A    Correct.

19          MS. BONN:  Object- --

20    BY MR. McCAFFREY:

21    Q    What entities or how are they any different

22    than what you just described to me?

23          MS. BONN:  Object to form.  Object.

24    Outside the scope of the 30(b)(6).

25          THE WITNESS:  Prior to that all entities

16

1        ROUGH TRANSCRIPT

2        THE WITNESS:  I'm sorry.  State your

3    question again.

4    BY MR. McCAFFREY:

5    Q    I think we got on FDD because I asked you

6    about Dean Foods & Co.

7    A    Okay.

8    Q    You said that was part I think you said and

9    I apologize if I got it wrong but you said Dean

10   Foods an co was part of FDD SoCal correct?

11   A    So to the best of my ability and knowledge

12   and understanding, it is Dean Foods company the

13   parent company, and then there's various levels of

14   high Arkansas east of subsidiaries an how they're

15   laid out by region or location or type of business.

16   It is FDD SoCal under FDD SoCal we would fall DTI

17   and Alta Dairy.

18   Q    What is DTI?

19   A    Dean transportation Inc.

20   Q    How many drivers currently are employed by

21   any Dean Foods company in California?

22       MS. BONN:  Object outside the scope of the

23   30(b)(6).

24       THE WITNESS:  I don't know.

25   Q    Do you have any estimate?

26

1          ROUGH TRANSCRIPT

2     A   No.

3     Q   Are all the drivers in California employed

4   by the same entity?

5          MS. BONN:  Object outside the scope of the

6   30(b)(6).

7          THE WITNESS:  Say that again please.

8   BY MR. McCAFFREY:

9     Q    Are all the drivers employed in California

10   employed by the same entity?

11          MS. BONN:  Object outside the scope of the

12   30(b)(6).

13          THE WITNESS:  Yes.

14   BY MR. McCAFFREY:

15     Q   Which entity employs them?

16          MS. BONN:  Object outside the scope of the

17   30(b)(6).

18          MS. BONN:

19          THE WITNESS:  Dean transportation.

20   BY MR. McCAFFREY:

21     Q   DTI?

22     A   Correct.

23     Q   How long has DTI employed all the drivers

24   in California?

25          MS. BONN:  Object outside the scope of the

27

ROUGH TRANSCRIPT

2   30(b)(6).

3        MR. McCAFFREY:

4        THE WITNESS:  I don't know.

5   BY MR. McCAFFREY:

6    Q   What is your best estimate?

7    A   A little bit over two years.

8    Q   Then prior to this period I understand it

9   is your best estimate so I'm not trying to say

10   that's the time just prior to this a little over two

11   years, did an entity employ all the drivers in

12   California?

13        MS. BONN:  Object outside the scope of the

14   30(b)(6).

15        THE WITNESS:  So when you say all

16   California dairies I will only respond to Alta Dena.

17    Q   Driver?

18    A   Alta Dena drivers.

19   BY MR. McCAFFREY:

20    Q   My first question when you said they're all

21   employed by DTI under understood that?

22    A   To the best of my ability yes all drivers.

23   I guess what I'm asking for you to be more specific

24   when you you say all drivers.  Had he you say all

25   drivers are we talking about all dean food company

28

1          ROUGH TRANSCRIPT

2      Q   Is there a separate line item for that

3   extra pay?

4      A   No.

5      Q   Why not?

6      A   I'm not sure if you have an example of a

7   check stub but the check stub out license your

8   regular pay.  It is more focused on the regular rate

9   and hours worked versus the type of hours that you

10   worked.

11      Q   I'll hand you what we'll mark Exhibit

12   101 -- marked marked?

13   BY MR. McCAFFREY:

14      Q   You understand you have been designated as

15   the company representative as the company person

16   most knowledgeable to discuss several topics in the

17   deposition notice correct including the pay stubs

18   for drivers?

19      A   Correct.

20      Q   So looking at Exhibit 102, this is a

21   compilation that we've pulled from a production from

22   the defendant it bears Bates label 42220 to 42244

23   excuse me 45.

24          I'll represent we believe this is a

25   compilation of Miguel De La Cueva's pay stubs for

34

1          ROUGH TRANSCRIPT

2          A    It is up to the supervisor/manager to do

3     the investigation, go back to the employee find out

4     what happened and then record it into the proper

5     systems.

6          Q    Which info is fed into Kronos from XATA

7     from the driver work time?

8               MS. BONN:  Object to form.

9               THE WITNESS:  It is the punch in and punch

10    out that interfaces into Kronos.

11    BY MR. McCAFFREY:

12         Q    Anything else?

13         A    No.

14         Q    I'm going to use the company for the sake

15    of east right now.  Did the company ever have a

16    policy of automatically deducting 30 minutes from

17    the drivers time?

18              MS. BONN:  Object to form.

19              THE WITNESS:  The only company I'm aware of

20    is for Alta Dena.

21    BY MR. McCAFFREY:

22         Q    Did Alta Dena have a policy of

23    automatically deducting 30 minutes from the drivers

24    time?

25         A    Yes.

EXHIBIT - B, PAGE 12
PAGE 35

1       ROUGH TRANSCRIPT

2    Q   Was that done on a daily basis?

3    A   It is an automatic process yes.

4    Q   On a daily basis?

5    A   Yes.

6    Q   Regardless of how many hours the driver

7  worked?

8    A   Yes.

9    Q   Why was the 30 minutes automatically

10  deducted from the drivers time?

11    A   I don't know.

12    Q   Who would know?

13    A   Probably our HR department.

14    Q   When did that policy strike that.

15        Is that policy still?  Place?

16    A   What policy are you referring to.

17    Q   The automatic 30 minute deduct?

18    A   When I took over payroll, it was already

19  instituted.  So I don't know when when it started.

20    Q   Is it still in effect?

21    A   Yes.

22    Q   Why do you limit it to Alta Dena?

23    A   Let me back up.  It is up to the point that

24  I left in 2012.  If it has now changed, I don't

25  know.

42

1        ROUGH TRANSCRIPT

2    yourself regarding the 30 minute Dee duct policy

3    from 2008 to the present?

4        A   No.

5        Q   Did you make any -- take any steps to

6    educate yourself on the company's payroll policy or

7    practices from 2008 to the present?

8        A   No.

9        Q   Is the automatic 30 minute deduct reflected

10   anywhere on the pay stubs that the drivers receive?

11       A   Not to the best of my knowledge.

12       Q   Is it reflected in any document that's

13   communicated to the drivers?

14           MS. BONN:  Object outside the scope.

15           THE WITNESS:  Not to the best of my

16   knowledge.

17   BY MR. McCAFFREY:

18       Q   Did the company obtain any written

19   authorization from the drivers to authorize the 30

20   minute automatic deduct?

21           MS. BONN:  Object outside the scope.

22           THE WITNESS:  I don't know and only because

23   I stated earlier the auto deduct had already been in

24   place when I took over payroll.

25   BY MR. McCAFFREY:

44

1    ROUGH TRANSCRIPT

2    Q    And you have no idea why the 30 minute auto

3    deduct is in place?

4    A    I can speculate around it.

5    Q    Well, speculation is a fancy word for

6    guess?

7    A    So the answer is no.

8    Q    Okay.  But then again I am entitled to your

9    best testimony insofar as if you have a general

10   idea, I am entitled to that.  With that caveat, do

11   you have a general idea as to why the 30 minute auto

12   deduct exists?

13   A    Yes.

14   Q    What is that?

15   A    Is that at the end of the day if an

16   employee follows policies and procedures on meal

17   breaks right then every employee has to take their

18   half hour non-paid meal break and therefore the auto

19   deduct came into place.

20        So in Kronos, in order to deduct that half

21   hour meal break that should be accounted for in

22   XATA, it is deducted out of the total hours worked

23   from a Kronos perspective.

24   Q    Does the company have any policy or

25   practice in place to ensure that the employee

45

ROUGH TRANSCRIPT

2  in and time out in Kronos and that's how you would

3  know whether the half hour -- I am sorry the one

4  hour of payment was included or not included.

5      Q   Then if you don't see it, you can conclude

6  it was not?

7      A   Yes.

8      Q   Then you referred to making sure there were

9  40 hours a few times in the morning?

10     A   Uh-huh.

11     Q   Is that because the basic deal with the

12  drivers was to guarantee them 40 hours of work?

13     A   That is part of it.  There are times when

14  employees are -- drivers are done with their shift

15  much earlier and they're paid the full eight hours

16  although they finished the work at 6th or seventh

17  hour.

18     Q   4, 10's they might finish?

19     A   The 8th or 9th hour.

20     Q   But the company's agreement with the

21  drivers is they're going to be guaranteed that base

22  level of compensation no matter what?

23     A   Are we going back to the 40 hours or the

24  guaranties of a workday?

25     Q   Well, isn't it kind of one and the same?

135

**EXHIBIT C**

**12/13/12 – 10:31 a.m.**
From:  Natasha Chesler
To:  Amanda Bonn
Subject:  De La Cueva v. Alta Dena – DRAFT OPT OUT NOTICE

Amanda, I just want to confirm that the names and addresses you provided Simplurius encompass <u>all drivers</u> (including, but not limited to, Class A Relay Driver, Class A Shuttle Driver, Local Class A Delivery Route Driver, and Class B Driver) employed by Defendant through <u>all of California</u> from <u>February 2008 to the present</u>.  Please confirm.  Thank you.

- Natasha

**12/17/12 – 12:05 p.m.**
From:  Natasha Chesler
To:  Amanda Bonn
Subject:  De La Cueva v. Alta Dena – DRAFT OPT OUT NOTICE

I never received a response to my email [above].  Please confirm.  Thanks.

**12/17/12 – 12:43 p.m.**
From:  Amanda Bonn
To:  Natasha Chesler
Subject:  De La Cueva v. Alta Dena – DRAFT OPT OUT NOTICE

Natasha,
We have not seen the title "Local Class A Delivery Route Driver" come up. But, we can confirm that we have provided Simpluris with contact information for all drivers employed by Alta-Dena in California from February 2008 to the present.

**1/30/13 – 9:23 a.m.**
From: Tim McCaffrey
To: Amanda Bonn
Subject: De La Cueva v. Alta-Dena

Hi Amanda,

[] …[W]e intend to argue that the 30 minute automatic deduct is a violation of the California Labor Code, including Sections 221, 224, and 512.  We just learned about this uniform policy/practice at Llamas' depo and it was not confirmed until Alfaro's deposition last week.  We can either stipulate that this is part and parcel of plaintiff's current meal break claims or we can file an ex parte to amend the complaint to add a separate cause of action or via notice motion on shortened time and/or file a separate action.  The latter obviously seems to be inefficient given that ultimately it will likely end up in the same case.  We don't at this point believe we need any additional time for discovery on the 30 minute deduct issue so we think it is most efficient to simply proceed with deeming it part of the complaint via stipulation or stipulating to an amended complaint.  Please let us know your position by tomorrow morning.  If we haven't heard from you, then we will file our ex parte papers on Friday, February 1.  My experience is in Federal Court you will then have 24 or 48 hours to submit a written opposition.  No appearance is generally necessary but we should confirm with Judge King's clerk.

Please let me know if you have any questions.

Thank you and best regards,

Tim

**1/31/13 – 9:17 a.m.**
From: Tim McCaffrey
To: Amanda Bonn
Subject: De La Cueva v. Alta-Dena

Hi Amanda,

As a follow up to my email [above], we would also like to add the following entities as defendants (again based on the recent deposition testimony):

Swiss II, LLC
Heartland Farms, Inc.
Dean Foods of Southern California, LLC dba Heartland Farms
Dean Transportation, Inc.

Finally, we are contemplating adding another class representative. We will let you know by tomorrow on this point.

Please let us know defendant's position asap.

Thank you.


**1/31/13 – 11:54 a.m.**
From: Amanda Bonn
To: Tim McCaffrey
Subject: De La Cueva v. Alta Dena

Tim,

We will not agree to your proposed amendments, which are (a) proposed well after the deadline set by the scheduling order, (b) prejudicial to our client, and (c) futile. The scheduling order provides that "[a]ny stipulation or motion to amend as to any claims, defenses and/or parties shall be lodged/filed by no later than September 4, 2012, failing which it shall be deemed that party's waiver of any such amendments in this action." Your attempt to amend the pleadings at this late stage is not only contrary to the scheduling order, but would prejudice our client. More specifically:

(1)   We oppose your attempt to add new defendants. In addition to the delay and prejudice mentioned above, we object because Mr. De La Cueva has never been employed by Swiss II, Heartland, Dean Foods of Southern California dba heartland Farms, or Dean Transportation, Inc. and therefore any claims he purports to assert against those entities are futile.

(2)   For the reasons cited above, we oppose your attempt to add a new class representative less than three weeks before Plaintiff's class certification brief is due. In addition, contrary to your assurances to Judge Woehrle that you were interested in obtaining putative class members' contact information so you could interview them as witnesses, it now appears you were soliciting a

new client, which many of the cases we cited counsel against.

(3)   We disagree with your position that a 30 minute automatic deduction of time for lunch violates the California Labor Code.  We will not agree to stipulate that this issue is encompassed in Plaintiff's Complaint, nor will we stipulate to your filing an amended complaint.  We disagree with your suggestion that Plaintiff only learned of the auto-deduction issue during depositions in the last couple of weeks, and we think it is improper for Plaintiff to seek leave to amend via an ex parte application when any need for urgency resulted from Plaintiff's own delay and lack of diligence.

[…]

Regards,

Amanda

**1/31/13 – 12:06 p.m.**
From:  Natasha Chesler
To:  Amanda Bonn
Subject:  De La Cueva v. Alta-Dena

Amanda, […] …just to clarify, our request for leave to amend will obviously encompass a request to modify the scheduling order to permit us to do so.

**1/31/13 – 12:49 p.m.**
From:  Natasha Chesler
To:  Amanda Bonn
Subject:  De La Cueva v. Alta-Dena

Amanda, in addition, we are available to discuss our ex parte application telephonically if you believe it will be useful.  Please let me know if you wish to do so.  Thanks.

**1/31/13 – 1:38 p.m.**
From:  Amanda Bonn
To:  Tim McCaffrey
Subject:  De La Cueva v. Alta-Dena

Natasha,
It would be helpful for you to send us your proposed amended complaint and any proposed modification to the scheduling order you intend to seek.

Thank you,

Amanda


**1/31/13 – 7:19 p.m.**
From:  Natasha Chesler
To:  Amanda Bonn
Subject:  De La Cueva v. Alta-Dena

Amanda, In reviewing the docket in the Ikeda matter, it appears that your firm represented to the Court in February 2012 that Swiss LLC drivers had merged with and into Alta Dena Certified Dairy LLC.  Thus, the former "Swiss" drivers should have been included in our opt-out notice.  Please confirm whether or not the former "Swiss" drivers were sent the opt-out notice.


**2/1/13 – 4:08 p.m.**
From:  Natasha Chesler
To:  Amanda Bonn
Subject:  De La Cueva v. Alta-Dena

Amanda, attached is a draft of our proposed First Amended Complaint.  The only modification to the scheduling order we intend to seek is relief from the deadline to file an amended complaint (and then to amend again per Cal. Lab. Code 2699.3 within approximately 33 days).  We are open to discussing the appropriate corporate defendants.  To give you a chance to consider your position with respect to the attached, we will wait until the end of the day Monday to file our ex parte papers if still necessary.  I also still haven't heard back from you in response to my email last night concerning

the former Swiss II LLC employees and whether they received the opt-out letter. Please let me know (as well as whether the letter went to the former Heartland employees that have also been similarly merged). Thanks.

**2/4/13 – 1:29 p.m.**
From: Amanda Bonn
To: Natasha Chesler
Subject: De La Cueva v. Alta-Dena

Natasha,
Your e-mail is incorrect. In *Ikeda*, we pointed out that the legal entity Swiss II, LLC had merged with and into the legal entity Alta-Dena Certified Dairy, LLC. We did not argue-- nor is it the case-- that any Swiss II drivers became Alta-Dena Certified Dairy, LLC employees as a result of the merger.

We sent Simpluris the contact information for any driver employed by Alta-Dena Certified Dairy, LLC between February 1, 2008 and the present. In fact, it appears that we were over-inclusive in the information that we sent to Simpluris and inadvertently included some persons who do not fall into that category. Attached please find an updated list of putative class members, which reflects persons employed by Alta-Dena Certified Dairy, LLC as drivers between February 1, 2008 and the present.

Regards,

Amanda

**2/4/13 – 1:41 p.m.**
From: Natasha Chesler
To: Amanda Bonn
Subject: De La Cueva v. Alta-Dena

Based on my review of the *Ikeda* records, Swiss II LLC was dropped as a defendant and Alta Dena Certified Diary was named in its place, and the entity your firm represented. It certainly was represented to the Court that it was the proper defendant in a wage and hour case as to those employees. If Swiss merged into Alta Dena, but the drivers did not – where were those employees assigned to? Also, based on Alfaro's deposition, Alta Dena Certified Dairy took control over Swiss and Heartland Farms in 2010. So

those drivers – at least from 2010 onward – should have been included in
our opt-out letter. Also, your email is unclear. Given the recent testimony
that the Alta Dena drivers were then all moved over to Dean Transportation,
Inc. ("DTI") in approximately 2011, what do you mean by 2008 to the
present in your email below? Are you including DTI or not? In other
words, are you just including drivers until the switch to DTI?


**2/5/13 – 10:26 a.m.**
From: Natasha Chesler
To: Amanda Bonn
Subject: De La Cueva v. Alta-Dena

Amanda, We still have not heard back from you. As you know, we are
seeking to add defendants to ensure that all putative class members are
covered. We understand that you disagree with any amendment, but at this
point we just want to make sure we have the entities right so that we can do
this efficiently for the parties and the Court.

It is our understanding that both Heartland Farms and Swiss Dairy merged
with Alta Dena in approximately 2010, with Alta Dena as the successor
entity for all purposes, including liability. If Defendant is taking the position
that the former Swiss and Heartland entities need to be named (and are still
viable entities), then we will name them as well as Dean Foods and FDD So
Cal to ensure everyone is covered. Please let me know this morning so we
can finalize our papers. Thank you.