**EXHIBIT R**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MIGUEL DE LA CUEVA, on
behalf of himself and those
similarly situated,

        Plaintiff,

  vs.

ALTA DENA CERTIFIED DAIRY,
LLC, a Delaware Limited
Liability Company, et al.,

        Defendants.

**CERTIFIED COPY**

CASE NO. CV 12-01804 GHK
(CWx)

30(B)(6) DEPOSITION OF

GENOVEVA ALFARO

LOS ANGELES, CALIFORNIA

WEDNESDAY, JANUARY 23, 2013

Reported by:
CAROL LYNN COX
CSR No. 5128
13-23856



KARYN ABBOTT & ASSOCIATES
COURT REPORTERS
420 North McCadden Place
Los Angeles, California 90004
Phone 213.749.1234 | Fax 213.749.0644

```
 1              MS. BONN:  Object to form.  Object.  Outside

 2    the scope of the 30(b)(6).

 3              THE WITNESS:  No.

 4    BY MR. McCAFFREY:

 5      Q    What is the policy with respect to meal breaks?

 6              MS. BONN:  Object to form.  Object.  Outside

 7    the scope of the 30(b)(6).

 8              THE WITNESS:  In my experience as a manager in

 9    leading my team, all employees are entitled to two

10    fifteen-minute breaks and a half hour non-paid meal

11    break.

12    BY MR. McCAFFREY:

13      Q    Was that policy any different for the Swiss

14    entities prior to 2010?

15              MS. BONN:  Object to form.  Object.  Outside

16    the scope of the 30(b)(6).

17              THE WITNESS:  I don't know.

18    BY MR. McCAFFREY:

19      Q    Who would know?

20      A    I would imagine you can talk to an HR person

21    and they would be able to confirm that.

22      Q    Who currently would be able to confirm that?

23      A    Human resources.

24      Q    Who in HR?

25      A    There's multiple people.  So currently
```

KARYN ABBOTT & ASSOCIATES

```
 1      A    Okay.

 2      Q    You said that was part -- I think you said, and

 3  I apologize if I got it wrong, but you said that Dean

 4  Foods & Co. was part of FDD SoCal; is that correct?

 5      A    So to the best of my ability and knowledge and

 6  understanding, it's Dean Foods Company, the parent

 7  company, and then there's various layers of hierarchy

 8  for subsidiaries and the layout and how they're

 9  segregated, to a certain extent, by region or location

10  or type of business.  It's FDD SoCal.  Under FDD SoCal

11  we would fall DTI and Alta Dairy Certified Dairy.

12      Q    What's DTI?

13      A    Dean Transportation, Inc.

14      Q    How many drivers currently are employed by any

15  Dean Foods company in California?

16          MS. BONN:  Object.  Outside the scope of the

17  30(b)(6).

18          THE WITNESS:  I don't know.

19  BY MR. McCAFFREY:

20      Q    Do you have any estimate?

21      A    No.

22      Q    Are all the drivers in California employed by

23  the same entity?

24          MS. BONN:  Object.  Outside the scope of the

25  30(b)(6).
```

KARYN ABBOTT & ASSOCIATES

31

1           THE WITNESS:  Say that again, please.

2    BY MR. McCAFFREY:

3       Q    Are all of the drivers employed in California

4    employed by the same entity?

5           MS. BONN:  Object.  Outside the scope of the

6    30(b)(6).

7           THE WITNESS:  Yes.

8    BY MR. McCAFFREY:

9       Q    Which entity employs them?

10          MS. BONN:  Object.  Outside the scope of the

11   30(b)(6).

12          THE WITNESS:  Dean Transportation.

13   BY MR. McCAFFREY:

14      Q    DTI?

15      A    Correct.

16      Q    How long has DTI employed all the drivers in

17   California?

18          MS. BONN:  Object.  Outside the scope of the

19   30(b)(6).

20          THE WITNESS:  I don't know.

21   BY MR. McCAFFREY:

22      Q    What's your best estimate?

23      A    A little bit over two years.

24      Q    Then prior to this period -- I understand

25   that's your best estimate, so I'm not trying to say

KARYN ABBOTT & ASSOCIATES

```
 1   that's the time.  Just prior to this a little over two
 2   years, did an entity employ all the drivers in
 3   California?
 4           MS. BONN:  Object.  Outside the scope of the
 5   30(b)(6).
 6           THE WITNESS:  So when you say all California
 7   dairies, I will only respond to Alta Dena.
 8   BY MR. McCAFFREY:
 9       Q    Drivers.
10       A    Alta Dena drivers.
11       Q    Well, my first question, when you said they're
12   all employed by DTI, was all drivers.  You understood
13   that?
14       A    To the best of my ability, yes, all drivers.
15   I guess what I'm asking is for you to be more specific
16   when you say all drivers.  When you say all drivers,
17   are we talking about all Dean Foods Company drivers --
18       Q    Yes?
19       A    -- versus Alta Dena versus Dean
20   Transportation, Inc.?
21       Q    All drivers under Dean Foods Company.
22       A    Okay.  That I don't know.
23       Q    When you said all drivers -- does it change
24   your testimony -- I'm not saying change it, but clarify
25   I guess what you meant.  When you say all drivers are
```

KARYN ABBOTT & ASSOCIATES

1    employed by DTI and have been for approximately the last

2    two years, which drivers are you referring to?

3         A    The Alta Dena drivers.

4         Q    Do the other entities that we've discussed have

5    drivers that they or it employ?

6              MS. BONN:  Object.  Outside the scope of the

7    30(b)(6).

8              THE WITNESS:  Yes.

9    BY MR. McCAFFREY:

10        Q    Which entities are those?

11             MS. BONN:  Object.  Outside the scope of the

12   30(b)(6).

13             THE WITNESS:  In today's environment, they're

14   all Dean Transportation, Inc.

15   BY MR. McCAFFREY:

16        Q    So they are all employed by Dean

17   Transportation, Inc.?

18        A    Yes.

19             MS. BONN:  Object.  Outside the scope.

20             THE WITNESS:  There is a difference when you

21   ask about Dean Foods Company versus asking me about

22   Alta Dena drivers and any of our local subsidiary

23   drivers.  So again, Dean Foods Company is the parent

24   company.

25   \ \ \

KARYN ABBOTT & ASSOCIATES

1    BY MR. McCAFFREY:

2        Q    Correct.  DTI is one of the subsidiaries of

3    Dean Foods Company, correct?

4        A    Correct.

5        Q    Just to make sure I'm crystal clear, all

6    drivers, whether they're local, regional, any driver

7    that's employed in California, is it fair to say that

8    their current employer is DTI?

9        A    I don't know.

10            MS. BONN:  Object.  Outside the scope.

11            THE WITNESS:  I don't know.

12   BY MR. McCAFFREY:

13       Q    How about for those drivers who worked for FDD

14   SoCal or perform any driving services for FDD SoCal, are

15   they all employed technically by DTI?

16            MS. BONN:  Object.  Outside the scope of the

17   30(b)(6).

18            THE WITNESS:  To the best of my knowledge,

19   yes.

20   BY MR. McCAFFREY:

21       Q    Is it also fair to say that, to the best of

22   your knowledge, all drivers employed by FDD SoCal have

23   been employed by DTI since approximately two plus years

24   ago?

25            MS. BONN:  Object.  Outside the scope of the

KARYN ABBOTT & ASSOCIATES

1    30(b)(6).

2            THE WITNESS:  That is correct.

3    BY MR. McCAFFREY:

4        Q    Prior to two plus years ago, were the drivers

5    who are currently employed by DTI employed by some other

6    entity?

7            MS. BONN:  Object.  Outside the scope of the

8    30(b)(6).

9            THE WITNESS:  Prior to Dean Transportation,

10   Inc. being the driver entity, per se, Alta Dena drivers

11   were under Alta Dena Certified Dairy.

12   BY MR. McCAFFREY:

13       Q    Any other entity that they were under?

14           MS. BONN:  Object to form.

15           THE WITNESS:  Not to the best of my knowledge.

16   BY MR. McCAFFREY:

17       Q    Are you aware -- are you aware of any extra pay

18   that is supposed to come to driver if they do not get a

19   meal and/or rest break?

20           MS. BONN:  Object to form.

21           THE WITNESS:  Yes.

22   BY MR. McCAFFREY:

23       Q    And what is your awareness of that requirement?

24       A    In the case where an employee cannot take a

25   meal break due to job responsibilities, he is entitled

KARYN ABBOTT & ASSOCIATES

EXHIBIT - R, PAGE 8
PAGE 93

1    on the situation with the employee, the employee

2    chooses not to take his meal break, then he gets paid

3    for that meal break not taken by his choice.

4         In the case where an employee is unable to

5    take his meal break during or -- during the six hours

6    of his workday but takes it later, then that employee

7    is compensated for an extra hour of premium pay.

8         Q    Is that extra hour of premium pay reflected on

9    the employee's pay stub?

10        A    It is part of his pay stub.

11        Q    Is there a separate line item for that extra

12   pay?

13        A    No.

14        Q    Why not?

15        A    I'm not sure if you have an example of a check

16   stub, but the check stub outlines your regular pay.

17   It's more focused on the regular rate and hours worked

18   versus the type of hours that you worked.

19        Q    I'll hand you what we'll mark Exhibit 101.

20        Let's have the court reporter mark it real

21   quick.

22        THE REPORTER:  It's actually Exhibit 102.

23        (Deposition Exhibit 102 was marked

24        for identification by the reporter and

25        is bound separately.)

KARYN ABBOTT & ASSOCIATES

1    BY MR. McCAFFREY:

2        Q    You understand that you have been designated as

3    the company representative, the company's person most

4    knowledgeable, to discuss several topics in the

5    deposition notice, correct, including the pay stubs for

6    drivers?

7        A    Correct.

8        Q    Okay.  So looking at Exhibit 102, this is just

9    a compilation that we've pulled from a production from

10   the defendant.  It bears Bates label 42220 to 42244 --

11   excuse me, -45.  I'll represent that we believe this is

12   a compilation of Miguel De La Cueva's pay stubs for

13   2010.

14            Do you recognize the form of this document,

15   Exhibit 102?

16       A    Yes, I recognize the document.

17       Q    Have I represented it accurately?  Is it a copy

18   of his pay stubs for what appears to be 2010?

19       A    Yes, this is an actual copy it looks like of

20   it could have been a live check -- or check stub, I

21   should say, yes.

22       Q    Just getting back to my question, if a driver

23   receives an extra hour of premium pay in the

24   circumstances that you just described, is that reflected

25   on their pay stub?

KARYN ABBOTT & ASSOCIATES

1     A    It is not outlined separately on the pay stub.

2 It is included in the pay stub.  So in the example

3 where you would pay an employee for an hour of premium

4 pay due to not meeting that obligation of taking his

5 meal break, it would be included in his regular pay,

6 and it would be compiled in the hours outlined there.

7     Q    There are two regular pays on most of these pay

8 stubs.  Which of the two regular pays would it appear

9 in?

10    A    Regular pay.  It would be the first line.

11    Q    Why do you say that?

12    A    Because you would pay the employee based on

13 his regular rate, not any other different rate.

14    Q    For example, the first page of Exhibit 102 has

15 two regular rates, right?

16    A    Uh-huh.  Correct.

17    Q    One is $24.695 and one is $24.945.  Do you see

18 that?

19    A    Correct.

20    Q    Then according to the first page, it looks like

21 Mr. De La Cueva had 1.5 hours at the lower rate and 78.5

22 at the higher rate.  Am I reading this correctly?

23    A    Correct.

24    Q    So why do you say that the premium pay would be

25 at the lower rate?

KARYN ABBOTT & ASSOCIATES

1        A     Because the state law requires that it be paid

2     at a regular rate, not at a regular with shift pay

3     rate.

4              THE REPORTER:  Regular with?

5              THE WITNESS:  Regular with shift pay.

6     BY MR. McCAFFREY:

7        Q     Where are you getting that from?

8        A     Just reading.  My reading.  Just my

9     understanding based on the state law that I read.

10       Q     Were you given any training by the company with

11    respect to how to determine which rate to apply to any

12    premium pay that was paid to employees?

13       A     Not specific training, no.

14       Q     Was it your decision to decide which rate would

15    be applicable for any premium pay?

16       A     I have not come across that scenario, so I

17    have not made that judgment call.  In my experience, it

18    has been at regular rate.

19       Q     Okay.  Just a second.  Are you aware of any

20    instances where the company actually paid a driver an

21    extra hour of premium pay for either a missed meal or

22    rest break?

23       A     Not that I can recall.

24       Q     What document would reflect such a payment?

25       A     It would be all over Kronos time management

KARYN ABBOTT & ASSOCIATES

1    punch detail.

2         Q    A punch detail?

3         A    Uh-huh.

4         Q    I'm sorry.  Yes?

5         A    Yes.

6         Q    Is there any other document besides the punch

7    detail that would show whether or not the employee was

8    paid an extra hour of premium pay for a missed meal or

9    rest break?

10            MS. BONN:  Object to form.

11            THE WITNESS:  No, not that I'm aware of.

12   BY MR. McCAFFREY:

13        Q    How are the hours determined for the pay stubs

14   such as those reflected in Exhibit 102?

15            MS. BONN:  Object to form.

16            THE WITNESS:  Based on hours worked and

17   clocking into a time clock.

18   BY MR. McCAFFREY:

19        Q    How does the company know -- obviously, the

20   company contracted with ADP to prepare its pay stubs,

21   correct?

22        A    Correct.

23        Q    And that relationship with ADP was in place

24   from 2008 to the present?

25        A    Correct.

KARYN ABBOTT & ASSOCIATES

1     Q     How does the company know which hours to

2    communicate to ADP for a particular employee?

3     A     So currently, depending on what aspect of our

4    business you're referring to, since this is related to

5    Mr. De La Cueva, I'll relate it back to drivers.

6     Q     That's fine.  Start with drivers.

7     A     So the drivers have a system called XATA --

8     Q     That's X-A-T-A?

9     A     Correct.

10          -- that they log into for their entire

11   workday.  From XATA, the punch in and punch out is

12   uploaded into Kronos, which is the actual time

13   management system.  Kronos then interfaces into ADP, in

14   which ADP is the actual compensation system.

15    Q     Is it fair to say that the processing you just

16   described happens automatically?  Other than, of course,

17   the driver punching in and out.  Once the driver punches

18   in and out in XATA, that information gets automatically

19   uploaded into Kronos, and then gets transferred over to

20   ADP so that payroll can be run?

21    A     No.

22    Q     Okay.  Where am I wrong?

23    A     There are several steps that take place from

24   Kronos into ADP.

25    Q     Taking a step back, is it fair to say the

KARYN ABBOTT & ASSOCIATES

1    information in XATA gets automatically transferred to

2    Kronos?

3        A    Correct.

4        Q    So the only thing manual that's about that is

5    the driver punch in and out on XATA?

6        A    Yes.  From XATA, yes.

7        Q    Just to be clear, the only human error aspect

8    of that particular portion of this process is the driver

9    actually clocking in and out using XATA, correct?

10       A    No.

11       Q    What other human element is there?

12       A    In XATA, if an employee forgets to punch in --

13   so given that employee does everything properly, you're

14   right, it's an automatic upload.  Given that there is

15   not, there's incomplete data.  So the automatic will

16   then require manual intervention.

17       Q    Fair enough.  But before we get to that, if the

18   employee does what they're supposed to do, punch in and

19   punch out, then at that point the information from XATA

20   automatically goes to Kronos?

21       A    Correct.

22       Q    If the employee fails to punch in or punch out,

23   what happens?

24       A    Then it's up to the supervisor to go back and

25   gather the details to, one, have his own records kept,

KARYN ABBOTT & ASSOCIATES

1    and then, two, to enter it into Kronos.

2        Q    Would the supervisor do the entering for the

3    employee in that situation or will the employee do the

4    entering?

5        A    That would be up to the supervisor to enter

6    into Kronos.

7        Q    So it's the supervisor's obligation to

8    basically do a manual entry for the employee's in or out

9    time?

10       A    It is up to the supervisor/manager to do the

11   investigation, go back to the employee, find out what

12   happened, and then record it into the proper systems.

13       Q    Which info is fed into Kronos from XATA with

14   respect to the driver work time?

15            MS. BONN:  Object to form.

16            THE WITNESS:  It is the punch in and punch out

17   that interfaces into Kronos.

18   BY MR. McCAFFREY:

19       Q    Anything else?

20       A    No.

21       Q    I'm just going to use "the company" for the

22   sake of ease right now.

23            Did the company ever have a policy of

24   automatically deducting 30 minutes from the driver's

25   time?

KARYN ABBOTT & ASSOCIATES

1          MS. BONN:  Object to form.

2          THE WITNESS:  The only company that I'm aware

3    of is for Alta Dena.

4    BY MR. McCAFFREY:

5      Q    Did Alta Dena have a policy of automatically

6    deducting 30 minutes from the driver's time?

7      A    Yes.

8      Q    Was that done on a daily basis?

9      A    It's an automatic process, yes.

10     Q    On a daily basis?

11     A    Yes.

12     Q    Regardless of how many hours the driver worked?

13     A    Yes.

14     Q    Why was the 30 minutes automatically deducted

15   from the driver's time?

16     A    I don't know.

17     Q    Who would know?

18     A    Probably our HR department.

19     Q    When did that policy -- strike that.

20          Is that policy still in place?

21     A    What policy are you referring to?

22     Q    The automatic 30-minute deduct.

23     A    When I took over payroll, it was already

24   instituted.  So I don't know when it got started.

25     Q    Is it still in effect?

KARYN ABBOTT & ASSOCIATES

```
 1       A     Yes.

 2       Q     So why do you limit it to Alta Dena?

 3       A     Let me back up.  It is, yes, up to the point

 4  that I left in 2012.  If it has now changed, I don't

 5  know.

 6       Q     But you're the PMK on the topics of

 7  determining --

 8       A     I'm sorry.  What's PMK?

 9       Q     Person most knowledgeable.  It's lawyers speak

10  for like -- is like LDD or what was it -- FDD for

11  lawyers.

12       A     FDD.

13       Q     So you're the person most knowledgeable on the

14  topic of payroll, correct?

15       A     Up to the point that I was there.  So if I

16  left in October and there have been any payroll changes

17  or any company changes that pertain to payroll,

18  currently, I would not be involved with that process.

19       Q     Did anyone tell you prior to today that there

20  has been a change in the automatic 30-minute deduct for

21  drivers?

22       A     No.

23       Q     Have you heard that from any source?

24       A     No.

25       Q     It's fair to say that policy applies
```

KARYN ABBOTT & ASSOCIATES

1    company-wide, correct?

2            MS. BONN:  Object to form.

3            THE WITNESS:  No.

4    BY MR. McCAFFREY:

5       Q    Did you take any steps to educate yourself

6    regarding the 30-minute deduct policy from 2008 to the

7    present?

8       A    No.

9       Q    Did you make any -- did you take any steps to

10   educate yourself on the company's payroll policy or

11   practices from 2008 to the present?

12      A    No.

13      Q    Is the automatic 30-minute deduct reflected

14   anywhere on the pay stubs that the drivers receive?

15      A    Not to the best of my knowledge.

16      Q    Is it reflected in any document that's

17   communicated to the drivers?

18           MS. BONN:  Object.  Outside the scope.

19           THE WITNESS:  Not to the best of my knowledge.

20   BY MR. McCAFFREY:

21      Q    Did the company obtain any written

22   authorization from the drivers to authorize the

23   30-minute automatic deduct?

24           MS. BONN:  Object.  Outside the scope.

25           THE WITNESS:  I don't know.  And only because,

KARYN ABBOTT & ASSOCIATES

1    as I stated earlier, the auto deduct had already been

2    in place when I took over payroll.

3    BY MR. McCAFFREY:

4        Q    And you have no idea why the 30-minute auto

5    deduct is in place?

6        A    I can speculate around it.

7        Q    Well, "speculation" is a fancy word for

8    "guess," so...

9        A    So the answer is no.

10       Q    Okay.  But then, again, I am entitled to your

11   best testimony, insofar as if you have a general idea, I

12   am entitled to that.

13            With that caveat, do you have a general idea as

14   to why the 30-minute auto deduct exists?

15       A    Yes.

16       Q    What is that?

17       A    That at the end of the day, if an employee

18   follows all policies and procedures on meal breaks,

19   right, then every employee has to take their half-hour

20   non-paid meal break, and therefore the auto deduct came

21   into place.

22            So in Kronos, in order to deduct that

23   half-hour meal break that should be accounted for in

24   XATA, it is deducted out of the total hours worked from

25   a Kronos perspective.

KARYN ABBOTT & ASSOCIATES

1     Q    Does the company have any policy or practice in

2  place to ensure that the employee actually has taken a

3  meal or rest break within the confines of the law before

4  it takes away the 30 minutes of time?

5     A    Yes.

6     Q    What's that?

7     A    XATA records are continuously reviewed by our

8  distribution staff.

9     Q    The XATA records are continuously reviewed for

10  what purpose?

11     A    To ensure that employees are taking their

12  breaks and/or meal breaks.

13     Q    And if the XATA records reflect that they are

14  not taking their meal and/or rest breaks within the

15  requirements of the law, what happens?

16     A    It is up to the supervisor to do the

17  investigative work as to whether it happened or did not

18  happen.  In other words, it may not reflect it in XATA.

19  However, as the supervisor goes back and talks to the

20  employee, the employee forgot to log out and log back

21  in after his meal break.

22     Q    And is the supervisor under any obligation to

23  record such an investigation by writing or E-mail or any

24  manner?

25          MS. BONN:  Object.  Outside the scope of the

KARYN ABBOTT & ASSOCIATES

1    30(b)(6).

2          THE WITNESS:  To the best of my knowledge,

3    yes, they do record that.

4    BY MR. McCAFFREY:

5          Q    And where are those recordings kept?

6          A    That I don't know.

7          Q    When you were in charge of payroll, what

8    efforts did you make or undertake to make sure that

9    employees were not getting deducted 30 minutes

10   improperly?

11         A    I had conversations with Joe Llamas and Craig

12   Widlund to ensure that we were validating that

13   employees were taking their meals or breaks and that

14   the correct action plan was taken in case that did not

15   happen.

16         Q    What was the correct action plan?

17         A    If an employee missed a meal break due to work

18   responsibilities, that he would be properly

19   compensated.

20         Q    When you say "properly compensated," how would

21   the employee -- what do you mean by "properly

22   compensated" in a situation where the employee misses

23   the meal break?

24         A    So if the employee because of work reasons

25   missed his meal break, he would be compensated an extra

KARYN ABBOTT & ASSOCIATES

1    hour of regular pay.

2         Q    What about the 30-minute auto deduct?

3         A    If he missed it, meaning that he missed it but

4    took it at a later time, he would be compensated an

5    hour of regular pay.  If he did not take it at all, he

6    would be paid that half hour as well.

7         Q    What records will reflect that he gets paid the

8    extra half hour or that the 30-minute auto deduct does

9    not occur?

10        A    Kronos would be your best source for that.

11        Q    Kronos meaning the punch detail history?

12        A    Correct.

13        Q    If the company is aware that the driver has not

14   taken a meal or rest break in compliance with the law,

15   do the 30 minutes get added back?

16             MS. BONN:  Object to form.

17             THE WITNESS:  So it depends.  It's not an

18   automatic process.  As stated earlier, the supervisor

19   does investigative work -- let me finish, all right --

20   to find out why that meal break was not recorded.

21             So in my experience, there has been cases

22   where drivers do take their meal break but forgot to

23   log out and log back in.

24   BY MR. McCAFFREY:

25        Q    I understand there might be a human -- going

KARYN ABBOTT & ASSOCIATES

1    back to XATA, they're supposed to log in and out for

2    their meal break on XATA?

3        A    Correct.

4        Q    There's no other place for them to log in or

5    out for their meal break, correct?

6        A    If XATA is down, there are options.  There's a

7    piece of paper and a pencil that they should be using.

8        Q    Fair to say it's the unusual situation that

9    XATA is down?

10       A    Correct.

11            MS. BONN:  Object.  Outside the scope.

12   BY MR. McCAFFREY:

13       Q    Is there any other type of way the employee

14   would record their meal or rest break -- excuse me.

15            Do they have to record both their meal and rest

16   break or just their meal break in XATA?

17            MS. BONN:  Object.  Outside the scope.

18            THE WITNESS:  They should record both, if

19   taken.

20   BY MR. McCAFFREY:

21       Q    So putting aside whether XATA is down or if the

22   driver made a manual error or not in recording it, is

23   there any circumstance under which the company will not

24   take the 30 minutes off of their pay?

25            MS. BONN:  Object to form.

KARYN ABBOTT & ASSOCIATES

1          THE WITNESS:  Rephrase that question.  I'm not

2     grasping.

3     BY MR. McCAFFREY:

4          Q    Well, I don't want to get too caught up on the

5     word "automatic," but it's fair to say the company

6     automatically takes away 30 minutes, correct?

7          A    Yes.

8          Q    Then if I understand the process correctly,

9     someone is supposed to double check the XATA records to

10    make sure that the employee has taken their required

11    breaks?

12         A    Correct.

13         Q    And if they determine that they have not based

14    on the XATA records, they're supposed to then go talk to

15    the driver or the employee and figure out why they

16    didn't take the break?

17         MS. BONN:  Object to form.

18         THE WITNESS:  Correct.

19    BY MR. McCAFFREY:

20         Q    Depending on that conversation, if the answer

21    is we couldn't take the break because our route lasted

22    seven hours, they're supposed to get the extra hour of

23    pay and 30 minutes added back into their pay, correct?

24         MS. BONN:  Object to form.

25         THE WITNESS:  That is correct.

KARYN ABBOTT & ASSOCIATES

1    BY MR. McCAFFREY:

2        Q    Just in terms of timing, does this happen

3    automatically within a payroll cycle?

4        A    I haven't seen it happen.

5        Q    You haven't seen what happen?

6        A    Where -- I don't recall a time where I've come

7    across a situation where an employee needed to be paid

8    back the hour and a half for a meal that was skipped.

9        Q    Have you seen the situation where the employee

10   needed to be credited back the half hour?

11       A    No.

12       Q    Just so I'm clear -- let's take a timeout real

13   quick.  Off the record.

14            (At which time a brief recess was taken.)

15   BY MR. McCAFFREY:

16       Q    Just so I'm clear on this, if it's determined

17   that the employee missed a meal break because of his,

18   quote, unquote, choice, does the 30 minutes get credited

19   back?

20       A    I'm sorry.  State that again.

21       Q    Sure.  If it's determined that the employee

22   missed 30 minutes -- excuse me.  Try again.

23            If it's determined that the employee missed his

24   meal break because of his choice, does the 30 minutes

25   get credited back?

KARYN ABBOTT & ASSOCIATES

1      A     If the employee missed his meal break by his

2   choice.   If the employee -- I'm sorry.  State that

3   again.

4            MR. McCAFFREY:  Will you read it back, please.

5                 (At which time the record was read

6                 as follows:

7                 "If it's determined that the employee

8         missed his meal break because of his choice,

9         does the 30 minutes get credited back?")

10           THE WITNESS:  If the employee missed his meal

11  break because of his choice.  I haven't seen that

12  happen.  Yes, he should be credited that back.  He

13  didn't take a meal break, if that's the final outcome.

14  BY MR. McCAFFREY:

15     Q     Does anyone besides the supervisor have any --

16  do any review of the punch detail history to determine

17  whether or not the employee took a meal or rest break?

18     A     No.  We rely on the distribution supervisors

19  to manage that.

20     Q     Is it fair to say that you have not seen a

21  situation where the employee says, "I decided not to

22  take a break"?

23     A     I haven't.  I haven't come across that

24  situation.

25     Q     So then if the employee has not elected to not

KARYN ABBOTT & ASSOCIATES

1    take the break but still has not taken the break, then

2    there should not be a 30-minute deduct, correct?

3           MS. BONN:  Object to form.

4           THE WITNESS:  Correct.

5    BY MR. McCAFFREY:

6       Q    And likewise, if the employee does elect to

7    take a break, the company's position is then the

8    30-minute deduct is appropriate?

9       A    When you say "break," are you referring to the

10   meal break or are you talking about the two rest

11   breaks?

12      Q    Well, I'm assuming the 30 minutes is only for

13   the meal because that's the only uncompensated time,

14   correct?

15      A    Correct.

16      Q    So to answer your question then, it's about the

17   meal.

18      A    So ask your question again.

19      Q    Sure.  If the employee takes the break, a meal

20   break, the company's position is that 30 minutes was

21   appropriately automatically deducted from his pay?

22      A    Correct.

23      Q    What steps does the company take to make sure

24   that whatever investigation regarding the taking or not

25   taking a meal break occurs within the time for payment

KARYN ABBOTT & ASSOCIATES

1  in that particular pay period?

2      A    So my experience from a payroll perspective?

3      Q    Yes.

4      A    From a payroll management perspective, we

5  ensure all employees reflect their 40-hour workweek,

6  regardless of whether it was worked or not.  Meaning

7  one day could have been eight hours or ten hours of

8  sick pay, a holiday, or a vacation day.

9           It is up to the supervisor, specifically in

10  reference to distribution, it is up to the supervisor

11  to review not just the Kronos hours worked, but also to

12  check XATA and review and investigate any gaps in those

13  hours.

14      Q    During what period -- taking a step back, you

15  are aware that employees must be paid basically within

16  seven days of the pay period in question, correct?

17      A    Correct.

18      Q    So what steps does the company make to ensure

19  that they're actually getting paid properly within seven

20  days of the pay period?

21      A    All payroll is submitted biweekly.

22      Q    But there's an automatic deduct from everyone's

23  day.

24      A    Right.

25      Q    So even if they worked 80 hours, they're

KARYN ABBOTT & ASSOCIATES

```
 1   getting paid at least -- strike that.

 2          Even if they work 40 hours, they're getting

 3   paid is it -- is it four ten or five days that they

 4   work?

 5   A    It depends on the individual.  We've got both

 6   shifts going on, so...

 7   Q    But assuming a 40-hour workweek, if the

 8   employee actually works extra time, because that

 9   happens, what effort does the company make to ensure the

10   30-minute deduct is properly being taken?

11   A    Again, when you say "the company," it's not so

12   much a company out there or a group of people.  It's

13   the individual's supervisor who is responsible for an

14   employee or a group of employees that reviews the

15   Kronos records that, in essence, reflects what has

16   occurred in XATA.

17   Q    And your testimony is that's supposed to happen

18   within a certain amount of time after the pay period in

19   question?

20   A    In my experience of being involved with

21   payroll for the last three years, it happens daily

22   where the supervisors are reviewing those records.

23   Q    Let me hand you what we'll identify as Exhibit

24   103.

25          MS. BONN:  Do you have any extra copies?
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - R, PAGE 30
PAGE 115

```
 1          MR. McCAFFREY:  Of that one, I don't.  Sorry.

 2               (Deposition Exhibit 103 was marked

 3          for identification by the reporter and

 4          is bound separately.)

 5          MR. McCAFFREY:  For the record, Exhibit 103 is

 6     what appears to be a copy of the pay stubs for Mr. De

 7     La Cueva for 2009.  It's Bates labeled Respondent 42193

 8     to 42219.

 9     Q     Would you agree that this appears to be his pay

10     stubs for that time period, 2009?

11     A     In looking at this, yes.

12     Q     Then I'll also hand you what we'll identify as

13     Exhibit 104.

14               (Deposition Exhibit 104 was marked

15          for identification by the reporter and

16          is bound separately.)

17          MR. McCAFFREY:  I'll identify this as a Punch

18     Detail History for Mr. De La Cueva from January 1, 2009

19     to December 31, 2010.  That's Exhibit 104, right?

20          THE REPORTER:  Yes.

21          MR. McCAFFREY:  Then I'll hand you what we'll

22     identify as Exhibit 105.

23               (Deposition Exhibit 105 was marked

24          for identification by the reporter and

25          is bound separately.)
```

KARYN ABBOTT & ASSOCIATES

1          MR. McCAFFREY:  Then I'll hand you one more

2  which we'll identify as Exhibit 106.  This one we do

3  have an extra copy of.

4          (Deposition Exhibit 106 was marked

5          for identification by the reporter and

6          is bound separately.)

7          MS. BONN:  Go ahead and just take a look

8  through them.

9          MR. McCAFFREY:  For the record, Exhibit 106 is

10  the Driver Trip Report.  It's 28 pages.  It's for the

11  period of March 1, 2009 to March 28, 2009.

12    Q    I know that I've put a bunch of documents in

13  front of you.  Are you generally familiar with these

14  different documents?

15    A    No.

16    Q    No?

17    A    No.

18    Q    Well, you're obviously familiar with Exhibit

19  103, correct, the pay stubs?

20    A    Yes.  103 and 104.

21    Q    And you're familiar with 104, yes?

22    A    Yes.

23    Q    Okay.  Are you familiar with Exhibit 105?

24    A    I've been exposed to it in the past, yes.

25    Q    And what does Exhibit 105 reflect?

KARYN ABBOTT & ASSOCIATES

1   processing, that they are complete.

2       Q    Can it be any more specific with your random

3   checks?

4       A    Sure.  One of them in specific is at the end

5   of the day, before I submit payroll for payment

6   processing, is every employee must have a minimum of 40

7   hours for that week.

8       Q    So looking at like Exhibit 102 or 103, the pay

9   stubs, you'd want that to add up to 40 hours per week?

10      A    40 or 80 hours, depending on the pay period.

11      Q    What was the pay period for 2008?  Was it

12  weekly, biweekly, semimonthly?

13      A    I was not doing payroll back then.

14      Q    Did you make any effort to educate yourself as

15  to what the payroll practices were for the company for

16  2008?

17      A    No.  I was only concerned about getting myself

18  paid.

19      Q    Did you make any effort to determine what the

20  payroll practices were in 2009 in terms of was it

21  weekly, biweekly, semimonthly?

22      A    I was not there in 2009.

23      Q    Did you make any effort to educate yourself

24  before you showed up today as the person most

25  knowledgeable on those topics so that you could tell us

KARYN ABBOTT & ASSOCIATES

1          Exhibit 104, the Punch Detail History, is this
2    the only record that shows the driver's actual
3    in-and-out punches that you're aware of?
4          A     No.
5          Q     What other record shows the driver's in-and-out
6    punches?
7          A     XATA driver logs.
8          Q     And that's different than the Driver Trip
9    Report or is it the same as the Driver Trip Report?
10         A     XATA offers multiple reports.  So that could
11   be one report.  The driver log could be another report.
12   There are various reports that XATA has.
13         Q     They're all automatically generated from the
14   information that's been input into XATA?
15         A     Correct.
16         Q     Is the information in Exhibit 104 generated
17   from the information that's input into XATA?
18         A     Yes.
19         Q     So if I wanted to read through a report such as
20   that that appears as Exhibit 104 and compare it to his
21   pay records or his pay stub, what I would do would be to
22   add up the time in the hours column, correct, for the
23   particular date in question, and that should mirror what
24   he gets paid on his pay stub?
25         A     Correct.

KARYN ABBOTT & ASSOCIATES

1      Q     I guess just for the sake of prudence, I'll

2    hand you what we'll mark as Exhibit 107.

3                  (Deposition Exhibit 107 was marked

4            for identification by the reporter and

5            is bound separately.)

6            MR. McCAFFREY:  For the record, this is

7    another compilation of pay stubs that appears to be for

8    2008 for Mr. De La Cueva.  It's defendant's Bates label

9    41625 to 42192.

10     Q     Again, you recognize the form of this document,

11   correct?

12     A     Yes.

13     Q     And this is what you understand to be a true

14   and correct copy of Mr. De La Cueva's pay stubs for the

15   time period reflected in the top right of each page,

16   correct?

17     A     Yes.

18     Q     I'm sorry.  I know you tried to explain it to

19   me, but I just want to make sure I understand this.

20           The regular rate that's reflected on page 1 of

21   107, who determines which rate to apply to which hours?

22     A     So the rate is part of the employee setup

23   which is done through HR based on how that employee was

24   hired to do, what position.  Then in Kronos, based on

25   the hours worked, there's some what I would call

KARYN ABBOTT & ASSOCIATES

```
 1   back-end programming to determine whether employees get

 2   paid regular, at regular rate, and if they work within

 3   certain hours, they get regular pay with shift.

 4          Then there's the whole overtime and overtime

 5   with shift, double time, double time with shift, and

 6   all other categories that get paid to an employee.

 7      Q   I'm sure you are trying your best to explain it

 8   to me, but I'm having a hard time.  Let me use an

 9   example and maybe you can walk me through it.

10          Please put 103 and 104 in front of you.  On

11   Exhibit 103, please turn to Bates label page 42198.

12          Do you have that page of Exhibit 103 in front

13   of you?

14      A   42198.

15      Q   Yes.

16      A   Yes.

17      Q   That should be for the period beginning

18   March 1, 2009 to the period ending March 14, 2009,

19   correct?

20      A   Correct.

21      Q   Then if you look back at Exhibit 104 which is

22   the Punch Detail History --

23      A   Uh-huh.

24      Q   -- how is it determined using -- well, strike

25   that.
```

KARYN ABBOTT & ASSOCIATES

1          Do you use Exhibit 104 to generate the

2     information on the pay stub that's shown in Exhibit 103?

3          A     Yes.

4          Q     Is there any other information that's used to

5     generate the information for the pay stubs in Exhibit

6     103?

7               MS. BONN:  Object to form.

8               THE WITNESS:  I'm going to have to say no.

9     BY MR. McCAFFREY:

10         Q     Am I reading Exhibit 104 correctly where it

11    says pay code and it has like reg 1 --

12               Do you see that?

13         A     Correct.

14         Q     -- that's regular rate 1; is that correct?

15         A     That's reg 1.

16         Q     Meaning regular rate 1?

17         A     It means regular with shift.

18         Q     I'm sorry.  It means what?

19         A     Regular with shift.

20         Q     I'm sorry.  I don't understand.

21         A     Regular with shift.

22         Q     Then if it doesn't have such an indication,

23    what does that mean?

24         A     It mean if there is a pay code, for example --

25         Q     There is no pay code.  For the majority, there

```
 1      A     That I don't -- I don't think so.  I would
 2  have to say I'm not sure how to answer that.  Again, I
 3  don't work with XATA that closely.  I've never been
 4  trained on XATA.  I don't know to the full extent what
 5  supervisors can and can't do in XATA.
 6      Q     Just for the sake of clarity, I'll hand you
 7  another exhibit.  This one we'll identify Exhibit 108.
 8            (Deposition Exhibit 108 was marked
 9            for identification by the reporter and
10            is bound separately.)
11            MR. McCAFFREY:  For the record, this is a
12  document that appears to say Earnings Statement at the
13  top.  It's Bates labeled defendant's 1669 to 1695.  It
14  looks a lot like a pay stub, but it doesn't have as much
15  information like Exhibit 102, 103, or 107.
16      Q     Do you know what Exhibit 108 is?
17      A     Yes.
18      Q     What is it?
19      A     It's a regenerated check stub out of ADP.
20      Q     Why would this be created?
21      A     Why would this check stub be regenerated?
22      Q     Yes.
23      A     Upon request.
24      Q     Do you know why it doesn't have the same
25  information as the regular pay stub?
```

KARYN ABBOTT & ASSOCIATES

1       A     I would say, depending on the person who

2    pulled it or the purpose of the pulling for this check

3    stub, that the information would vary.

4       Q     So you could basically input what information

5    that you want to have regenerated; is that your

6    understanding?

7       A     It's just like all systems.  They have options

8    as to what you want to regenerate.

9       Q     Did you have anything to do with regenerating

10   what we have here as Exhibit 108?

11      A     Yes.

12      Q     Is there a reason why you did not include the

13   other information that appears on the pay stub?

14      A     I did not pull them myself.

15      Q     What was your role in getting the pay stubs

16   reflected in Exhibit 108 regenerated?

17      A     I requested these from our corporate office.

18      Q     Looking back to Exhibits 107, 103, and 102, and

19   starting with Exhibit 102, was Alta Dena Certified

20   Dairy, Inc. Mr. De La Cueva's employer in 2010?

21           MS. BONN:  Object.  Outside the scope.

22           THE WITNESS:  In looking at this, I would say

23   yes, based on the check stub.

24   BY MR. McCAFFREY:

25      Q     When did Alta Dena Certified Dairy, LLC become

KARYN ABBOTT & ASSOCIATES

1  assumption?

2      A    Again, I haven't seen that kind of scenario.

3  So, no, I have not seen any documentation to it.

4      Q    Well, I just showed you an example today of

5  March 2, 2009 where it appears that Mr. De La Cueva was

6  not properly compensated.  Would you agree?

7          MS. BONN:  Object to form.

8          THE WITNESS:  No, I would not agree with that.

9  BY MR. McCAFFREY:

10     Q    Oh, really?  Why not?

11     A    Well, because you're comparing your XATA

12 reports to Kronos.  If the miss of where we did take

13 the deduction but he did not take a meal break and it

14 was fully investigated and it came back that he was

15 unable because of work requirements to take his meal

16 break, if it was manually compensated, it would not be

17 reflected in this Punch History Detail.

18     Q    If what was manually compensated?

19     A    If there was a manual process, a payroll

20 adjustment submitted, in the case where indeed the

21 investigation was completed and the employee is owed

22 back that half hour or an hour premium and there was

23 any manual process done, it would not be reflected in

24 the punch detail, yet it would be reflected on any pay

25 stub that would be printed out for the employee.

1    Q    Then let's look at Exhibit 103.  Please find me

2    the pay stub where he was compensated the half hour that

3    was deducted or the hour that he didn't get because he

4    didn't get his statutory meal break on March 2, 2009.

5         MS. BONN:  Object to form.

6         THE WITNESS:  I can't answer that.  I'd have

7    to spend a lot of time looking into the detail of the

8    pay stub, cross checking it back to the punch detail,

9    going back to the supervisor, and understanding what

10   happened on March 2.

11   BY MR. McCAFFREY:

12   Q    Okay.  Go ahead.  You have Exhibit 103 in front

13   of you, the pay stubs for 2009.  You have the punch

14   detail for the relevant time period.  That's Exhibit

15   104.

16   A    I would need a calculator and I would prefer

17   to use a computer to do that calculation.

18   Q    You can tell me how it is you're going to

19   insist that he was properly paid.

20   A    I'm not insisting that he was or he wasn't.

21   I'm saying I would have to spend a lengthy time in

22   reviewing the pay stub against the punch detail and any

23   other source that would indicate whether we did or did

24   not pay him for that missed meal break.

25   Q    Ma'am, you already testify that you're aware of

KARYN ABBOTT & ASSOCIATES

1    no occasion in which someone --

2        A    I'm not.  That's right.  That's why I keep

3    saying I don't know if we did or did not.  I would have

4    to spend a lengthy amount of time in reviewing these

5    documents.

6        Q    But you can look at, again, it's the same pay

7    stub we've already looked at.  The relevant time period

8    is March 1 to March 14, 2009.  He has a pay stub there

9    that's Bates labeled 42198 of Exhibit 103.

10       A    Okay.  In looking at this --

11       Q    Is there any indication on that pay stub that

12   he received any extra compensation for not getting his

13   statutory meal break?

14            MS. BONN:  Objection.  Assumes facts not in

15   evidence.

16            What date are we talking about?

17            MR. McCAFFREY:  March 2009.

18       Q    Take a look at Exhibit 103 and turn to page

19   Bates labeled 42198.  Are you there?

20       A    I'm there.

21       Q    Is there any indication in this pay period that

22   he received any premium pay for a missed meal or rest

23   break?

24       A    First of all, if that incident had happened

25   where an employee needed an additional hour of

KARYN ABBOTT & ASSOCIATES

1    compensation, it would not be separately outlined.   It

2    would be inclusive of his total hours being paid at the

3    regular rate.

4        Q    Then we need to go back to Exhibit 104 and add

5    up the total hours worked in the relevant time period,

6    correct?

7        A    Right.

8            MS. BONN:   Object to form.

9    BY MR. McCAFFREY:

10       Q    So take out Exhibit 104.   You would have to add

11   up the hours column which includes the 30-minute deduct,

12   correct?

13       A    Correct.

14       Q    Starting with March 2, 2009, correct, through I

15   guess March 13, 2009, right?

16       A    Am I supposed to add it?

17           MS. BONN:   He's not asking you to add it.

18   He's just asking whether you would add it.

19   BY MR. McCAFFREY:

20       Q    If you add it up and it equals the regular

21   hours, then you could deduce that he wasn't given any

22   premium pay, correct?

23       A    Again, without spending a lengthy time in

24   reviewing this to be able to answer that, I have not

25   seen the incident take place nor have I seen it on any

1    documentation or pay stub.

2         But referring back to March 2, in order to say

3    yes or no, I would have to spend a great amount of time

4    on this to go back and validate whether he was or was

5    not paid an hour premium pay.

6    Q    With all due respect, ma'am, that's not really

7    true.  You would just add up the hours column here on

8    Exhibit 104, right?  You would add up the numbers.

9    A    Right.

10   Q    That takes a great deal of time?  I mean we can

11   do the math.

12   A    Then you can do it.

13   Q    That's fine.  I will.

14        The point is, if you're not capable of doing

15   it, that's fine.  But when I add up March 2 through 13,

16   if that total equals the total of regular hours that are

17   reflected on his pay stub, he did not get any premium

18   pay for missed meal or rest breaks during that pay

19   period, correct?

20   A    So that would be correct.  If one is tied to

21   the other, that is correct.

22   Q    My processes would be correct, right?

23   A    Given that all proper steps to get to that end

24   result were taken, yes, such as --

25   Q    Well, I want to make sure I understand all the

KARYN ABBOTT & ASSOCIATES

1   proper steps.  If we're not going to sit here and do

2   them all, then tell me what the proper steps are.

3      A     So at the end of the day, if he needed to be

4   paid an extra hour of premium pay, that would be

5   reflected in the Punch History Detail which would then

6   be inclusive into his total hours paid on this pay

7   stub.

8      Q     Where in the punch detail would it be?

9      A     It would be inclusive of that day, hours

10   worked.

11      Q     Let's make sure we're clear.  Looking at

12   Exhibit 104 which is the Punch Detail History --

13      A     Right.

14      Q     -- for March 2, 2009 -- I'm going to keep

15   harping on that because he was written up for not

16   actually doing anything in terms of meal or rest break

17   on that day.

18      MS. BONN:  Object to form.  Misstates the

19   evidence.

20      MR. McCAFFREY:  Technically, there is no

21   evidence yet.

22      Q     Anyway, 11.5 is the starting point, right, and

23   you would add 8.75, 9.0, 8.5, 10.0, 11.25, 10.5, and

24   10.0, correct -- oh, and 10.5, right?

25      A     Uh-huh.

EXHIBIT - R, PAGE 45
PAGE 130

```
 1        Q     Correct?

 2        A     Yes.

 3        Q     That would be your total regular hours worked

 4   for the pay period?

 5        A     Right.

 6        Q     And if that number equals the amount that's

 7   shown on his pay stub for the corresponding period, then

 8   you can conclude that he did not get an extra premium --

 9   an extra hour of premium pay for a missed meal or rest

10   break, correct?

11        A     No.  Here's why.  If I'm a distribution

12   supervisor and I'm reviewing the hours for my employee

13   for this day, March 2, right -- and I don't know this

14   because I haven't done the comparison necessary -- but

15   I can easily go in and change instead of -- in case he

16   only worked from 6:25 p.m. to 6:00 a.m., I can change

17   that to 6:30 or 5:30, if it was 5:30, to include that

18   one hour for that missed meal.

19        Q     I thought the only person that could go into

20   XATA was the employee.

21        A     Again, I stated that, that is correct.  But

22   this is Kronos.  We're looking at Kronos.

23        Q     But the basis of the Kronos information is what

24   comes from XATA, right?

25        A     It's a basis of what's XATA.  Again, I have
```

KARYN ABBOTT & ASSOCIATES

1    not verified that.

2         Q    But according to you, there is an audit log

3    from Kronos, right?

4         A    This would indicate if there was no changes

5    made that this is exactly how it reads in XATA.

6         Q    So the only way that this example that you're

7    coming up with, the supervisor could have added an extra

8    hour, that would be reflected in the Kronos detail audit

9    trail, correct?

10        A    Right, there would have to be an audit report.

11        Q    Yet, there's no such --

12        A    I just can't tell whether it was or wasn't

13   included.

14        Q    And if there is no such audit report, then he

15   wasn't paid the extra hour of premium pay for a missed

16   meal or rest break, correct?

17        A    If the change was not done in Kronos, your

18   assumption would be correct.

19        Q    Thank you.

20             MS. BONN:  Can we take a lunch break soon?

21             MR. McCAFFREY:  Sure.  Do you want to go now?

22   I have a court call at 1:30, so let's go now until like

23   2:00.

24             MS. BONN:  Okay.  Off the record.

25             MR. McCAFFREY:  Yes.

KARYN ABBOTT & ASSOCIATES

EXHIBIT - R, PAGE 47
PAGE 132

```
 1              (At the time of 12:55 p.m., a luncheon

 2         recess was taken.)

 3                             *

 4              (At the time of 2:13 p.m., the

 5         deposition of GENOVEVA ALFARO was resumed

 6         at the same location, the same parties

 7         being present.)

 8                             *

 9                   EXAMINATION (Resumed)

10  BY MR. McCAFFREY:

11     Q    Is there any reason why you can't give your

12  best testimony this afternoon?

13     A    No.

14     Q    We left off with Exhibits 104 and 103 in front

15  of you.  I just want to make sure I got it right.

16          Again, if I add up the hours column and I go to

17  the pay stub and that equals the amount of regular time

18  and/or overtime, then we know that there was no

19  compensation for a missed meal or rest break unless the

20  supervisor has gone in and changed the actual hours

21  worked, correct?

22     A    Well, yes, unless this was changed and

23  included in there, if that was the case.

24     Q    That's what I mean.

25     A    So you would have to check your XATA time in
```

KARYN ABBOTT & ASSOCIATES

1    already be in Kronos.

2            Then it is estimated that if it's Tuesday and

3    the employee is being terminated on Friday, there is an

4    estimation of the hours that will be worked between

5    that last pull in Kronos, or last punch in there, to

6    estimate how many hours an employee will be paid.

7            A review happens with the distribution

8    supervisor or manager, whoever it is that's leading

9    that, and then HR compiles the full payment to the

10   employee.

11           If at any given time after the employee is

12   terminated there's a difference in the hours paid out,

13   where in most cases they are overpaid, then there will

14   be an adjustment done to compensate additional moneys

15   to the employee.  But that is very rare.  We always

16   tend to overpay our employees.

17   BY MS. BONN:

18       Q    I am showing you what was marked as Exhibit 103

19   again.  This appears to be some wage statements for

20   Mr. De La Cueva in what looks like the year 2009; is

21   that right?

22       A    Correct.

23       Q    We talked a little bit earlier about these two

24   different entries for regular that have two different

25   rates.  On page Bates stamped 42193, it looks like there

KARYN ABBOTT & ASSOCIATES

1    is one regular at 24.0950 and another regular at

2    24.3450.  Do you see that?

3        A    Yes.

4        Q    Is that what you talked about when you

5    mentioned something called regular with shift?

6        A    Correct.

7        Q    What does "regular with shift" mean?  What is

8    that?

9        A    Any employee who works between the hours of

10   6:00 p.m. and 6:00 a.m. is paid an additional anywhere

11   between 15 to 25 cents more than their regular rate.

12   So if you look at that, he would be a 25 cent -- he

13   would be compensated 25 cents higher than his regular

14   rate.  For Alta Dena, that has been the past practice

15   for any hours worked between 6:00 p.m. and 6:00 a.m.

16       Q    Likewise, is there a rate that's the overtime

17   with shift rate?

18       A    Yes.

19       Q    What is an overtime with shift rate?

20       A    Overtime with shift is any hours that are over

21   their regular shift.  So if they are to work a five

22   eight, overtime is paid on any hours worked over the

23   eighth hours.  If they are between the hours of 6:00

24   p.m. and 6:00 a.m., they are paid at an overtime rate

25   with shift.

KARYN ABBOTT & ASSOCIATES

EXHIBIT - R, PAGE 50
PAGE 135

1          As I think about how you refer -- both you and

2     the gentleman refer to the regular and regular with

3     shift, those are basically pay codes that exist in our

4     Kronos system.  As a matter of fact, in the case where

5     an employee has missed his meal or needs to be

6     compensated an hour of premium pay, there is a code in

7     Kronos that they should be using to identify that

8     employee being paid for that incremental one hour of

9     premium pay.

10          MR. McCAFFREY:  What code is that?

11          THE WITNESS:  It's called --

12          MS. BONN:  Don't answer.  It's not his

13     questioning.  You're answering my questions.

14     Q     In terms of the pay code that you mentioned for

15     a missed meal or a missed rest break, is that a code

16     that would be entered manually or is it an automatic

17     code?

18     A     No.  It's a manual entry.  And that would only

19     be used after the XATA records -- or after the

20     supervisor has done the investigation after reviewing

21     the XATA records.  And it would only be entered into

22     Kronos, not XATA.

23     Q     Who would enter that code manually if it was

24     supposed to be entered?

25     A     It would be the distribution supervisor or

KARYN ABBOTT & ASSOCIATES

160

1      A      Correct.

2      Q      If it does appear, then we can just conclude

3    that there was no premium pay paid?

4      A      I would not conclude that.

5      Q      I mean why not?

6      A      If it wasn't used, it doesn't necessarily mean

7    that it was not paid out to the employee.  It means

8    that the supervisor might not have used the code;

9    however, only managed to change the hours and include

10   the premium pay in totality.

11     Q      Then if we wanted to go back and double check

12   that, then we would go to the XATA reports?

13     A      Then you compare the XATA reports to the

14   Kronos reports.

15     Q      So there is a way to figure it out?

16     A      Yes, there is.  By spending some time on it,

17   yes, there is.

18     Q      In terms of running the NOLUN code, that's

19   something that can be done from January 2008 to the

20   present?

21     A      I would have to look to see when that pay code

22   took effect.

23     Q      Do you have any idea when the pay code took

24   effect?

25     A      No.  That's what I just stated.

1    Q     I'm almost close to wrapping up.

2          Is it fair to say that the hours that are

3    reflected on the pay stub as the hours they're getting

4    compensated in each pay period are not necessarily the

5    hours that the employee worked?

6          MS. BONN:  Object to form.

7          THE WITNESS:  Yes.  A perfect example of that

8    is when an employee doesn't work his full shift and we

9    pay him his full shift.

10   BY MR. McCAFFREY:

11   Q     Another example would be when you do the

12   30-minute deduct and he didn't get his lunch?

13   A     If that took place, correct.

14   Q     Or if the supervisor makes an adjustment in

15   Kronos as to the hours that were actually worked?

16         MS. BONN:  Object to form.

17         THE WITNESS:  There's possibilities.

18         MR. McCAFFREY:  Then the last thing I want to

19   put on the record is I do believe that running a report

20   with the NOLUN pay code or to see if there are any such

21   instances would be a very valuable exercise for

22   everyone involved in the case.  It was certainly

23   requested in one of the many different requests that

24   we've done, if not required by Rule 26.  So I would ask

25   counsel to please look into doing that.

KARYN ABBOTT & ASSOCIATES

EXHIBIT - R, PAGE 53
PAGE 192

1   STATE OF CALIFORNIA    )
                            ) SS.

2   COUNTY OF LOS ANGELES  )

3

4

5        I, CAROL LYNN COX, CSR 5128, a Certified

6   Shorthand Reporter in and for the County of Los

7   Angeles, State of California, do hereby certify;

8        That GENOVEVA ALFARO, the witness named in the

9   foregoing deposition, was, before the commencement of

10  the deposition, duly administered an oath in accordance

11  with CCP 2094;

12       That said deposition was taken down in

13  stenograph writing by me and thereafter transcribed

14  into typewriting under my direction.

15       I further certify that I am neither counsel

16  for nor related to any party to said action, nor in

17  anywise interested in the outcome thereof.

18       DATED THIS 4TH DAY OF FEBRUARY, 2013.

19

20

21

22                    CERTIFIED SHORTHAND REPORTER

23                   IN AND FOR THE COUNTY OF
                           LOS ANGELES

24                    STATE OF CALIFORNIA

25

KARYN ABBOTT & ASSOCIATES

EXHIBIT - R, PAGE 54
PAGE 139

**EXHIBIT S**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MIGUEL DE LA CUEVA, on behalf
of himself and those similarly
situated,

        Plaintiff,

vs.

ALTA DENA CERTIFIED DAIRY, LLC,
a Delaware limited liability
company, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CERTIFIED COPY**

No. CV 12-01804
   GHK (CWx)

DEPOSITION OF

JOSÉ ANTONIO BERRIOS

LOS ANGELES, CALIFORNIA

TUESDAY, FEBRUARY 12, 2013

Reported by:
ANDREA M. RINKER
CSR No. 13437, RPR, CLR
No. 13-24188A



KARYN ABBOTT
& ASSOCIATES
COURT REPORTERS

420 North Brand Blvd.
Los Angeles, California 90001
Phone 213.749.1234 Fax 213.749.1044

EXHIBIT 5 PAGE 1
PAGE 140

```
 1    truck driver or --

 2         A    I'm a -- well, a milkman.

 3         Q    You deliver the milk?

 4         A    Yeah.  I deliver the milk.

 5         Q    Have you ever worked for Swiss too, LLC?

 6         A    No.

 7         Q    Have you ever worked for Heartland?

 8         A    No.

 9         Q    And where do you work for Alta Dena?  Do you

10    have a hub you go to?  Is there like a place you show up

11    to to go to work?

12         A    Yes.  City of Industry.

13         Q    And have you been at City of Industry for the

14    eight years that you've worked for Alta Dena?

15         A    Yes.

16         Q    Have you ever worked at any other locations?

17         A    No.

18         Q    Do you have a schedule?

19         A    Yes.  It's -- normally is from 4:30 until I'm

20    done.

21         Q    4:30 a.m.?

22         A    a.m., yes.

23         Q    Has your -- has it normally been 4:30 a.m. until

24    you're done the entire time you've worked for Alta Dena?

25         A    No.  It's changed.
```

KARYN ABBOTT & ASSOCIATES

```
 1        Q    When you first started, what was your schedule?
 2             Let me ask you a different question:  How long
 3   has it been 4:30?
 4        A    4:30?  Let me see.  I'm not good with dates.
 5        Q    Just your best --
 6        A    Just my --
 7        Q    -- estimate.
 8        A    Estimate, I would say two to three years.
 9        Q    And prior to that?
10        A    It was -- I believe it was 3:30, the starting
11   time.
12        Q    3:30 a.m.?
13        A    a.m.
14        Q    And how long did you have a start time of
15   3:30 a.m.?
16        A    I cannot say for the previous -- you know, if I
17   said two to three years for the 4:30, I cannot really say
18   for the -- for the remaining time because time changes
19   depending in -- in what you're doing, you know.  If I had
20   a route -- let's say the -- I cannot give you like an
21   estimate like -- like a solid amount of time because I've
22   done, you know, kind of different things depending --
23   when I started in training, I would do a little bit of
24   everything, you know, as you're learning the process of
25   how it works in the company.
```

KARYN ABBOTT & ASSOCIATES

1      Q    Sure.   How long were you in training?

2      A    I think it was three months.

3      Q    Okay.   So when you first start, you were in

4    training for about three months, correct?

5      A    Yeah.   For about three months.

6      Q    And then you were doing a bunch of different --

7      A    Yeah, different things.

8      Q    So if I understand it, there's like wholesale

9    driver's, there's retail/relay, right?

10     A    No.   Relay -- never did relay.

11     Q    You never did relay?

12     A    I never did relay.

13     Q    So what type of driving did you do?

14     A    I did a little bit of shipping.

15     Q    Shipping.

16     A    I did a little bit like special deliveries, they

17   call.   I did a little bit of a Coffee Bean route and I

18   ended up with my route -- like a standard route that I do

19   like on an everyday basis after that.

20     Q    And when did you start your standard route that

21   you do generally on an everyday basis?

22     A    Before the route that I have right now with the

23   4:30 schedule, I had another route for probably -- I

24   would say for another two years.   Another two years.

25     Q    And then when you had that other route for about

KARYN ABBOTT & ASSOCIATES

1   two years, was that the route that you started at 3:30?

2       A    Yes.

3       Q    Okay.  So going back about five or six years

4   ago, you had a standard route that was starting at 3:30?

5       A    Mm-hmm.

6       Q    Yes?

7       A    Yes.

8       Q    And then after a couple years then your route

9   changed and you started at 4:30?

10      A    Yes.  It's just that they arranged all the

11  routes.  So they put the routes for bidding.  So I ended

12  up with a route that starts at 4:30, the one that I have

13  right now.

14      Q    So you obviously -- you prefer to start at 4:30

15  instead of 3:30?

16      A    Yes.

17      Q    So you bid for routes?

18      A    Well, you know, as you go down in seniority, of

19  course the guys with more time, they get to pick first.

20      Q    Right.

21      A    So you are like -- your options in what you can

22  choose, you know, are being reduced by the other guys

23  that have longer time.  So that was the best I could

24  pick.

25      Q    Fair enough.  And then as you got more

KARYN ABBOTT & ASSOCIATES

1    seniority, you could pick a different route?

2        A    Yes.  Pretty much.

3        Q    Okay.  And what's your basic route now?  Do you

4    have a set route that you have every day or --

5        A    Yes.

6        Q    -- does it change?

7        A    Yes.  Well, it changes on Wednesday.

8        Q    Okay.  How many days a week do you work?

9        A    Five days.

10       Q    And what's your expected -- do you have any

11   expectation of how long you're going to work each day?

12   Is it supposed to be an eight-hour day?

13       A    No.  They don't give us a time frame.  You know,

14   you go out in your day, you know, and -- and just come

15   back and finish, you know, when you finish.  Of course if

16   you -- if you go out with 200 cases and it takes you 12

17   hours, I mean, it's like, you know, a little bit that

18   you're being like -- just like sleeping around.

19       Q    No.  I don't understand.  I'm sorry.  What's

20   that?

21       A    Yeah.  Of course.  If they don't give you a time

22   frame, you know, to finish your route -- let's say they

23   don't tell you "Come back" -- "You need to come back

24   within eight hours."  They never tell you that.  You go

25   ahead and do your deliveries, you know, and come back

KARYN ABBOTT & ASSOCIATES

1  when you're done.

2      Q   And generally speaking, how long does it take

3  you?

4      A   It changes.  I couldn't tell you exact time.

5      Q   What about generally?  Is it usually eight

6  hours, is it usually more?

7      A   No.  It's an average of about -- average ten

8  hours.  Ten-hour days.

9      Q   So you average about two hours of overtime a

10 day?

11     A   Yes.

12     Q   And the route that you are given, does it

13 require you to come back to the City of Industry or do

14 you just have a bunch of stops along the way?

15     A   What do you mean?  I don't understand.

16     Q   Do you have to return to the City of Industry at

17 any point during your day to pick up more milk or more

18 dairy?

19     A   No.  The only time I come back is when I'm done.

20     Q   So you come in the morning, you get your load or

21 you get your deliveries and you take off and do your

22 different routes?

23     A   Mm-hmm.

24     Q   How many stops do you have along the way?

25     A   It varies in the day.  Let's say, Mondays I have

KARYN ABBOTT & ASSOCIATES

1

2

3        I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5        That the foregoing proceedings were taken before

6   me at the time and place herein set forth; that any

7   witnesses in the foregoing proceedings, prior to

8   testifying, were duly sworn; that a record of the

9   proceedings was made by me using machine shorthand which

10  was thereafter transcribed under my direction; that the

11  foregoing transcript is a true record of the testimony

12  given.

13        Further, that if the foregoing pertains to the

14  original transcript of a deposition in a Federal Case,

15  before completion of the proceedings, review of the

16  transcript [ ] was [ ] was not required.

17        I further certify I am neither financially

18  interested in the action nor a relative or employee of

19  any attorney or party to this action.

20        IN WITNESS WHEREOF, I have this date subscribed

21  my name.

22  Dated: _____ February 14th, 2013

23

24        _____
          ANDREA M. RINKER

25        CSR No. 13437, RPR, CLR

**EXHIBIT T**

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL DE LA CUEVA, on behalf of himself and those similarly situated,   )<br>)<br>)<br>)<br>       Plaintiff,   )<br>)<br>vs.   )<br>)<br>ALTA DENA CERTIFIED DAIRY, LLC, )<br>a Delaware limited liability )<br>company, et al.,   )<br>)<br>      Defendants.   )<br>_____) | **CERTIFIED COPY**<br><br>No. CV 12-01804<br>    GHK (CWx) |


DEPOSITION OF

RONNIE DEMLER

LOS ANGELES, CALIFORNIA

TUESDAY, FEBRUARY 12, 2013

Reported by:
ANDREA M. RINKER
CSR No. 13437, RPR, CLR
No. 24188B

KARYN ABBOTT & ASSOCIATES
COURT REPORTERS
523 West Sixth Street · Suite 1204
Los Angeles, California 90004
Phone 213.749.1234 · Fax 213.749.0644

EXHIBIT PAGE 1

1   department is we take a load of our product and deliver

2   it to another yard of ours.  And they unload the product

3   there onto the smaller trucks and trailers and from there

4   it goes to the stores and restaurants.

5       Q   Got it.  Is there a particular place that you go

6   to to do -- do you have a set -- well, actually, I guess

7   as a vacation driver, maybe you don't.  But is there a

8   set place that you'll go to as a transportation driver?

9       MS. BONN:  Object to form.

10      THE WITNESS:  Whatever the person I'm relieving did.

11  BY MR. McCAFFREY:

12      Q   Whatever their route was?

13      A   Yeah.  Whatever they're route, yeah.

14      Q   And how many hours a day do you work that you

15  recall?

16      A   Anywhere from eight minimum to generally 12

17  max -- is usually the max.

18      Q   And how many days a week are you finding work?

19      A   Five.  It's usually five days -- five days a

20  week.

21      Q   So, in essence, even though you're a vacation

22  relief driver, you work a full-time schedule; is that

23  fair?

24      A   Yeah.  Yeah.  I'm a full-time employee.

25      Q   You get the full-time hours?

KARYN ABBOTT & ASSOCIATES

1     A    Yes, I do.  Uh-huh.

2     Q    How many hours of overtime do you average per

3  week?

4     A    It varies.  Depends on the person I'm relieving.

5  But anywhere from a couple to ten hours a week, max

6  probably.

7     Q    Do you get a scorecard for your -- do you get a

8  driver scorecard?

9     A    I haven't seen one, but I heard there's -- they

10  started a new program starting February 1st about some

11  new scorecard.

12     Q    Okay.  Prior to hearing about this new program,

13  were you aware that there was such a thing as a driver

14  scorecard?

15     A    Actually, I have seen it.  I'm sorry.  I have

16  seen that scorecard.  I think it's -- shows your miles

17  per gallon and your average speed and things like that,

18  your shifting patterns and things like that.

19     Q    And did you -- how often would you -- well,

20  strike that.

21        Would you actually yourself get a scorecard, a

22  driver scorecard?

23     A    Yes, I have.

24     Q    How often would you get one?

25     A    It seemed like for a while they came out once a

KARYN ABBOTT & ASSOCIATES

1

2

3        I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5        That the foregoing proceedings were taken before

6   me at the time and place herein set forth; that any

7   witnesses in the foregoing proceedings, prior to

8   testifying, were duly sworn; that a record of the

9   proceedings was made by me using machine shorthand which

10  was thereafter transcribed under my direction; that the

11  foregoing transcript is a true record of the testimony

12  given.

13       Further, that if the foregoing pertains to the

14  original transcript of a deposition in a Federal Case,

15  before completion of the proceedings, review of the

16  transcript [ ] was [ ] was not required.

17       I further certify I am neither financially

18  interested in the action nor a relative or employee of

19  any attorney or party to this action.

20       IN WITNESS WHEREOF, I have this date subscribed

21  my name.

22  Dated: _____ February 12th, 2013 _____

23

24       _____

            ANDREA M. RINKER
25          CSR No. 13437, RPR, CLR

**EXHIBIT U**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MIGUEL DE LA CUEVA, on behalf
of himself and those similarly
situated,

          Plaintiff,

vs.

ALTA DENA CERTIFIED DAIRY, LLC,
a Delaware limited liability
company, et al.,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**CERTIFIED COPY**

No. CV 12-01804
    GHK (CWx)

DEPOSITION OF

DANIEL DELAND DURKEE

LOS ANGELES, CALIFORNIA

TUESDAY, FEBRUARY 12, 2013

Reported by:
ANDREA M. RINKER
CSR No. 13437, RPR, CLR
No. 24188C

KARYN ABBOTT
& ASSOCIATES
COURT REPORTERS
420 SOUTH GRAND CLADING PLACE
LOS ANGELES, CALIFORNIA 90094
PHONE 213.749.1234 | FAX 213.749.0644

EXHIBIT J, PAGE 1
Page 152

```
 1   BY MR. McCAFFREY:

 2       Q    And then do you have -- strike that.

 3            Did you ever work for Swiss or Heartland?

 4       A    No.

 5       Q    And where do you work for Alta Dena/Dean Foods?

 6       A    In the City of Industry.

 7       Q    How long have you worked in the City of

 8   Industry?

 9       A    24 years.

10       Q    So it's always been there?

11       A    It's always been there, yes.

12       Q    And what's your job?

13       A    I'm a route driver.

14       Q    So does that mean that you have -- you get a

15   route when you show up and you have different stops along

16   the way and then you finish and come back to the plant?

17       A    Yes.

18       Q    And generally how many stops a day do you have?

19       A    I average between five and six.

20       Q    And do you have a schedule that you generally

21   work?

22       A    Pretty much.  It's go out, get the job done.

23       Q    Do you have a certain start time that you

24   usually show up?

25       A    Yes.  I start at 6:00 a.m.
```

KARYN ABBOTT & ASSOCIATES

```
 1       Q    And generally speaking, how many hours a day do
 2   you work?
 3       A    Between eight and ten.
 4       Q    On average, how much overtime are you averaging
 5   per week?
 6       A    I would say ten -- ten hours.
 7       Q    Has that been pretty consistent over, say, the
 8   last four, five years?
 9       A    Maybe I would say the last year, year and a
10   half.
11       Q    And what about prior to that?
12       A    It was pretty -- it's been pretty good.  Well,
13   actually, we were on four-10s, my schedule was.  I was on
14   a four-10 schedule.
15       Q    For what period of time were you on a four-10?
16       A    How long of a period?
17       Q    Yes.
18       A    Oh, man.  I was on that for 15 years.  That just
19   recently changed in the last year, year and a half.
20   About a year and a half.
21       Q    When you were on a four-10, did you get any
22   overtime hours?
23       A    Not that often.
24       Q    But then when you switched back to the five-8s,
25   you started to get some more overtime?
```

KARYN ABBOTT & ASSOCIATES

1       A    Yeah.

2       Q    Do you have any idea why that changed?

3       A    Being due to the fact that with the four-10

4   schedule that we had, they could do away with one less

5   relief driver.  And we had more work coming up being that

6   we incorporated with Swiss and Heartland.  So the routes

7   were changing up and it was better for them to go to the

8   five-8s.

9       Q    So did everyone go to five-8s at that time?

10      A    Not everybody, but most of the routes did.

11      Q    Okay.  And there's still some four-10s?

12      A    Yeah.  Mm-hmm.

13      Q    When you say it -- or I don't know if you used

14   the word "integrated" -- but came together with Swiss and

15   Heartland --

16      A    Well, we had Swiss -- we had Swiss routes coming

17   over to our company.

18      Q    And when did that happen?

19      A    That's probably been about two years ago -- year

20   and a half, two years ago, about that time.

21      Q    And what about Heartland?  Were there routes

22   from Heartland that came over as well?

23      A    Not so much routes.  We're doing production for

24   them.

25      Q    Were there -- strike that.

KARYN ABBOTT & ASSOCIATES

1           Did the supervisors or managers that were in

2    control at the City of Industry, did they then take

3    control of the Swiss or Heartland drivers that came over?

4           MS. BONN:  Object to form.

5           THE WITNESS:  Swiss -- with the Swiss drivers, one

6    manager came over from Swiss.

7    BY MR. McCAFFREY:

8        Q   And who was that?

9        A   Craig Widlund.

10       Q   And when did Craig come over from Swiss?

11       A   It's been about two years, I believe.

12       Q   Okay.  And how long has it been that you started

13   at about 6:00 a.m.?

14       A   That's probably been about a year and a half,

15   two years now.

16       Q   And what about before?

17       A   It used to be 5:00 a.m.

18       Q   So when you were doing the four-10s, you

19   generally started at 5:00 a.m.?

20       A   Mm-hmm.

21       Q   Yes?

22       A   Yes.

23       Q   And then when you went to the five-8s, now you

24   start around 6:00?

25       A   Yes.

KARYN ABBOTT & ASSOCIATES

1      Q    Now, at some point I know you signed an

2  affidavit, correct?

3      A    Mm-hmm.

4      Q    Yes?

5      A    Yes.  Sorry.

6      Q    That's all right.  I'm not trying to be

7  annoying.

8      A    I know.

9      Q    And what were the circumstances under which you

10 signed that affidavit?

11     A    As far as I'm concerned, there was no

12 circumstances other than the fact they asked me some

13 questions and I told them how I felt and I answered the

14 questions like they asked me.

15     Q    I take it you didn't type your affidavit,

16 correct?

17     A    No.

18     Q    Okay.  Who typed it?

19     A    Someone who was there.  I don't remember who was

20 there, who the person was.

21     Q    Did you meet with Amanda Bonn?

22     A    No.  There was a lady named Francis and there

23 was a gentleman there.  I believe his name was Steve.

24     Q    Steven?  And which one of the two prepared the

25 affidavit?

KARYN ABBOTT & ASSOCIATES

1        A    Yes.

2        Q    So that's basically the 12 hours?

3        A    Yeah.  My loads are heavy even though it's only

4   five stops.

5        Q    So is that a typical day for you or are the

6   other days less?

7        A    Some days are less.  Some days are -- let me

8   see.  My Friday is kind of long.  It's not heavy.  It's

9   just I have seven stops there spread out.

10       Q    Okay.  And then -- you've gotten a scorecard

11  before, right?

12       A    Oh, yeah.

13       Q    Okay.

14       A    Yes.

15       Q    When did you start getting scorecards?

16       A    I think they started doing that about a year

17  ago.

18       MR. McCAFFREY:  I'll hand you what we'll identify as

19  Exhibit 125.

20           I'm sorry.  I only have one copy.

21       MS. BONN:  That's okay.

22           (Deposition Exhibit 125 was marked for

23           identification by the court reporter.)

24  BY MR. McCAFFREY:

25       Q    I'll represent to you these are copies of your

KARYN ABBOTT & ASSOCIATES

1    driver scorecards for -- I think it's for 2012.  Does

2    that sound about right when they did it?

3         A    Yeah.  Yes.

4         Q    Do you get these delivered to you in some

5    fashion?

6         A    A lot of times when we come in the morning,

7    Vince will have us -- he'll review them with us, go over

8    it with each driver.

9         Q    Individually?

10        A    Individually.

11        Q    And is that something that -- it looks like it

12   happens on a monthly basis?

13        A    Yes.

14        Q    Is there any set time you know you're going to

15   meet with Vince to go over your scorecard?

16        A    No.

17        Q    Does he hand you essentially what I've handed

18   you?

19        A    Yes.

20        Q    So it's a piece of paper with your information?

21        A    Yes.

22        Q    And do you understand these different

23   categories?

24        A    For the most part, yes.

25        Q    Okay.  Can you help me -- like for time

KARYN ABBOTT & ASSOCIATES

1    management, I understand what the words "time management"

2    mean, but what are they trying to, I guess, score -- for

3    lack of a better word -- with respect to time management?

4        A    Yeah.  Yard time and stuff, how long it takes to

5    get out of the yard.  You know, some days you get out

6    soon, some days we have to go over to the cooler and pick

7    up shortages.

8        Q    Okay.  And that's the -- a.m. yard time refers

9    obviously to when you first clock in.

10       A    Yes.

11       Q    This is how long it takes for you basically to

12   get out the door?

13       A    Yes.

14       Q    Okay.  And then what's trip-start duration?

15       A    Let's see.

16       Q    Well, it says clock-in duration, trip-start

17   duration --

18       A    That's probably going to be when I first punch

19   in like I'm leaving the yard.

20       Q    Okay.  And then drive hours?

21       A    I take that back.  That's probably when I'm

22   doing my pre-trip calculation or I'm on delay at the

23   cooler, one of the two.  Because a lot of times we'll go

24   over to the cooler and pick up a short sheet that shows

25   what was cut on our whole load for the day.  So that's

KARYN ABBOTT & ASSOCIATES

1   what that might mean there.

2        Q   Okay.  And then what about drive hours?

3        A   It's the hours that I've driven probably for the

4   day or for the week, however they're doing it.

5        Q   Or the month?

6        A   Yes.

7        Q   Or -- I don't know.  I mean, it says 60 --

8        A   62 to 25.

9        Q   Yeah.  And then there's one for actual, which

10  I'm assuming means how many hours you actually spent

11  driving -- and there's one for planned.  Do you see that?

12       A   Yes.

13       Q   Do you know that planned figure, where that's

14  coming from?

15       A   No, I don't.

16       Q   Has anyone ever told you?

17       A   If anything, I'm sure it's coming from

18  corporate.

19       Q   Has anyone told you -- so basically do you want

20  your drive hours to be above or below planned?

21       MS. BONN:  Object to form.

22       THE WITNESS:  That I don't recall.  They never told

23  me.

24  BY MR. McCAFFREY:

25       Q   You see how it says under one hour and 59

KARYN ABBOTT & ASSOCIATES

1  minutes?  I mean, there's a difference between the two,

2  right?  It's reflected on Exhibit 125.  It says "Under

3  159."

4      A   Mm-hmm.

5      Q   Do you have any idea if that's good or bad?

6      MS. BONN:  Object to form.

7      THE WITNESS:  No, I don't know if it's good or bad.

8  BY MR. McCAFFREY:

9      Q   And then trip hours -- again, there's an actual

10  and a planned difference.

11      A   Yes.

12      Q   Do you know what trip hours refers to?

13      A   Probably what that -- either that route should

14  take or the trip time.  You know, you can't -- in L.A.

15  you can't go by that, the traffic the way it is.

16      Q   Well, someone has planned two hours and ten

17   minutes -- excuse me.  I don't know what that is.  I

18  guess it's 210 hours and 17 minutes, possibly?

19      MS. BONN:  Object to form.

20      THE WITNESS:  I guess.  Like I said, I'm not

21  familiar with it.  I can't answer this.

22  BY MR. McCAFFREY:

23      Q   Okay.  Well, do you have an understanding that

24  they're giving you some sort of ranking?  They're giving

25  a score, correct?

KARYN ABBOTT & ASSOCIATES

1    A    That I don't know.

2    Q    Are you given at the beginning of your day some

3    parameters as to how long the company expects you to take

4    to do a particular stop?

5    A    No.

6    Q    So when you have a typical Monday, do they tell

7    you we think it should take two hours for you to get to

8    Smart & Final in South Central or --

9    A    No.

10   Q    So do you have any idea what they're measuring

11   the on-time percentage against on the driver scorecard?

12   A    No.

13   Q    Have you ever asked anyone like how come 70

14   percent?

15   A    I show up, I do my job.  I ain't got nothing to

16   worry about.

17   Q    Fair enough.  I'm sure -- have you ever played

18   baseball or football or anything like that?

19   A    Yeah.  But it's --

20   Q    Because you want to know what your score is.

21   You want to do well, right?

22   MS. BONN:  Object to form.

23   THE WITNESS:  Yeah.  To me, I'm doing fine.

24   BY MR. McCAFFREY:

25   Q    Okay.  You got a score of 87?  I'm assuming that

KARYN ABBOTT & ASSOCIATES

1    you realize that it sounds like it's pretty good.

2         A    Yeah.  And I bet you next month over I'm

3    probably going to have a low count because I was idling

4    on a Wednesday for a long time when I was doing shipment.

5         Q    You got some 97s, 75 --

6         A    You might find a 50 in there too.

7         Q    Really?  I hope not.

8         A    Yeah.  I think I did have some close to that.

9         Q    67 maybe.

10             I'm just trying to get a sense of how it's

11   based.  So it says average delivery stop time.  You have

12   an hour and nine minutes there.

13        A    Mm-hmm.

14        Q    And that's basically consistent with the 60 to

15   90 minutes we were talking about, right?

16        A    Yes.

17        Q    And then average order size -- is that referring

18   to the number of --

19        A    -- cases.

20        Q    -- cases?

21        A    Yes.

22        Q    And is that per stop?

23        A    Yes.

24        Q    Okay.  And delivery stop hours, it says planned,

25   9402; actual, 12048.  Any idea what that's about?

KARYN ABBOTT & ASSOCIATES

```
 1        A    Where is that one at?

 2        Q    Top right under "Route Performance" is delivery

 3   stop hours.

 4        A    I still don't see it.

 5        MS. BONN:  It's up here.  Delivery stop hours.

 6        THE WITNESS:  Yeah.  Well, that's probably -- you

 7   know, that's the average, 94.2.  But a lot of times

 8   you'll get there and they don't receive you right away.

 9   So then that's when the number is changing.

10   BY MR. McCAFFREY:

11        Q    Okay.  And so this refers to the amount of time

12   it takes to complete a delivery at a particular stop?

13        A    Yes.

14        MS. BONN:  Object to form.

15   BY MR. McCAFFREY:

16        Q    And do you have any understanding as to what

17   that 9402 number comes from with respect to it being a

18   planned --

19        A    Well, I think that might have been when my

20   relief driver went out before me.  That's a possibility.

21        Q    But see, it's a planned versus actual again.

22        A    I don't know.

23        MS. BONN:  Object to form.

24   BY MR. McCAFFREY:

25        Q    Okay.  Are you aware of the company having any
```

KARYN ABBOTT & ASSOCIATES

1    plan for how long -- or how many delivery stop hours you

2    ought to have on a monthly basis?

3         MS. BONN:  Object to form.

4         THE WITNESS:  No.

5    BY MR. McCAFFREY:

6         Q    Okay.  Actual delivery units versus planned

7    delivery units -- pretty much self-explanatory, correct?

8         A    Yes.

9         Q    And then you have your score.  And do you ever

10   talk to Vince or any of the supervisors about how the

11   score was derived?

12        A    He will explain to you why it was low and you

13   got to watch this, you've been idling too much.  And he's

14   never really pressured me on my time.  It's always just

15   about the idle time and the torque is what they're mostly

16   concerned about.

17        Q    Okay.  Do you know though how the 87 is derived?

18        A    It's probably because I was idling a lot.

19        Q    As far as you're concerned, the thing that

20   sticks out is don't idle, you idle too much?

21        A    Yes.

22        Q    And then the second thing is don't drive like a

23   mad man because you hurt the torque and it's bad for gas

24   mileage?

25        A    Yes.

1      Q    But do you have any understanding as to how the

2  87 score total was derived?  Each of those went into this

3  score; is that your understanding?

4      MS. BONN:  Object to form.

5  BY MR. McCAFFREY:

6      Q    When I say "these," I mean these categories.

7      A    Like I said, it doesn't concern me.  I don't

8  worry about it all that much.  I don't -- like this, I

9  don't feel like I'm being picked on.  Put it that way.

10     Q    I don't think you should.  I was more just

11 asking -- I mean, obviously the company takes the time to

12 sit down with you on a monthly basis and go over your

13 overall performance and give you a score, right?

14     A    Yes.

15     Q    So they're letting you know how you're doing

16 versus their expectations, correct?

17     A    Yes.

18     Q    And you understand the higher your score, the

19 better you're doing, correct?

20     A    Yes.

21     Q    And obviously the company wouldn't waste their

22 time and do something they wouldn't care about; is that

23 right?

24     MS. BONN:  Object to form.

25     THE WITNESS:  I don't know.

KARYN ABBOTT & ASSOCIATES

1   BY MR. McCAFFREY:

2       Q   Really?  Do you think the company is -- Alta

3   Dena is an entity that likes to waste time?

4       MS. BONN:  Object to form.

5       THE WITNESS:  I feel they're not out to just pick on

6   me or -- you know, it's just I know -- I think they're

7   doing this to save costs.

8   BY MR. McCAFFREY:

9       Q   And why do you say that?

10      A   Because that's how you run a company

11  efficiently.

12      MR. McCAFFREY:  Okay.  I'll hand you what we'll

13  identify as Exhibit 126.

14          (Deposition Exhibit 126 was marked for

15          identification by the court reporter.)

16  BY MR. McCAFFREY:

17      Q   By the way, are you still getting these driver

18  scorecards?  Did you just get another one this last

19  month?

20      A   Yes.

21      Q   So that process still continues?

22      A   Yes.

23      Q   Did it happen before January 2012 or is that

24  when it started?

25      A   I don't recall.  I'm sure we've had it for a

KARYN ABBOTT & ASSOCIATES

1   while.

2       Q    Are the topics that are covered in the driver

3   scorecard -- are those things that were discussed with

4   you as a driver before you actually got a driver

5   scorecard?

6       A    I'm sure they notified us there would be one

7   coming out, pretty much keep us informed on stuff like

8   that.

9       Q    But the issues or topics that are addressed in

10  the driver scorecard, are those things you would talk

11  about with your supervisor pre- -- or before the driver

12  scorecard was issued?

13      MS. BONN:  Object to form.

14      THE WITNESS:  I don't recall.

15  BY MR. McCAFFREY:

16      Q    Like idle time?

17      A    That's a -- idle time and torque, that's all you

18  hear all the time.  So --

19      Q    And that's been that way throughout your whole

20  time?

21      A    Pretty much when we went to XATA and they were

22  watching our driver performance.

23      Q    And what about planned versus actual on stop

24  count or delivery routes?

25      A    They explained to us what it means, but I didn't

KARYN ABBOTT & ASSOCIATES

1    pay attention.  I don't even remember that.

2        Q    Fair enough.

3             Have you ever seen 126 before?

4        A    Not this small.

5        Q    Do you have any idea what it is?

6        A    It looks like a XATA report.

7        Q    Yeah.  Have you ever seen anything like -- a

8    report like this for you?

9        A    Probably.  This is an old one.  Yeah.  This is

10   an old one.  I haven't been to the market in a long time.

11       Q    Oh, I see.  On the first page, line 18?

12       A    Yeah.

13       MR. McCAFFREY:  Okay.  I'm going to hand you what

14   we'll identify as Exhibit 127.

15            (Deposition Exhibit 127 was marked for

16            identification by the court reporter.)

17   BY MR. McCAFFREY:

18       Q    I'll represent to you this is a compilation of

19   various driver delay detail reports that have your name

20   on it that we put together based on the documents that

21   were produced by Alta Dena.

22       A    Okay.

23       Q    Have you ever seen a document such as those that

24   appear in Exhibit 127?

25       A    Yes.

KARYN ABBOTT & ASSOCIATES

1        THE WITNESS:  Yes.

2    BY MS. BONN:

3        Q    Do you think Exhibit 85 fully explains -- before

4    this union agreement getting rid of the four-to-six-hour

5    rule, do you think this exhibit would have accurately

6    described the full extent of Alta Dena's meal break

7    policies?

8        MR. McCAFFREY:  Objection.  Vague.  Lacks

9    foundation.  Leading.

10       THE WITNESS:  I don't understand the question.  Can

11   you ask me again?

12   BY MS. BONN:

13       Q    Sure.  I guess my question is it sounds like

14   this four-to-six-hour rule used to exist and it sounds

15   like it's not in this document.  What I'm asking is are

16   there other policies you've been told about or received

17   other than this document back in 2009?

18       A    Yes.  I'm sure I signed something back then.

19       Q    And do you remember -- do you sitting here today

20   have any actual memory of receiving this particular

21   Exhibit 85?

22       A    It's been so long.  I'm not sure.

23       Q    Okay.  I'm showing you Exhibit 125.  That's the

24   driver scorecard we looked at earlier.  Taking a look at

25   the category that's marked drive hours actual versus

KARYN ABBOTT & ASSOCIATES

73

1    planned -- sitting here today do you have any actual,

2    personal knowledge as to what actual drive hours means in

3    this report?

4         A    Not exactly.

5         Q    So if you were to give a statement about what it

6    might mean, would you just be guessing?

7         A    Yes.

8         Q    Okay.  What about -- sitting here today do you

9    have any actual, personal knowledge of what planned drive

10   hours refers to in this report?

11        A    No.  Because like I said, I'm not a XATA expert.

12        Q    So if you were to offer a possibility of what it

13   might mean, would you just be guessing?

14        A    Yes.

15        Q    Okay.  What about trip hours actual?  Sitting

16   here today do you have any actual, personal knowledge

17   about what actual trip hours means in this report?

18        A    No.

19        Q    So if you were to offer a possibility of what it

20   might mean, would you just be guessing?

21        A    Yes.

22        MR. McCAFFREY:  Leading.  The whole line is leading.

23   So if your employee has no idea what the report means,

24   that's fine.

25   //

KARYN ABBOTT & ASSOCIATES

```
1   BY MS. BONN:

2       Q    Do you have any actual, personal knowledge

3   sitting here today of what any of the categories under

4   delivery stop count mean, actual versus planned?

5       A    That's possible it means case count.

6       Q    Do you know that or is that a guess?

7       A    It's pretty much a guess, but I'm pretty sure

8   that's what it means.

9       Q    What about delivery stop hours?  Sitting here

10  today do you have any actual, personal knowledge of what

11  that means in this report?

12      A    I'm assuming that means how many hours I was

13  there.  I'm assuming.

14      Q    Do you know that or are you guessing?

15      A    I'm guessing.

16      Q    What was your understanding when you actually

17  talked to your supervisor about these reports about what

18  you were being evaluated on?

19      A    On our overall performance.  And like I said,

20  the thing that sticks out the most is torque and idle

21  time.

22      Q    Do you think how much torque you use when you're

23  driving has anything to do with meals or breaks?

24      A    No.

25      Q    What about vehicle idle time?  Do you think that
```

KARYN ABBOTT & ASSOCIATES

1    has anything to do with meals or breaks?

2         A    No.

3         Q    Did you ever have an impression --

4         MR. McCAFFREY:  Unless he really wants to get to a

5    meal break.  Then he would use a lot of torque, right?

6         THE WITNESS:  No.

7         MS. BONN:  Don't answer.  It's not his time to ask

8    questions.  He can ask you that if he wants to later.

9         Q    Did you ever leave one of these meetings with

10   your supervisor with the impression that you were going

11   to be downgraded on your score for taking your meals and

12   breaks?

13        A    No.

14        Q    Did you ever leave a meeting with your

15   supervisor to talk about your scorecard with the

16   impression that your score had been lowered because you

17   were taking your meals and breaks?

18        A    No.

19        Q    Did you ever leave one of these meetings with

20   your supervisor to talk about your scorecard with the

21   impression that you should try to cut down on your meals

22   and breaks to get a better score?

23        A    No.

24        Q    I'm showing you a document that's been

25   previously identified as Exhibit 60.  You can take a

KARYN ABBOTT & ASSOCIATES

1    minute to look it over.

2        A    Okay.

3        Q    Okay.  And does this appear to be an e-mail from

4    Norma Jimenez?

5        A    Yes.

6        Q    And do you -- do you see where it says that it

7    was sent to or rather copied to Humberto Rodriguez

8    and Joe Llamas?

9        MR. McCAFFREY:  Lacks foundation.

10        THE WITNESS:  Yes.

11   BY MS. BONN:

12       Q    And who is Joe Llamas?

13       A    That's one of our supervisors.

14       Q    And what about Humberto Rodriguez?

15       A    He's one of our supervisors.

16       Q    Okay.  And do you see where it says:

17            "Matt and Randy, here are the drivers who

18   continue to either not take a lunch or take less than

19   30 minutes.  Please help me correct this problem"?

20       A    Yes.

21       Q    Okay.  And turning to the next page under where

22   it says "Week of April 26th, lunch meals -- the following

23   drivers did not take a lunch or did not take a full 30

24   minutes as required," do you see your name listed under

25   COI?

KARYN ABBOTT & ASSOCIATES

1

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby certify:

5          That the foregoing proceedings were taken before

6    me at the time and place herein set forth; that any

7    witnesses in the foregoing proceedings, prior to

8    testifying, were duly sworn; that a record of the

9    proceedings was made by me using machine shorthand which

10   was thereafter transcribed under my direction; that the

11   foregoing transcript is a true record of the testimony

12   given.

13         Further, that if the foregoing pertains to the

14   original transcript of a deposition in a Federal Case,

15   before completion of the proceedings, review of the

16   transcript [ ] was [ ] was not required.

17         I further certify I am neither financially

18   interested in the action nor a relative or employee of

19   any attorney or party to this action.

20         IN WITNESS WHEREOF, I have this date subscribed

21   my name.

22   Dated: _____February 14th, 2013_____

23

24         _____
                ANDREA M. RINKER
25              CSR No. 13437, RPR, CLR

**EXHIBIT V**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MIGUEL DE LA CUEVA, on behalf of himself and those similarly situated,

        Plaintiff,

  vs.

ALTA DENA CERTIFIED DAIRY, LLC, a Delaware Limited Liability Company, ALTA-DENA CERTIFIED DAIRY, INC., a Delaware Corporation, and DOES 1 through 10, inclusive,

        Defendants.

CERTIFIED COPY

CASE NO.
CV 12-01804 GHK (CWx)

DEPOSITION OF

SATPAL GILL

LOS ANGELES, CALIFORNIA

FEBRUARY 13, 2013

Reported by:
JULIA Y. GHEKIERE
CSR No. 12006/CLR
Job:  13-24189A

KARYN ABBOTT & ASSOCIATES
COURT REPORTERS
420 South Catalina
Los Angeles, California 90004
Phone 213.749.1234   Fax 213.749.0644

1  over the years, but basically, in your mind, you've

2  always been a driver for Alta Dena?

3      A    Yes.

4      Q    Have you ever worked for Swiss or Swiss 2

5  Dairies?

6      A    No.

7      Q    Have you ever worked for Heartland?

8      A    No.

9      Q    Do you have a regular schedule?

10     A    Yes, I do.

11     Q    And what's your regular schedule?

12     A    It's 4:00 to 2:30 in the afternoon.

13     Q    So 4:00 a.m. to 2:30 in the afternoon?

14     A    Yes.

15     Q    And how long has that be your schedule?

16     A    It's started about -- I used to start 3:30 but a

17  week ago, they changed it to 4:00 o'clock.

18     Q    For how long did you start at 3:30 a.m.?

19     A    I will say long time, more than four year.

20     Q    And prior to that, when did you start?

21     A    Prior to that I would say around the same time,

22  3:30, 3:00 it varies sometimes?

23     Q    So it varies between 3:00 or 3:30 a.m.?

24     A    Yes.

25     Q    Is it fair to say that for the last five to six

KARYN ABBOTT & ASSOCIATES

1    years your start time has been 3:00 or 3:30 a.m.?

2       A    Yes.

3       Q    Have you ever done any driving besides route

4    driving?

5       A    Not on a regular basis, maybe once in a while.

6       Q    Every once in a while you might do transport or

7    wholesale or something like that?

8       A    Yeah, maybe if they want me to go to different

9    plants, once in a while.  But it happen very rarely.

10      Q    Very rarely?

11      A    Yes.

12      Q    Do you have a set delivery schedule?

13      A    Yes.  When you say set, what do you mean by

14   "set"?

15      Q    Like are all your Mondays the same or all your

16   Tuesdays the same?

17      A    Yes.

18      Q    Do you usually work Monday to Friday?

19      A    I work Monday, Tuesday, off Wednesday, Thursday,

20   Friday off Saturday and Sunday.

21      Q    So you work four days a week?

22      A    Four days a week 4/10.

23      Q    And how long have you been a 4/10 schedule?

24      A    I would say more than four years.

25      Q    Okay.  Did you have to go through a process

KARYN ABBOTT & ASSOCIATES

12

1    where you had to, like, do a ballot to elect the 4/10

2    schedule or approve the 4/10 schedule?

3        A    No.

4        Q    Do you remember doing any type of -- or being

5    informed in any way or having any type of election as to

6    whether or not the drivers wanted the 4/10 schedule?

7        A    It may have been done a long time ago, but I

8    don't remember.

9        Q    Okay.  And I'm sorry, you said you've been doing

10   4/10s for approximately four years?

11       A    Yes.

12       Q    Prior to that?

13       A    I used to be 4/10 too.

14       Q    So 4/10s pretty much the whole time?

15       A    4/10s, yes.  That's what I did.  I've never been

16   a 5/8.

17       Q    So you've always been a 4/10?

18       A    Yes.

19       Q    And then on Monday, do you have a set drop

20   schedule or delivery schedule?

21       A    Yes, I do.

22       Q    And what is that?

23       A    Monday I will go to -- it's in Fontana, Target.

24       Q    Okay.

25       A    Target.  Then to the Target, it's Rancho.  Then

KARYN ABBOTT & ASSOCIATES

```
 1        Q     And which customer?

 2        A     Target.

 3        Q     Target?  Okay.

 4        A     Yes.

 5        Q     And what time do you get there?

 6        A     Between 5:00 and 6:00, what did I say before,

 7   yeah, same time.

 8        Q     Which one is that?

 9        A     Yeah, Tuesday --

10        Q     You go there on Tuesdays?

11        A     Tuesday is the same.

12        Q     Oh, is Friday the same as Tuesday?

13        A     Yes.

14        Q     Oh, okay.  Then we don't have to go through it.

15              So Friday's exactly the same as Tuesday?

16        A     It is.

17        Q     Okay.  How many -- strike this.

18              Do you get overtime generally on a --

19        A     Yes, I do?

20        Q     And how many overtime hours do you average?

21        A     Average between one and two.

22        Q     Per week or per day?

23        A     Per day.

24        Q     Okay.  So per week you get between, say, five

25   and ten hours of overtime?
```

KARYN ABBOTT & ASSOCIATES

1      A      Yes.

2      Q      Okay.   Just on average?

3      A      Yes.

4      Q      Okay.   And because you're 4/10s you only get

5  overtime if you go over the 10 hours; correct?

6      A      Yes.

7      Q      Do you ever go beyond 12 hours?

8      A      Maybe once in a while, used to but not anymore.

9      Q      When you go beyond 12 hours, do they pay you

10  double time?

11      A      Yes.

12      Q      And you say used to get some double time but not

13  anymore?

14      A      No.

15      Q      How long has it been since you got any double

16  time?

17      A      During Christmastime -- around that time we got

18  more work.   So after holiday, will slow down.

19      Q      So it's kind of a seasonal thing?

20      A      Yes.

21      Q      With Christmas being the main season?

22      A      Obviously, it's a route, like, the schedule is

23  heavier.

24              (Reporter's Clarification.)

25              THE WITNESS:   I would so, yes, so the schedule

KARYN ABBOTT & ASSOCIATES

```
 1   tell you what time, I don't remember what time I was used

 2   to be there.

 3        Q    Fair enough.

 4        A    Yeah.

 5        Q    Were there some in particular that you can

 6   remember?  Like, what day did you go to Beverly Hills?

 7   Where'd you go to Beverly Hills?  What time did you

 8   usually get there?  That type of thing?  Or is it too

 9   foggy?

10        A    No, I can the recall a couple of them.  I used

11   to go to Hyatt, that's off Santa Monica and Avenue of the

12   Stars, the hotel over there.

13        Q    The Hyatt?

14        A    Yes.

15        Q    Okay.  But you can't remember what -- can you

16   remember what day you did that or --

17        A    No, I don't remember.

18        Q    You can't remember the specifics of it?

19        A    No.

20        Q    Generally speaking, was your schedule the same

21   in the terms of you had to do four -- it looks like five

22   drops a day?

23        A    Five or four.

24        Q    And generally speaking, you worked one or two

25   hours of overtime a day?
```

KARYN ABBOTT & ASSOCIATES

```
1        A      Yes.

2        Q      So in the terms of the time you actually worked,

3    it was about the same?

4        A      Yes, same.

5        Q      And in terms of when you took your meal break,

6    did you generally take it in the same time frame that you

7    explained to me when we went through your current

8    schedule?

9        A      I would say the same time, yes, sometime if --

10   if I don't feel like, I go to next stop, take my lunch

11   over there, depends on me.

12       Q      Okay.  But generally speaking, you take it

13   around noon to 1:00?

14       A      Yes, sometimes I take it earlier.

15       Q      Sometimes you take it earlier?

16       A      Yes.

17       Q      As a general rule, though, did -- pre 2010, did

18   you usually take your lunch break somewhere around 12:00

19   or 1:00?

20       A      Yes, I would say between 12:00 and 1:00 -- maybe

21   -- between 11:00 and 1:00 I will say.

22       Q      Okay.  I'll hand you what's been previously

23   identified as Exhibit 85.

24              (The aforementioned document was

25              previously marked Plaintiff's Exhibit No.
```

KARYN ABBOTT & ASSOCIATES

1

2   STATE OF CALIFORNIA        ) ss

3

4        I, Julia Y. Ghekiere, CSR NO. 12006, do hearby

5   declare:

6

7        That, prior to being examined, the witness named

8   in the foregoing deposition was by me duly sworn;

9

10        That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter transcribed under my direction;

13

14        I further declare that I have no interest in the

15   event of the action.

16

17        I declare under penalty of perjury under the

18   laws of the State of California that the foregoing is

19   true and correct.

20

21        WITNESS my hand this 14th day of February, 2013.

22

23

24   _____

     JULIA Y. GHEKIERE, CSR 12006/CLR

25

KARYN ABBOTT & ASSOCIATES

**EXHIBIT W**

UNITED STATE DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MIGUEL DE LA CUEVA, on behalf of himself and those similarly situated,

        Plaintiff,

   vs.

ALTA DENA CERTIFIED DAIRY, LLC, a Delaware Limited Liability Company, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CERTIFIED COPY**

CASE NO. CV 12-01804 GHK (CWx)

30(B)(6) DEPOSITION OF

JOSE LLAMAS

LOS ANGELES, CALIFORNIA

WEDNESDAY, JANUARY 16, 2013

Reported by:
CAROL LYNN COX
CSR No. 5128
13-23855



KARYN ABBOTT
& ASSOCIATES
COURT REPORTERS

420 NORTH McCADDEN PLACE
LOS ANGELES, CALIFORNIA 90004
PHONE (719) 841-1113 FAX (213) 406-0126

EXHIBIT 11 PAGE 1
PAGE 186

1      A      The one right before that.  I think it was

2    2005.

3      Q      Any other handbooks?

4      A      No.

5      Q      And based on your review of those two

6    handbooks, you were unclear or at least enough to have a

7    question as to the time frame when meals were to be

8    taken; is that right?

9             MS. BONN:  Object to form.

10            THE WITNESS:  No.

11   BY MS. CHESLER:

12     Q      What was your question?

13     A      I wanted to refresh my memory as to what was

14   the time frame, if there was any specific time frames

15   that was on the handbook that the employees need to

16   take their lunch.

17     Q      Was there a time frame in the handbook?

18     A      No.

19     Q      Was there just one company handbook?  I'm not

20   talking about a year.  But is there like a separate

21   handbook for San Diego, a separate handbook for City of

22   Industry, or is there just one Alta Dena handbook?

23     A      There's one employee handbook.

24     Q      For everybody?

25     A      Yes.

KARYN ABBOTT & ASSOCIATES

1      Q     All locations?

2      A     Yes.

3      Q     Did you have any other questions as you were

4   preparing for this deposition?

5      A     No.

6      Q     You're currently employed by Alta Dena?

7      A     I'm currently employed by Dean Transportation

8   Incorporated, and I work out of the Alta Dena Dairy in

9   City of Industry.

10     Q     What does Dean Transportation Incorporated do?

11     A     A couple years ago, it was a corporate

12  decision to split up anybody in transportation or

13  distribution, drivers, including supervisors, managers

14  that worked for distribution, and put them under the

15  Dean Transportation Incorporated.

16     Q     Do the drivers work for Dean Transportation

17  Incorporated?

18     A     Yes.

19     Q     And how long has that system been in place?

20     A     A couple years.  Maybe two.

21     Q     At least two years?

22     A     Yes.

23     Q     So prior to two years ago, were you employed by

24  Alta Dena?

25     A     Before Dean Transportation Incorporated, it

KARYN ABBOTT & ASSOCIATES

```
 1          THE WITNESS:  It really depends on the
 2   customer base.  If the customer base requires you to
 3   have that in your inventory, then that branch will
 4   deliver it.
 5   BY MS. CHESLER:
 6      Q    I guess I'm a little confused when you say
 7   requires you to have it in your inventory.  Is this
 8   something that you sell them?
 9      A    Yes.
10      Q    Are you delivering anything that you don't
11   sell?
12          MS. BONN:  Object.  Outside the 30(b)(6).
13          You can answer in your individual capacity.
14          THE WITNESS:  No.
15   BY MS. CHESLER:
16      Q    Between February 2008 to the present, how many
17   different types of drivers has the company had?
18          MS. BONN:  Object to form.
19   BY MS. CHESLER:
20      Q    Different titles are what I'm looking for.
21      A    We have what we would call a transport/relay
22   driver and what we call a wholesale delivery driver.
23   We also have what we called a shipping delivery driver.
24      Q    Anything else?
25      A    No.
```

KARYN ABBOTT & ASSOCIATES

1    Q    How about a shuttle driver?

2    A    That would fall under the transport/relay.

3    Q    A vacation relief driver?

4    A    That would fall under the wholesale.

5    Q    I assume a relay driver falls under the

6    transport/relay driver?

7    A    Yes.

8    Q    How about a route sales driver?

9    A    That would fall under wholesale.

10   Q    And a Class A driver?

11   A    That could fall under, actually, all of them.

12   Q    How about a Class B driver?

13   A    Currently, we do not hire Class B.

14   Q    When did that change?

15   A    It was June 2011 when we went union.

16   Q    So between 2008 to approximately June 2011,

17   there was a Class B driver, correct?

18   A    We did have Class B drivers, correct.

19   Q    Can you tell me what do transport/relay drivers

20   do?

21   A    Pretty much transport/relay drivers will

22   transport products to either a branch or to what we

23   call a distributor branch.

24   Q    What is a distributor branch?

25   A    A distributor branch is kind of like a third

KARYN ABBOTT & ASSOCIATES

1    party contractor that is hired by Alta Dena to deliver

2    to Alta Dena customer.

3         Q    What does a wholesale delivery driver do?

4         A    A wholesale delivery driver does deliveries,

5    what we call direct store deliveries, whether a Smart &

6    Final, a Target, mom-and-pop stores.

7         Q    And what does a shipping delivery driver do?

8         A    A shipping delivery driver does deliveries to

9    what he we call warehouses; for example, Ralphs,

10   Safeway.

11        Q    So these warehouses and the wholesale

12   delivery -- sorry.  Strike that.

13             I'm sorry.  Where did you say the wholesale

14   delivery drivers go to?

15        A    Wholesale, we call it direct store delivery.

16        Q    So like The Coffee Bean?

17        A    Correct.

18        Q    So the warehouses and The Coffee Bean type

19   locations that wholesale delivery drivers go to, these

20   are the company's customers, correct?

21        A    That's correct.

22        Q    They're buying Alta Dena products, correct?

23        A    Correct.

24        Q    And all the drivers we just talked about, the

25   functions of the transport/relay, the wholesale

KARYN ABBOTT & ASSOCIATES

1       Q    So you understand as we move forward, when I

2    say "the company," I'm referring to all

3    transportation/relay drivers, wholesale delivery

4    drivers, shipping delivery drivers within California,

5    including all of the locations you mentioned.  Do you

6    understand that?

7       A    I understand.

8       Q    Okay.  Am I correct there are Department of

9    Transportation rules that cover these drivers?  Is that

10   correct?

11      A    Correct.

12      Q    Sorry.  Moving back for just one second, some

13   of these drivers work a 12-hour shift or more; is that

14   correct?

15      A    That would be fair to say, correct.

16      Q    Do all the drivers basically work a 4-10

17   schedule?

18      A    No.

19      Q    No.  So some work five days a week and some

20   work four days a week?

21      A    Correct.

22      Q    But they all work at least eight hours a day,

23   right?

24      A    Correct.

25      Q    Can I refer to Department of Transportation as

KARYN ABBOTT & ASSOCIATES

```
 1      Q     So if a driver doesn't work the full eight
 2   hours, it's not -- strike that.
 3            They're scheduled to work at least eight hours
 4   a day?
 5      A     That's correct.
 6      Q     What would be the reason for not working a full
 7   day?
 8      A     Change of plan.  The customer maybe canceled
 9   an order, you know.  Something out of the driver's
10   reach that he couldn't do anything about.
11   Unfortunately, he came in, so I'm going to pay him for
12   the day.
13      Q     Okay.  I understand.  We're not talking about a
14   driver who feels like going home at 3:00 in the
15   afternoon.
16      A     No.
17      Q     So if I understand you correctly, on the DOT
18   regulations, you can only be on the clock for 16 hours,
19   and then you have to have at least ten hours before you
20   drive again; is that correct?
21      A     That's --
22            MS. BONN:  Object to form.  Object.  Outside
23   the scope.
24            You can answer an as individual.
25            THE WITNESS:  That's correct.
```

KARYN ABBOTT & ASSOCIATES

1      Q    The drivers that are delivering to stores like

2   Walmart, Smart & Final, Walgreens, The Coffee Bean, they

3   have delivery windows at many of these companies; is

4   that correct?

5      A    Correct.

6      Q    Can you tell me what a delivery window is?

7      A    A delivery window is a time frame that a

8   customer gives you to make their delivery within.

9      Q    And how long is that window usually?

10     A    It will vary from customer to customer.

11     Q    Can you give me a range?

12     A    I really can't because it varies.  Literally,

13   each customers has a different delivery window.

14     Q    I'm not asking for what the times are.  I'm

15   asking like do most people usually have a two-hour

16   delivery window?  Do some people have a six-hour

17   delivery window?

18     A    Most people have, I'm going to say, if it's

19   not a grocery chain, they'll have probably about a

20   four- to five- up to six-hour delivery window.

21     Q    You said if it's not a grocery chain.  How

22   about grocery chains?

23     A    Grocery chains usually tend to have about a

24   four hour.

25     Q    What happens if you get there beyond the

KARYN ABBOTT & ASSOCIATES

1    delivery window?

2            MS. BONN:  Object to form.  Object.  Outside

3    the scope of the 30(b)(6).

4            You can answer as an individual.

5            THE WITNESS:  From experience, nothing.  We

6    just simply make a call and just let them know we're

7    running a little bit behind.

8    BY MS. CHESLER:

9        Q    Do some of these companies have someone whose

10   job is referred to as a receiver, there to receive the

11   delivery?

12       A    Yes.

13       Q    Are you guaranteed that a receiver will be

14   there if you go past the delivery window?

15       A    No.

16       Q    What happens if a receiver is not there?

17       A    Then they bring in their store clerk or the

18   manager themselves have received us.

19       Q    Is there any effort made to deliver within the

20   delivery window?

21       A    Yes.

22       Q    What is the effort that you make to do that?

23       A    When we put the routes together, we take all

24   the windows into consideration, and that's how we build

25   the routes, based on the customer needs.

KARYN ABBOTT & ASSOCIATES

1    Q    So the customer dictates the delivery window,

2  not the company?

3    A    That's correct.

4    Q    Is it important to you to comply with the

5  customer's request for the delivery window?

6         MS. BONN:  Object.  Outside the scope of the

7  30(b)(6).  Object to form.

8         You can answer as an individual.

9         THE WITNESS:  Yes.

10  BY MS. CHESLER:

11    Q    You deliver to Walmart, correct?

12    A    Out of Alta Dena, sure.  The City of Industry,

13  that's correct.

14    Q    Any of the Alta Denas.

15         MS. BONN:  Object.  Outside the scope of the

16  30(b)(6) insofar as you're asking for non-Alta Dena

17  facilities.

18         MS. CHESLER:  Please don't lead the witness.

19  You can state your objection.  Your objection was

20  outside the 30(b)(6).

21         MS. BONN:  He can answer the question, but

22  it's in his individual capacity, to the extent he

23  understands it.

24         MS. CHESLER:  You can call it that, but that's

25  your objection.

KARYN ABBOTT & ASSOCIATES

```
 1              THE WITNESS:  That's correct.
 2    BY MS. CHESLER:
 3        Q    Does Walmart have a delivery window?
 4        A    Yes.
 5        Q    Do you know what it is?
 6        A    It varies from store to store, believe it or
 7    not.  For the most part, they have a post there from
 8    like 6:00 to 12:00.
 9        Q    Some of the locations deliver to schools,
10    correct?
11        A    That's correct.
12        Q    Do they have delivery windows?
13        A    The only -- well, you could call it a delivery
14    window.  Before the kids start school.
15        Q    How about Smart & Final, do you deliver to
16    Smart & Final?
17        A    Yes.
18        Q    Do they have delivery windows?
19        A    They do.
20        Q    How about Walgreens, do you deliver to them?
21        A    Very few.  Mostly on the shorter routes.
22        Q    But you do make deliveries to Walgreens?
23        A    Yes.
24        Q    And do they have delivery windows?
25        A    Yes.
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 12
PAGE 197

1    Q    Do you deliver to hospitals?

2    A    Yes.

3    Q    Do they have delivery windows?

4    Q    How about Women Infant Children stores, WIC?

5    A    WIC stores, yes.

6    Q    Do they have delivery windows?

7    A    You know, not formally delivery windows, but

8    they want us to be there by a certain time.  But they

9    don't give us a window.  It's not like -- they usually

10   will tell us, you know, to be here before we close,

11   which is like 5:00 for some of them.

12   Q    What happens if you get there after they close?

13   A    Normally, I mean from my experience, you know,

14   when the guys are running their route, if they're not

15   going to make a delivery, usually they will let us

16   know.  So we will reroute them to go make that delivery

17   so we don't miss a delivery.

18   Q    If a place is going to close, then you'll miss

19   the delivery.  You can't deliver if they're closed.

20   A    If the place is closed, yeah, then we won't be

21   able to make the delivery.

22   Q    And you'll reroute them as opposed to bringing

23   them back and just delivering the next day?

24   A    That's correct.

25   Q    Why is that?

KARYN ABBOTT & ASSOCIATES

```
 1      A    Because the customer wants their product that
 2  day.
 3      Q    How about Rite-Aid, do you deliver to Rite-Aid?
 4      A    Yes.
 5      Q    Did they have delivery windows?
 6      A    Yes.
 7      Q    Sprouts?
 8      A    Yes.
 9      Q    Delivery windows?
10      A    Yes.
11      Q    7-Eleven?
12      A    We deliver what we call a cross stock to
13  7-Eleven, not direct to the stores.
14      Q    A cross stock is an Alta Dena facility?
15      A    No.  It's a third party --
16      Q    Distribution?
17      A    -- that we deliver a truckload, and they
18  deliver on their trucks.  But we take it to their
19  warehouse, a third party warehouse for 7-Eleven.
20      Q    Does the third party warehouse have a delivery
21  window?
22      A    Yes.
23      Q    And you deliver to Coffee Bean?
24      A    Yes.
25      Q    Do they have a delivery window?
```

KARYN ABBOTT & ASSOCIATES

1     A     Yes.

2     Q     You deliver to Target?

3     A     Yes.

4     Q     Do they have a delivery window?

5     A     Yes.

6     Q     Any other customers you can think of that you

7  deliver to?

8            MS. BONN:  Object.  Outside the scope.

9            You can answer as an individual.

10           THE WITNESS:  Let me see.  We've got the Alta

11 Dena drive-through dairies, markets, liquor stores, you

12 know, smaller mom-and-pop stores.  I just can't name

13 them all off the top of my head.

14           MS. CHESLER:  No problem.

15    Q     My mom is a manufacturer, so I kind of remember

16 working with her and shipping a little bit.  When we

17 used to do it, we had delivery windows, you know.

18 Companies are receiving products from other people.

19           Does the delivery window also sort of insure

20 that there's not too many trucks in front of you?

21    A     Yes.

22    Q     Okay.  So if you miss a delivery window, you

23 might also be waiting longer to deliver product because

24 there might be three more deliveries in front of you?

25    A     Correct.

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 15
PAGE 200

1    A    Yeah.  If we feel that the driver is, you

2  know, going around maybe a longer way, then yeah, we'll

3  give them a better suggestion.

4    Q    Okay.  How about transport/relay drivers, in

5  the beginning do you provide them similar directions to

6  the locations?

7    A    Yeah, the same thing for the relay guys.  They

8  go to the different branches.  If you're new, they

9  print them on a map and say here is where it's at.

10   Q    And the system that you just explained to me

11  for the transport/relay driver and shipping delivery

12  driver, for the routing, did that change at all between

13  2008 to the present?

14   A    For shipping and relay, no.  It has been the

15  same.

16   Q    Then from 2008 until a little over a year ago,

17  for wholesale, were all the routes preplanned by

18  supervisors?

19   A    Yes.

20   Q    Do the supervisors or Territory Planner, do

21  they ever put a place for rest breaks or lunch break in

22  the route?

23   A    No.

24   Q    So the routes are provided without telling them

25  when to take a break; is that right?

KARYN ABBOTT & ASSOCIATES

```
 1      A    Yes.
 2      Q    Did that change at all between 2008 to the
 3   present?
 4      A    No.
 5      Q    For the drivers that are given routes, are they
 6   allowed to deviate from the route?
 7      A    No.
 8      Q    For any reason?
 9      A    You can for a reason.  It's you must notify
10   supervisor and explain why or if it's directed by one
11   of us.  But if not, we ask you stay, I think, within a
12   half mile of the radius of your route.
13      Q    Did that change at one point to a mile within
14   the route?
15      A    I think -- I think it changed to a mile.  I
16   don't remember the exact date, but I believe so.
17      Q    Currently, is it a mile or a half mile; do you
18   know?
19      A    Currently, I believe it's a mile.
20      Q    Was that in place from 2008 to the present?
21      A    I don't remember about 2008.  It might have
22   changed when we went FDD, I think, to a mile.
23      Q    But always at least half a mile?
24      A    Yeah.
25      Q    So between 2008 to the present, am I correct,
```

KARYN ABBOTT & ASSOCIATES

1    then, that all drivers had to stay within route limits

2    within half a mile to a mile?

3        A    That's correct.

4        Q    Can't deviate from that at any time unless you

5    contact a supervisor, correct?

6             MS. BONN:  Object to form.

7             THE WITNESS:  Well, I mean the driver can

8    deviate, but there's probably going to be

9    repercussions.

10   BY MS. CHESLER:

11       Q    Fair enough.  What are the repercussions?

12       A    It depends.

13       Q    What could they be?

14       A    It depends what he deviated for.

15       Q    I understand.  So it's a policy then --

16       A    That's correct.

17       Q    -- the radius, a half mile to mile, yes?

18       A    Yes.

19       Q    If you break it, you're considered, at least

20   initially, to be in violation of company policy?

21       A    That's correct.

22       Q    Depending on the nature and the reason, it may

23   lead to discipline up to and including termination?

24            MS. BONN:  Object to form.  Object.  Outside

25   the scope.

KARYN ABBOTT & ASSOCIATES

```
 1              THE WITNESS:  Progressive discipline, correct.
 2   BY MS. CHESLER:
 3       Q    Are you aware of any employees who were
 4   terminated for violating the route limits?
 5       A    No.
 6       Q    Are you aware of any employees on suspension
 7   for violating the route limits?
 8       A    No.
 9       Q    Is that something you would be aware of?
10       A    If it falls under my locations, yes.
11       Q    You don't recall anyone in the last month or so
12   being suspended for driving beyond route limits?
13       A    The last month?
14       Q    Are you familiar with Juan Perez?
15       A    Yeah.
16       Q    Didn't he drive outside the route limits?
17       A    Yeah.  But that's not what he was suspended
18   for.
19       Q    But he got in trouble for driving outside the
20   route limits?
21       A    That was part of it.
22       Q    That was part of it?
23       A    Yes.
24       Q    When did he drive outside the route limits?
25            MS. BONN:  Object to form.  Object.  Outside
```

1    the scope.

2           THE WITNESS:  The first time or the second

3    time?

4    BY MS. CHESLER:

5      Q    Both.

6           MS. BONN:  Object to form.  Object.  Outside

7    the scope.

8           THE WITNESS:  The first time I think -- the

9    first time -- oh, gosh, I have it documented.  I can't

10   remember the exact date.

11   BY MS. CHESLER:

12     Q    I don't need the date.  Do you remember why he

13   was deviating?  Sorry.

14          Did he deviate in making a delivery or did he

15   deviate while on a break?

16          MS. BONN:  Object to form.  Object.  Outside

17   the scope.

18          THE WITNESS:  He deviated because he felt it

19   was shorter to go that way.

20   BY MS. CHESLER:

21     Q    The first time?

22     A    That's correct.

23     Q    And the second time he deviated during his

24   lunch break, correct?

25          MS. BONN:  Object to form.  Object.  Outside

KARYN ABBOTT & ASSOCIATES

1     the scope.

2            THE WITNESS:  The second time he deviated to

3     go meet his wife and take her to lunch, correct.

4     BY MS. CHESLER:

5        Q    And he got in trouble for that, right?

6        A    He got -- that was part of it, correct.

7        Q    And then he got suspended?

8            MS. BONN:  Object to form.  Object.  Outside

9     the scope.

10           THE WITNESS:  That's correct.

11    BY MS. CHESLER:

12       Q    So part of the reason he got suspended was for

13    deviating from the route limits during his lunch break,

14    correct?

15       A    No, I wouldn't put it that way.

16       Q    That wasn't part of it?

17       A    He got suspended for stealing time.

18       Q    What time did he steal?

19       A    He took an undocumented break in the morning

20    for about 25 minutes down the street at a donut shop,

21    and then deviated off his route from his last stop in

22    the opposite way to meet his wife and I believe took

23    another hour and 20 minutes there.

24       Q    Okay.  But part of the issue was deviating from

25    the route, correct?

KARYN ABBOTT & ASSOCIATES

```
 1     A     That he went off of route.

 2     Q     Correct?

 3     A     Correct.

 4     Q     Are there any exceptions to the route limit

 5  policy?

 6     A     Manager exceptions or just --

 7     Q     Driver exceptions.  Any exceptions that you

 8  tell drivers that you're allowed to deviate for the

 9  following exceptions.

10     A     Well, you know, road closures.  If a road is

11  closed and you have to go around it.

12     Q     That makes sense.

13           Anything else?

14     A     No.

15     Q     Are you aware of granting any exception to the

16  route limit policy?

17     A     Granting.  If -- I mean it depends on the

18  case.  Say if the driver calls the supervisor/manager

19  and says, you know, something came up or something

20  that's very important, you know.  It all depends on the

21  case.

22     Q     Do the route limits apply to all drivers?

23           MS. BONN:  Object to form.  Object.  Outside

24  the scope.

25           THE WITNESS:  Yes.
```

KARYN ABBOTT & ASSOCIATES

```
 1    BY MS. CHESLER:

 2         Q     Just to make sure we've got this down, it may

 3    have changed between a half mile to a mile, but some

 4    form between a half mile to a mile existed between 2008

 5    to the present, correct?

 6         A     Correct.

 7         Q     I asked you earlier if you remember anyone who

 8    deviated and had an issue with that.  Now we've

 9    identified Juan Perez.

10               Can you remember anybody else who deviated?

11         A     I do not recall, to be honest with you.

12         Q     So you don't recall as you sit here?

13         A     I don't recall.

14               MS. BONN:  It has also been about an hour and

15    a half.  Could we take a break?

16               MS. CHESLER:  Sure.

17                    (At which time a brief recess was taken.)

18    BY MS. CHESLER:

19         Q     How are you doing, Joe?

20         A     I'm doing good.

21         Q     You know, I forgot the to ask you in the

22    beginning.  Did you consume anything either last night

23    or this morning that would affect your ability to

24    testify today?

25         A     No.
```

KARYN ABBOTT & ASSOCIATES

1          The company does review driver performance on

2    its own to evaluate, correct?

3          A    That's correct.

4          Q    Does the company ever meet with drivers to

5    discuss their performance?

6          A    Yes.

7          Q    And has it done that between 2008 and the

8    present?

9          A    Yes.

10         Q    And what kind of things do you discuss with the

11   drivers in that evaluation?

12         A    We'll discuss idle time, miles per gallon, the

13   yard time, basically job performance stuff.

14         Q    What does "idle time" refer to?

15         A    Idle time is when -- let's say if you're at a

16   customer site and you're waiting and you just have the

17   truck running.

18         Q    So is idle time any time the truck is running,

19   while it's on at a standstill?

20         A    When you're at a stop.

21         Q    But the truck is still on?

22         A    That's correct.

23         Q    Miles per gallon is just how much fuel

24   efficiency basically?

25         A    That's correct.

KARYN ABBOTT & ASSOCIATES

1    Q    What does "yard time" refer to?

2    A    Yard time is the amount of time it takes you

3 in the yard from the time you clock in until the time

4 you actually drive out of the facility.

5    Q    What facility?

6    A    City of Industry North, Alta Dena.

7    Q    If it's yard time for San Diego, does that

8 refer to San Diego's yard time?

9    A    Yes, separate by each location.

10    Q    Okay.  But I guess what I'm trying to figure

11 out is the same criteria applies to all locations,

12 correct, yard time, miles per gallon, idle time?

13    A    Correct.

14    Q    Does yard time ever refer to a customer's

15 location?

16    A    No.

17    Q    Do you also -- as part of reviewing driver

18 performance, does the company look at how many

19 deliveries were made in a day?

20    A    Yes.

21    Q    If a driver misses a delivery window, is that

22 something that you look at and review, that the company

23 looks at in reviewing driver performance?

24    A    It's on there, yes.

25    Q    And if a driver doesn't make a delivery on

```
 1    time, misses it entirely, it's closed, does that also

 2    factor into the company's review of driver performance?

 3        A    It measures it on that scorecard, yes,

 4    on-time deliveries.

 5        Q    Does the company post anything for drivers to

 6    see as to how they're performing?

 7            MS. BONN:  Object to form.

 8            THE WITNESS:  We post XATA reports, you know,

 9    that show the miles per gallon, the idle time, stuff

10    like that, yes.

11    BY MS. CHESLER:

12        Q    Where are they posted?

13        A    In the drivers' room.

14        Q    For all drivers?

15        A    Yes.

16        Q    What exactly is posted on there?  You said idle

17    time?

18        A    Yeah, we have idle time out there, yard time,

19    you know, your miles per gallon per driver.  That's

20    pretty much.

21        Q    Efficiency related items?

22        A    Pretty much.

23        Q    And all the drivers can see all the other

24    drivers' efficiency status?

25            MS. BONN:  Object to form.
```

KARYN ABBOTT & ASSOCIATES

1          THE WITNESS:   That's correct.

2   BY MS. CHESLER:

3       Q    Drivers are encouraged to be efficient by the

4   company?

5       A    Yes.

6       Q    The company lets drivers know that efficiency

7   is very important, correct?

8       A    Correct.

9       Q    The company stresses making your delivery

10  windows, correct?

11      A    To a certain degree.

12      Q    What do you mean to a certain degree?

13      A    Even though the customer gives you a broad

14  window, pretty much the company -- we make the windows

15  when we route for the purpose to better help the

16  customer kind of plan their day.

17          So if a window is missed, I mean it's not

18  something that -- you know, we don't sit there and say,

19  "Why did you miss this window?"  No, not to that

20  nature.

21      Q    What happens if a driver misses a window?

22      A    Nothing.

23      Q    Nobody asks the driver, "Why didn't you make

24  the window?"

25      A    Well, yeah.  I mean we'll know if the window

KARYN ABBOTT & ASSOCIATES

1    displays a 'sense of urgency'"?

2        A    Okay.

3        Q    Is that something the company reviews driver

4    performance on?

5        A    We -- I mean we don't do driver performance

6    like one on one.  But, yeah, we do look at uses time

7    wisely, yeah.

8        Q    Are drivers told to display a sense of urgency?

9        A    No.  Drivers are not told to display a sense

10   of urgency, no.

11       Q    Are they expected to by the company?

12       A    No.  You're only expect to be productive.

13       Q    What does it mean to be productive?

14       A    To work smart.

15       Q    Work smart to?

16       A    You know, I'll give you an example.  If a

17   driver is going in to see if the customer wants the

18   order, we ask, you know, grab your hand truck and grab

19   a stack of, for example, the homogenized milk that we

20   know he's going to take and take it in with you, and

21   then see if he wants the rest of their order.  That way

22   you at least have one stack in there already.  So

23   you're being productive.

24       Q    Little things can make a big difference as to

25   time then in a driver's performance, correct?

KARYN ABBOTT & ASSOCIATES

1          MS. BONN:  Object to form.

2          THE WITNESS:  I don't understand that

3     question.

4     BY MS. CHESLER:

5     Q     Well, the example you just gave me seems like

6     something very minor to think of.  Like on your first

7     time in to see the customer, bring a hand truck with

8     some product with you because that will save that little

9     bit of extra time in making the delivery; is that right?

10    A     I wouldn't put it that way.  But, you know, to

11    me it's not minor, because if I have 73 drivers and

12    each one is making a certain amount of deliveries, if

13    it's two minutes you can save from just one trip, you

14    know, it adds up at the end of the day.

15    Q     Two minutes can add up?

16    A     Yes.

17    Q     So two minutes is not minor.  I get that.

18         MS. BONN:  Object to form.

19    BY MS. CHESLER:

20    Q     Is that what you're saying?

21    A     Yeah, of course.  When you're talking pennies,

22    no, it's not.

23    Q     Regardless of whether you recognize this form,

24    the company does do like route ride coaching

25    assessments, correct?

KARYN ABBOTT & ASSOCIATES

1      A      Correct.

2      Q      Where a supervisor will ride with the driver to

3   ensure that the driver -- or to monitor a driver's

4   performance on his route; is that correct?

5      A      Correct.

6      Q      And that was done between 2008 to the present,

7   correct, in some way, shape, or form?

8      A      Correct.

9      Q      For all drivers, correct?

10         MS. BONN:  Object to form.  Object.  Outside

11   the scope.

12         THE WITNESS:  Yes.

13   BY MS. CHESLER:

14      Q      I'll hand you what was previously marked as

15   Exhibit 25.

16              (Deposition Exhibit 25, having been

17              previously marked, is bound separately.)

18   BY MS. CHESLER:

19      Q      Do you recognize this document?

20      A      Yeah, I recognize this document.

21      Q      And what is it?

22      A      It's says Route Ride Coaching Assessment.

23      Q      Have you seen this particular document before,

24   the one filled out for Mr. De La Cueva?

25      A      I haven't seen this one before, no.

KARYN ABBOTT & ASSOCIATES

1    for whether you take -- whether the driver takes his or

2    her meal break?

3        A    No.

4        Q    Why not?

5        A    Because the meals and breaks are pretty much

6    up to the driver discretion when he wants to take them.

7        Q    If during a route ride along where the

8    supervisor is sitting there -- let me back up.

9            It's my understanding that on a route ride

10   along, the supervisor rides with the driver for the

11   entire route for all deliveries?

12       A    That's correct.

13       Q    The beginning to end of the day, yes?

14       A    Yes.

15       Q    What if the driver doesn't take his meal break,

16   does the supervisor say anything?

17       A    I'm pretty sure the supervisor would say

18   something if you don't take your lunch, yes.

19       Q    Then as part of the route ride along, if they

20   see the driver is not taking a meal break, they will say

21   something?

22       A    If they witness it, yes.

23       Q    What if they witness it, say, at the seventh or

24   eighth hour of the day, will the supervisor say

25   something?

KARYN ABBOTT & ASSOCIATES

1      A    Correct.

2      Q    So what was communicated to the drivers between

3  2008 and 2010 with regard to the availability of a meal

4  break?  Take it at your discretion, but before the tenth

5  hour?

6      A    The first one, yes.  If you wish to take the

7  unpaid after the tenth hour, you know -- the first one

8  must be taken.  Then, like you said, you had a third

9  one after 12 hours.

10     Q    Let's focus on the first one.

11          Am I correct, then, that what was communicated

12  to all drivers by the company between 2008 and 2010 with

13  respect to just the first meal break was you can take it

14  whenever you want as long as you take it before the

15  tenth hour; is that right?

16          MS. BONN:  Object.  Outside the scope.

17          THE WITNESS:  I wouldn't -- okay.  I don't

18  think those were exact words.  But when the literature

19  started coming out in 2008, that's when we were making

20  them aware of the potential second and third lunch

21  break.

22          Before that, they knew they had 30 minutes of

23  break, 30 minutes of lunch to use at their discretion.

24  BY MS. CHESLER:

25     Q    With respect to the first meal break, what was

KARYN ABBOTT & ASSOCIATES

1    the company policy for all drivers between 2008 and

2    2010?

3        A    Between 2008 and 2010?

4        Q    Yes.

5        A    The company policy, without having the

6    document in front of me, but 2008, the drivers knew

7    that they had 30 minutes available to them to use at

8    their discretion and they had 30 minutes of break

9    available to use at their discretion as well.

10       Q    So 30 minutes for lunch and 30 minutes for

11   breaks between 2008 and 2010; is that right?

12       A    And when we started getting the --

13       Q    I'm just talking about the first lunch break.

14       A    Okay.  Yeah.  Yes.

15       Q    Correct?

16       A    Correct.

17       Q    Was there any policy in place between 2008 to

18   2010 as to when the first lunch should be taken?

19       A    There was a policy that came down 2008 with

20   time frames as to when to take your lunches, but that

21   was never the practice.

22       Q    What was the policy as to time frames between

23   2008 to 2010?

24       A    Without having the documents in front of me, I

25   believe it stated you must take your first lunch

KARYN ABBOTT & ASSOCIATES

1   between the fourth and sixth hour.

2        Q    And what was the practice between 2008 and 2010

3   as to time frames?

4        A    It varied by driver.

5        Q    Sometimes past the sixth hour?

6        A    It varied by driver, yes.

7        Q    But included in that variation, sometimes it

8   would be past the sixth hour worked for some drivers; is

9   that correct?

10            MS. BONN:  Object to form.

11            THE WITNESS:  Correct.

12  BY MS. CHESLER:

13       Q    Why would it be past the sixth hour?

14            MS. BONN:  Object to form.

15            THE WITNESS:  Because that's always been the

16  practice.

17  BY MS. CHESLER:

18       Q    Why was that the practice?

19            MS. BONN:  Object to form.

20            THE WITNESS:  Ever since I've been in the

21  industry, it's been the practice.  It's hard to

22  schedule your lunches in between a certain time when,

23  you know, you might be stuck in a delivery, you might

24  be stuck in a warehouse.  So it's complicated to

25  schedule a lunch at a certain time frame.

KARYN ABBOTT & ASSOCIATES

1   BY MS. CHESLER:

2       Q     Delivery windows make it complicated, too,

3   right?

4       A     They can.

5       Q     The same goes for the breaks; difficult to

6   schedule for the same reasons you've just --

7       A     Not difficult to schedule.  You take a break.

8   I mean it's up to the discretion of the driver, you

9   know.

10      Q     Okay.  Was the practice between 2008 and 2010

11  for all drivers to take the first lunch after a delivery

12  was completed?

13      A     No.  Like I say, it varied with the drivers.

14  It was up to them.

15      Q     But the practice was not to take it between the

16  fourth to sixth hour, correct, between 2008 and 2010?

17           MS. BONN:  Object to form.

18           THE WITNESS:  I would have to review every

19  single driver to answer that.

20  BY MS. CHESLER:

21      Q     Did you make any effort to do that?

22      A     No.

23      Q     Okay.  You said 30-minute breaks.  Is that one

24  30-minute break?  I'm focusing on the time period you

25  gave me, 2008 to 2010, for all drivers.  Is that one

KARYN ABBOTT & ASSOCIATES

1    30-minute break?  Is it two fifteen-minute breaks?  Is

2    it divvied up however you like?

3        A    It's pretty much up to the driver.  If he

4    wants to split it up, combine it with his 30-minute

5    lunch, you know, it's however the driver want to use

6    it.

7        Q    So it can be split up into more than two

8    breaks?  Can they take five breaks during the day?

9        A    Yeah, if they want to take five minutes here

10   and five minutes there.  I mean it's up to the driver.

11       Q    So the policy is that it's up to the driver; is

12   that right?

13       A    No.

14       Q    Okay.  What's the policy between 2008 and 2010

15   with respect to the breaks, not the lunch, the 30-minute

16   break you referred to?

17           MS. BONN:  Object to form.

18           THE WITNESS:  On the handbook, I believe it

19   stated on breaks that you were granted fifteen minutes

20   for every four hours of work.

21   BY MS. CHESLER:

22       Q    Was that the practice for all drivers between

23   2008 and 2010?

24       A    The practice as far as that's what they get or

25   how they were using it?

KARYN ABBOTT & ASSOCIATES

```
 1      A     That's correct.

 2            MS. BONN:   Object to form.

 3  BY MS. CHESLER:

 4      Q     Did that policy, the policy now, change between

 5  2010 to the present?

 6      A     Yes.

 7      Q     How did it change?

 8      A     So in 2011, they rolled out another meals and

 9  breaks policy.  That one, we were asked -- when we met

10  with all drivers, we had waiver forms, which at that

11  point they had the ability to waive the lunch after the

12  tenth hour.

13            But at that point, we did instruct every

14  driver to try and stick to the time frame that was

15  provided by the State of California for the meal

16  breaks.

17            At that point, we told them if you also work

18  more than 12 hours, you have a mandatory

19  30-minute unpaid meal break that you need to take

20  before you clock out.

21      Q     Let me back up for one second.  Sorry.

22            Between 2008 and 2010, you had made reference

23  to a second and possibly a third meal period.  Do you

24  recall that?

25      A     Yes.
```

KARYN ABBOTT & ASSOCIATES

1    Q    What was the policy between 2008 and 2010 for

2    all drivers with respect to the second meal break?

3    A    The policy when it was -- let me see.  I

4    believe the actual policy in the handbook -- I don't

5    think there was any specific language in the handbook

6    as to a second meal break other than it just said your

7    meal periods, in plural.  But there's no specific

8    language in the handbook.

9    Q    Putting aside whether there was language in the

10   handbook, did the company have any policy between 2008

11   to 2010 applicable to all drivers as to when they would

12   get a second meal period?

13   A    Yes.  In early 2008, they came down with the

14   first meals and breaks policy that was supposed to be

15   implemented to everybody.  But after, you know, we had

16   some concerns on the distribution side that weren't too

17   clear, other than we were making the drivers aware of

18   the tenth and twelfth hour lunch, we were still

19   continuing with the practice.

20   Q    You lost me.  I'm going to have to break it

21   down.

22        You said there were some concerns on the

23   distribution side that you weren't clear on with respect

24   to the meal and break policy, correct?

25   A    Correct.

KARYN ABBOTT & ASSOCIATES

1      Q      What were the concerns?

2      A      Scheduling.  Am I supposed to schedule every

3   guy for their lunch?  You know, how am I -- mainly

4   scheduling.  I mean how was I supposed to do that?

5      Q      Why would it be different to schedule all the

6   drivers for their lunches?

7      A      Because now you have to build routes not based

8   on customer needs, but now it's based on driver

9   lunches.

10     Q      Why couldn't you do that or the company do

11  that?

12     A      Because you would probably have a negative

13  impact on your customer base.

14     Q      So before this meal/rest break policy rolled

15  out you said sometime in approximately 2008, correct?

16     A      Yes.

17     Q      You weren't dealing with scheduling lunches or

18  worried about meal/rest breaks before then?

19     A      Before 2008?

20            MS. BONN:  Objection to form.  Object.

21  Outside the scope.

22            MS. CHESLER:  Correct.

23            THE WITNESS:  I'm sorry.  Was I --

24  BY MS. CHESLER:

25     Q      You said it rolled out in 2008, correct?

KARYN ABBOTT & ASSOCIATES

```
 1      A    That's correct.

 2      Q    You said you had some concerns or the company

 3  had some concerns on the distribution side, correct?

 4      A    That's correct.

 5      Q    The company didn't have those concerns before

 6  2008?

 7           MS. BONN:  Object to form.  Object.  Outside

 8  the scope.

 9           THE WITNESS:  Before 2008, we didn't have that

10  policy.

11  BY MS. CHESLER:

12      Q    Was there any meal/rest break policy before

13  2008?

14      A    Yeah, in the employee handbook.

15      Q    In 2008, after this policy came down, did the

16  distribution department make any effort to comply by

17  giving people routes that now specifically said, "Here

18  is where you can take your lunch or how you can take

19  your lunch or rest break"?

20      A    No.

21      Q    Did you make any effort to comply with the

22  policy --

23           MS. BONN:  Object to form.

24  BY MS. CHESLER:

25      Q    -- in any way in 2008?
```

KARYN ABBOTT & ASSOCIATES

102

1      A    Not in 2008, no.

2      Q    When did you first make an effort to comply

3  with the policy?

4      A    2011.  When they came back out in 2011, that's

5  when we were told that we had to try and make the

6  effort to follow the California state law.

7      Q    Who told you that?

8      A    At the time, that would be corporate.  It was

9  mandated by corporate.

10     Q    Who is corporate?

11     A    To be honest with you, I don't have a name.

12 It just came from HR.

13     Q    Who was HR in 2011 telling that they had to

14 make an effort to follow state law with respect to meal

15 and rest breaks?

16     A    HR was telling me, the department manager --

17 well, everybody.  Department managers.

18     Q    All department managers?

19     A    Uh-huh.

20     Q    In all distribution departments?

21         MS. BONN:  Object to form.  Object.  Outside

22 the scope.

23         THE WITNESS:  No.  Just there in my location.

24 BY MS. CHESLER:

25     Q    Do you know one way or another whether HR had

KARYN ABBOTT & ASSOCIATES

103

```
 1              MS. BONN:  Object to form.  Object.  Outside
 2    the scope.
 3              THE WITNESS:  The time frame.
 4    BY MS. CHESLER:
 5        Q    During what time frame?
 6        A    No.  The time frame you had to take it in.
 7        Q    Oh, okay.  So it was the company's
 8    understanding that drivers were exempt from meal and
 9    rest break laws with respect to what time they had to
10    take it in?
11              MS. BONN:  Object to form.  Object.  Outside
12    the scope.
13              THE WITNESS:  Within the time frame that you
14    had to take the breaks, yes, and your lunches.
15    BY MS. CHESLER:
16        Q    And the company had this understanding from
17    2008 until 2011; is that right?
18              MS. BONN:  Object to form.  Object.  Outside
19    the scope.
20              THE WITNESS:  No.
21    BY MS. CHESLER:
22        Q    When did the company have this understanding?
23        A    That was prior to 2008.
24        Q    And then in 2008, the company understood that
25    drivers were supposed to take it during a certain time
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 42
PAGE 227

1   period; is that right?

2       A    2008, the first packet came out, the first

3   literature of it.  But we were still not sure if it was

4   going to affect the distribution part of it.

5       Q    And so the prior practice of taking it whenever

6   you wanted, drivers taking it whenever they wanted,

7   continued as a practice until at least 2011, correct?

8       A    That's correct.

9       Q    And the company was aware of that practice,

10  correct?

11      A    Yes.

12      Q    Did the practice change in 2011?

13      A    Yes.

14      Q    How so?

15      A    For a very short time, we met with all

16  drivers.  They signed waivers.  We told them the time

17  frame.  We said, "We understand there will be some

18  exceptions.  If you are stuck at a customer location

19  and if you can't take your lunch in between that, just

20  call us and let us know," because at the same time, we

21  were in negotiations with the union for a union

22  contract.

23          Then shortly after, in June, the meals and

24  breaks are now governed by our CBA.

25      Q    In June of 2011?

KARYN ABBOTT & ASSOCIATES