1      But it wasn't till 2011 that the actual

2  language said you must take your first one if you wish

3  to skip the second one, which is the tenth hour, but

4  you may still, even signing the waiver, still take the

5  second one, if you wish to, because they're all unpaid.

6  BY MS. CHESLER:

7      Q    You say they're all unpaid.  From 2008 to the

8  present, has the company automatically deducted 30

9  minutes for lunch?

10     A    Yes.

11     Q    And that's stayed consistent from 2008 to the

12 present for all drivers?

13     A    That's correct.

14     Q    In all locations we mentioned?

15          MS. BONN:  Object to form.  Object.  Outside

16 the scope.

17          THE WITNESS:  Yes.

18 BY MS. CHESLER:

19     Q    And the deduction of the 30 minutes happens,

20 regardless of whether or not the driver has actually

21 taken a lunch break; is that right?

22          MS. BONN:  Object to form.

23          THE WITNESS:  It's an automatic deduction.

24 BY MS. CHESLER:

25     Q    Meaning that it's automatically deducted

1    irrespective if someone has clocked in or out for lunch,

2    correct?

3              MS. BONN:  Object to form.

4              THE WITNESS:  I don't understand the question.

5    BY MS. CHESLER:

6        Q    What do you mean by it's an automatic

7    deduction?

8        A    That means, you know, when you clock in that

9    day for work and you clock out, 30 minutes is

10   automatically deducted off your day.

11       Q    And that was consistent from 2008 to the

12   present as to all drivers in all locations, correct?

13             MS. BONN:  Object.  Outside the scope.

14             THE WITNESS:  Yes.

15   BY MS. CHESLER:

16       Q    In 2011, prior to the CBA coming into effect,

17   what was the company's practice as to the first meal

18   break for all drivers?  Well, I guess I should say, was

19   there a practice?

20             MS. BONN:  Object to form.

21             THE WITNESS:  Well, in 2011, that's when we

22   rolled it out, and we were trying to comply with the

23   state law as much as possible to try and stay within

24   the time frame of the first meal break.

25             Once again, when we had the waiver signed for

KARYN ABBOTT & ASSOCIATES

1   the meal at the tenth hour, and there was a mandatory

2   third after the twelfth hour.

3   BY MS. CHESLER:

4       Q    You say you were trying to comply as much as

5   possible?

6       A    Yeah, you know.  If a guy got stuck inside a

7   Ralphs warehouse, and it's between four to six hours --

8   I mean there's guys that get stuck in there three,

9   three-and-a-half hours.  So we said, "Just as soon as

10  you get out, find the safest place and take your

11  lunch."

12      Q    And that was the practice.  It would happen

13  that drivers couldn't take it between the fourth and

14  sixth hour, correct?

15          MS. BONN:  Object to form.

16          THE WITNESS:  I'm sorry.

17  BY MS. CHESLER:

18      Q    Well, let me back up for a second.

19          You explained the issue before.  The reason the

20  practice before was that the first meal break wouldn't

21  fall between the fourth and sixth hour is because there

22  were various general business industry issues, like

23  meeting a customer delivery window, traffic.  You might

24  be in the middle of a delivery.

25      A    Right.

KARYN ABBOTT & ASSOCIATES

1     Q    Did any of those things change after 2011,

2  those issues?

3     A    No, the issues were still there, but we were

4  told that we had to follow the state law in 2011.

5     Q    So what effort was made then to combat those

6  issues to comply with the four-to-six hour requirement

7  from 2011 moving forward?

8     A    What do you mean efforts?  You mean efforts as

9  far as the routes?

10    Q    Yes.

11    A    Nothing.

12    Q    Any other efforts?

13    A    No.  The routes were left alone.  We told the

14  drivers -- I mean the drivers could plan their day.  I

15  mean they do the same stuff everyday.  So they can plan

16  their day pretty good.

17         We said, "Look, try and take your lunch, the

18  first one, between the fourth and sixth hour, and if

19  you can't, let us know."

20    Q    So are drivers supposed to call -- does the

21  company require drivers to contact somebody if they

22  can't get the lunch between the fourth and sixth hour?

23    A    As much as possible, yeah.  We would say,

24  "Just give us a heads up, if you can.  That way if we

25  get questioned, we have an answer to it."

KARYN ABBOTT & ASSOCIATES

```
 1      A    I wouldn't be able to tell you a percentage on
 2  that.
 3      Q    The employees that were unable to take the
 4  break between the fourth and sixth hour, at any time
 5  between 2008 to the present, for all drivers, did the
 6  company pay an extra hour if they took it later than the
 7  sixth hour?
 8      A    Employees that were not able to take the lunch
 9  break?
10      Q    Yes.
11      A    From my experience, I never ran into that
12  problem.
13      Q    You never ran into what problem?
14      A    That the employee wasn't able to take the
15  break or lunch.
16      Q    No, no.  I'm focusing on -- earlier you said
17  that the policy at one point had a time frame; take it
18  between the fourth and sixth hour.  Given the nature of
19  distribution, it's really difficult to comply, correct?
20          MS. BONN:  Object to form.
21          THE WITNESS:  I mean not difficult, but it's
22  hard, yeah.
23  BY MS. CHESLER:
24      Q    Not easy, correct?
25      A    Not easy, right.
```

KARYN ABBOTT & ASSOCIATES

1          MS. BONN:  Object to form.

2          THE WITNESS:  If he doesn't take his lunch at

3    all?

4    BY MS. CHESLER:

5      Q    No, no.  He took his lunch, but he just took it

6    at hour eight.  Does he get an extra hour of pay?

7      A    If he took it after the eighth hour but he

8    took it?

9      Q    Yes.

10     A    No.

11     Q    No, he doesn't get an extra hour of pay?

12     A    No.

13     Q    Correct?

14     A    Correct.

15     Q    What if he didn't take it at all?

16     A    From my experience, I've never had that

17   problem, where a driver didn't take his lunch at all.

18     Q    You've never in all the time you've worked at

19   the company experienced a driver not take a lunch break?

20         MS. BONN:  Object to form.

21         THE WITNESS:  In my experience, no.

22   BY MS. CHESLER:

23     Q    Just to be clear, did the company ever change

24   the routes in an effort to help drivers take a meal

25   break between the fourth and sixth hour?

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 49
PAGE 234

1          MS. BONN:  Object to form.  Object.  Outside

2     the scope.

3          THE WITNESS:  No.

4     BY MS. CHESLER:

5      Q    Did the company do anything from 2008 to the

6     present to make sure the drivers got their meal break

7     within the first six hours?

8      A    From 2008 to present?

9      Q    Uh-huh.

10     A    That they got their first meal break.  No,

11    because we left it up to the driver.

12     Q    What is the company's policy with respect to a

13    driver that missed a meal period entirely, was unable to

14    take it?  Do they get an extra hour of pay for that?

15         MS. BONN:  Object to form.

16         THE WITNESS:  If it was to happen and the

17    driver decides not to take his lunch, then we would

18    have to add the automatic deduction back in, plus an

19    extra hour.

20    BY MS. CHESLER:

21     Q    Was that actually done; do you know?

22     A    From my experience, I've never -- from my

23    experience, no.

24     Q    In your experience, that was not done?

25     A    Correct.

KARYN ABBOTT & ASSOCIATES

1    what we call an equipment manager.

2        Q    In 2009, what was her role?

3        A    She was a distribution supervisor.

4        Q    She says, "Matt and Randy, here are the drivers

5    who continue to either not take lunch or take less than

6    30 minutes.  Please help me correct this problem."

7             Did that not cause you to think that there were

8    drivers who were not taking a lunch or taking less than

9    30 minutes?

10       A    No.  The problem with this E-mail is that --

11   you know, we need to be careful when we send E-mails.

12   But the drivers are not documenting their lunch in

13   XATA.

14       Q    How do you know that?

15       A    The E-mail was sent to me.  After you

16   investigate it, you know, you reach out to the drivers

17   and you talk to them and figure out, "No.  I took my

18   lunch.  I just didn't document it in XATA."

19       Q    Did you investigate it?

20       A    The ones that belonged to my location, yes.

21       Q    Well, let's turn the page.  The second page, I

22   see COI at the top.  Is that City of Industry?

23       A    Yes.

24       Q    And then Highland?

25       A    Yes.

KARYN ABBOTT & ASSOCIATES

1    first, here is where you're going second," some people

2    have a lot, some just have a few, right?  Correct?

3           MS. BONN:  Objection to form.

4           THE WITNESS:  Correct.

5    BY MS. CHESLER:

6      Q    And that didn't change between 2008 and the

7    present, right?

8           MS. BONN:  Object to form.

9           THE WITNESS:  As far as number of stops?

10   BY MS. CHESLER:

11     Q    No.  Just as far as the basic idea that each

12   driver is told, "Here is your deliveries, here is who

13   you're supposed to go to, here is where you're supposed

14   to go, and the order you're supposed to do it in,"

15   correct?

16     A    On the wholesale side, correct.

17     Q    How about on the other two sides?

18     A    On the shipping side, more than likely, you

19   might get two customers, depending on the appointments,

20   and then that might change depending on if you get

21   stuck at the appointment and we might change it when

22   you come back.

23     Q    For all of the drivers, at least, the route is

24   dictated by the company, correct?

25     A    Correct.

KARYN ABBOTT & ASSOCIATES

1    Q    Who they're going to, correct?

2    A    Correct.

3    Q    The order they're going in?

4    A    Correct.

5    Q    The way they're taking for the most part,

6    correct?

7    A    Correct.

8    Q    At any time between 2008 to the present, did

9    the company then tell the drivers or factor in a half

10   hour for lunch on that route?

11        MS. BONN:  Object to form.

12        THE WITNESS:  Factor in -- I just want to make

13   sure I answer it correct.

14        It was taken into consideration, yeah.  We

15   would say this route should take ten hours, so we would

16   say 11 hours.  But that's not -- we didn't have the

17   ability to dispatch like that because we didn't have

18   that Territory Planner.

19   BY MS. CHESLER:

20   Q    When you say it should take ten hours and we

21   add an extra hour, I don't understand.  Do you tell the

22   driver that you have 11 hours to complete this route?

23   A    In some cases, yeah.  I mean we would post

24   them out there.  When they've been on the routes, this

25   is your route.  It's a Friday.  We built the routes

KARYN ABBOTT & ASSOCIATES

1  lunch, four, five, six?

2     A    Because, like I said, it's always been the

3  practice just to leave it up to the driver when he

4  wants to take his lunch and his breaks.

5     Q    Why?

6     A    That's always been the practice because it's

7  more convenient for the driver.

8     Q    Why?

9     A    Some drivers, believe it or not, want to skip

10  traffic.  They want to get out to the first stop.  They

11  want to come back closer to the facility and take their

12  lunch at the facility so they can skip traffic.  They

13  want to get to a certain customer before a certain

14  vendor gets there because then they're going to have to

15  wait there for an hour.  It's going to vary by driver.

16     Q    What happens if they wait there for an hour?

17     A    Nothing.  They're on delay.

18     Q    And delay is counted against them, correct?

19          MS. BONN:  Object to form.

20          THE WITNESS:  No.  It's a delay.  It's out of

21  your control.

22  BY MS. CHESLER:

23     Q    If you're delayed at one customer for an hour,

24  does that affect the rest of your route?

25     A    Yes.  It's going to push everybody else, you

KARYN ABBOTT & ASSOCIATES

```
 1    know, up an hour as far as what time you're going to

 2    get your delivery.

 3         Q    You may even miss the last delivery?

 4              MS. BONN:  Object to form.

 5              THE WITNESS:  No, we don't build the routes

 6    that heavy.  Our routes are normally built, I'm going

 7    to say, seven stops on the whole.  So we know that

 8    unless there's a catastrophic event, then you might not

 9    be able to finish the route.

10    BY MS. CHESLER:

11         Q    You kind of made reference to shifts earlier.

12    Are there sort of like set shifts, morning shift,

13    evening shift?

14         A    Yes.

15         Q    What are they?

16         A    I've got drivers that start as early as

17    midnight and, you know, from every half hour to an hour

18    until about 6:00, 7:00 in the morning.

19         Q    What are the built-in shifts?  Are there

20    built-in shifts, like is there an a.m. shift, a p.m.

21    shift?

22         A    All my wholesale drivers we consider all

23    morning shifts.

24         Q    When does the morning shift start?

25         A    As early as midnight.
```

KARYN ABBOTT & ASSOCIATES

```
 1              Oh, why was that system put in place?
 2       A    XATA, that was a corporate decision.  I don't
 3  know exactly why they put it in place.  I mean I would
 4  be making assumption.  But I know it came from
 5  corporate and it was a directive from corporate.
 6       Q    What does XATA do?
 7       A    XATA is an onboard computer that's on your
 8  truck.  Basically, it does from reporting to keeping
 9  driver reports to keeping vehicle reports.
10       Q    It documents pretty much everywhere the truck
11  goes, correct?
12       A    This model of XATA, it's a web based.  It's
13  GPS, correct.
14       Q    So the company pretty much monitors with the
15  use of XATA every movement that truck makes, right?
16       A    Correct.
17       Q    And once XATA was put in place sometime in
18  2008, it remained in place to the present, correct?
19       A    It's still in place, correct.
20       Q    Once it was put in place, were drivers
21  instructed to log their meal breaks in XATA?
22       A    That was part of it.  They were instructed to
23  log their lunches and as many breaks as possible.
24       Q    So page 5298.  Do you have in front of you?
25       A    5298.
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 56
PAGE 241

1   2009, I mean it wasn't.

2   BY MS. CHESLER:

3       Q     So am I understanding correct that when we

4   focus on 2008 to the present -- are you with me?

5       A     Yes.

6       Q     All drivers -- are you with me?

7       A     Yes.

8       Q     Other than the short period from January 2011

9   to about June 2011, the practice was lunch was made

10  available any time before the tenth hour; is that

11  correct?

12      A     Other than a short time frame, 2008, the

13  practice was, yes, take your lunch and your breaks.

14  After 2008, when we started telling them about the

15  potential second and third lunch, then it was take it

16  before the tenth hour, correct.

17      Q     So my statement was correct, right?

18      A     That's correct.  For those individuals that

19  worked, you know, over ten hours, correct.

20      Q     Was there a different policy or practice for

21  employees that worked less than ten hours?

22      A     No.  If you had a guy that worked less than

23  ten hours or nine hours, he probably was going to take

24  his lunch before the ninth hour.

25      Q     Before what?

KARYN ABBOTT & ASSOCIATES

```
 1      A     The ninth hour.
 2      Q     Okay.  So am I correct that the practice was --
 3   other than January 2011 to June 2011, from 2008 to the
 4   present, the practice was your lunch was available at
 5   any time before the eleventh hour of work?
 6            MS. BONN:  Object to form.
 7            THE WITNESS:  Tenth.
 8   BY MS. CHESLER:
 9      Q     I'm sorry.  Tenth hour of work, correct?
10      A     Correct.  It's available at your discretion to
11   use whenever you want.
12            MS. BONN:  Can we take our lunch break?
13            MS. CHESLER:  Sure.  I just have a couple more
14   questions on this one.
15            I'll hand you what we'll mark as Exhibit 61.
16               (Deposition Exhibit 61 was marked
17               for identification by the reporter and
18               is bound separately.)
19   BY MS. CHESLER:
20      Q     I'm sorry.  Backing up for a quick second, you
21   conducted your investigation after Exhibit 60 and you
22   discovered, according to you, that everyone took their
23   break, they just didn't log it, correct?
24      A     From my location, correct.
25      Q     Did you report that to anybody, your findings?
```

KARYN ABBOTT & ASSOCIATES

```
 1              (At the time of 2:31 p.m., the

 2         deposition of JOSE LLAMAS was resumed at

 3         the same location, the same parties being

 4         present.)

 5                            *

 6                   EXAMINATION  (Resumed)

 7   BY MS. CHESLER:

 8         Q    Are you ready to go forward?

 9         A    Yes.

10         Q    Did you have a good lunch?

11         A    It was good.

12         Q    Did you consume anything that would affect your

13   ability to give your best testimony?

14         A    No.

15         Q    Any other reason you can't continue to give

16   your best testimony?

17         A    No.

18         Q    Earlier, we talked about how between 2008 and

19   2012, the 30 minutes were -- sorry.  Strike that.

20              Am I correct that between 2008 and 2012, for

21   all drivers in all locations, the meal break policy

22   included that 30 minutes would be deducted from pay

23   automatically, regardless of whether you clocked out for

24   lunch?  Is that correct?

25              MS. BONN:  Object to form.  Object.  Outside
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 59
PAGE 244

1    the scope.

2            THE WITNESS:  It was an automatic deduction in

3    Kronos, correct.

4    BY MS. CHESLER:

5        Q    So my statement was correct?

6        A    Correct.

7        Q    And that continues to today, correct?

8        A    Correct.

9        Q    Then my other question for you is:  When you do

10   have someone who is combining breaks, let's say they log

11   out of XATA for an hour because they've combined their

12   two fifteen minutes and their lunch, as part of the

13   company's meal break policy, are they compensated for

14   part of that hour or is it the entire hour deducted?

15           MS. BONN:  Object to form.

16           THE WITNESS:  It's only the half hour that's

17   deducted.

18   BY MS. CHESLER:

19       Q    How does the company know to do that?

20           MS. BONN:  Objection.  Outside the scope.

21           THE WITNESS:  Because you're given the breaks.

22   It's only a meal that's deducted.

23   BY MS. CHESLER:

24       Q    Okay.  Are they paid based on the hours worked

25   as reflected in XATA?

KARYN ABBOTT & ASSOCIATES

```
 1            THE WITNESS:  All that gets fed into Kronos is
 2   the clock in and out from XATA, correct.
 3   BY MS. CHESLER:
 4      Q    And then can Kronos deducts 30 minutes
 5   automatically for lunch, correct?
 6      A    Correct.
 7      Q    And that was true --
 8           When did Kronos come into play again?  I'm
 9   sorry.  Sometime in 2008?
10      A    No.  Kronos has been, I think, ever since I've
11   been at the company in total.  2001 maybe.
12      Q    So is it true, then, that as part of the meal
13   and break policy, ever since 2008 to the present, since
14   you've had Kronos, 30 minutes is automatically deducted
15   for lunch for all drivers in all locations?
16           MS. BONN:  Objection.  Outside the scope.
17           THE WITNESS:  Correct.
18   BY MS. CHESLER:
19      Q    And how does a driver clock out for a meal
20   break?
21      A    They log into XATA.  They don't technically
22   clock out because it doesn't feed into Kronos once
23   you're out on the route.  But you log it into XATA.
24      Q    The company disciplines for failing to log into
25   XATA, correct, the meal break?
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 61
PAGE 246

1    and as many breaks as possible.  But it does not tell

2    you what actions to take.

3    BY MS. CHESLER:

4        Q    So is it your testimony that the company has no

5    policy of issuing a corrective action notice for failure

6    to either take a meal break or log a meal break into

7    XATA?

8            MS. BONN:  Object to form.

9            THE WITNESS:  It's on the SOP, but it's to the

10   manager's discretion if you want to deem it job

11   performance.

12   BY MS. CHESLER:

13       Q    What does that mean?

14       A    That means if it's job performance, you simply

15   just keep forgetting.  The tools are there, but if you

16   keep forgetting, it becomes job performance now.

17       Q    Meaning you will receive a corrective action

18   notice?

19       A    It's up to the manager's discretion.  But it

20   doesn't state that in the policy.

21       Q    Going to Exhibit 62, you received this E-mail,

22   correct?

23       A    Yes, I was copied on it.

24       Q    And Ms. Jimenez continues to note there are

25   drivers who are not following the meal break policy?

KARYN ABBOTT & ASSOCIATES

1      A      Correct.

2      Q      Do you recall -- do you know whether there was

3  an investigation conducted into whether any of these

4  drivers complied with the policy?

5      A      I do not, to be honest with you.

6      Q      Do you know if any of the drivers were spoken

7  to about not having a break or meal break or taking less

8  than 30 minutes?

9      A      On this one, no, to be honest with you.

10      Q      Between 2008 and 2012, what would be the

11  company's policy in handling a situation like this?

12      A      Huh, 2008 and 2012.

13      Q      Sorry.  2008 to the present.

14      A      What would be the -- handling something

15  similar to this?

16      Q      Yes, drivers who you show on XATA are either

17  not, according to XATA, taking a meal break at all or

18  taking less than 30 minutes.

19      A      Well, it depends on the outcome after you

20  investigate, you know, the driver.  You have to ask

21  him.  If he says, "I input it" and he's sticking to his

22  word, I mean, and he says for some reason, you know.

23          With GPS, there's going to be glitches in the

24  system.  If you're in a dead zone, it's not going to

25  pick it up.

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 63
PAGE 248

1    present?

2        A    Yes.

3        Q    Okay.   During what period did the company

4    obtained signed meal period waivers for the second meal

5    period?

6        A    These went out January of 2011.

7        Q    Any time prior to January 2011?

8        A    No.

9        Q    I think we covered this before, but just to

10   make sure, at no time between 2008 to the present did

11   the company ever have a policy or a practice of

12   providing drivers a route that included a stop for

13   lunch; is that correct -- sorry, a stop for a meal

14   break; is that correct?

15           MS. BONN:   Object to form.   Object.   Outside

16   the scope.

17           THE WITNESS:   Not an actual stop, but the time

18   was factored into the whole route.

19   BY MS. CHESLER:

20       Q    By what you described to me before about the

21   customer window, et cetera?

22       A    Correct.

23       Q    But the routes provided to the driver never

24   contained "Here is where you can take 30 minutes for

25   lunch or for a meal," correct?

KARYN ABBOTT & ASSOCIATES

173

```
 1              MS. BONN:  Object to form.
 2              THE WITNESS:  Correct.
 3   BY MS. CHESLER:
 4      Q    I'll hand you what we'll mark as Exhibit 65.
 5              (Deposition Exhibit 65 was marked
 6           for identification by the reporter and
 7           is bound separately.)
 8   BY MS. CHESLER:
 9      Q    Do you recognize this document?
10      A    Yes.  It's an E-mail that Wayne Smith sends
11   out pretty consistent.
12      Q    I'm sorry.
13      A    It's an E-mail that Wayne Smith sends out
14   pretty consistently.
15      Q    But this one is from Nick Van Hoogmoed.
16      A    Yes.
17      Q    Is this something you heard a lot, that this is
18   a penny business?
19      A    Yes.
20      Q    Who did you hear that from?
21      A    Our market general manager.
22      Q    Nick Van Hoogmoed?
23      A    Yes.
24      Q    Did you hear it from Wayne Smith, too?
25      A    I don't recall Wayne Smith.  But just the
```

KARYN ABBOTT & ASSOCIATES

1    meetings in general.

2        Q    Meetings in general that pennies make a

3    difference in this business, correct?

4        A    Correct.

5        Q    Quite often, reports come out examining time

6    and driver time and how the company can improve on

7    driver time, correct?

8        A    Correct.

9        Q    Then if you kindly turn to the next page which

10   says, "Time Standard Results," can you tell me what this

11   report generally shows?

12       A    It's a recap of your clock-in duration,

13   meaning from the time you clock in until you get to

14   your truck, your trip duration, the morning yard time,

15   trip end, and then from the time you finish your trip

16   at the truck till you actually clock out, that's

17   clock-out duration.  Evening yard time, that means the

18   time you get back off your route, and it shows a recap

19   of total yard time.

20       Q    What does excess time refer to?

21       A    Excess hours?

22       Q    Well, there's excess time minutes and excess

23   hours.  I'm assuming that the excess hours is just an

24   explanation of the minutes and hours; is that right?

25       A    Excess time would be based on whatever they

KARYN ABBOTT & ASSOCIATES

1   have set in as a standard.  They feel the excess time

2   is what could be saved, converted into dollars in the

3   bottom.

4        Q    Then the excess time, how does the company

5   determine how much time the driver should take then to

6   complete his or her route?

7        A    Based on time studies that they've done on

8   every driver and every route.

9        Q    Okay.  Any other factors taken into account?

10        A    Well, the time study takes everything into

11   account, you know, from when you start to when you

12   finish.  Then, obviously, you build in any cushions for

13   traffic, you know, or your normal stuff.

14        Q    What's the normal stuff?  What are the cushions

15   that are built in?

16        A    Traffic, rain, depending on the time your

17   route starts, where it's located.

18        Q    Anything else?

19        A    No, not that I can remember right now.

20        Q    Is there anything that you can look at to

21   refresh your recollection?

22        A    If you show me, maybe I could --

23        Q    When you say "not that I can remember right

24   now," I don't know what I can show you.

25        A    Well, I don't remember exactly without looking

1    at everything, I mean, to name everything that they

2    take into consideration.

3        Q    Is there anything you can think of that you

4    could look at that would help you know what the company

5    takes into account in determining how long a driver's

6    schedule should take him?

7        A    No.

8        Q    Just the things you listed for me, correct?

9        A    Yes.

10       Q    If you turn to the next page, am I correct this

11   is a yard management report?

12       A    Time Standard Results.  Yes.

13       Q    And is this sent out weekly?

14            MS. BONN:  Object to form.

15            THE WITNESS:  Don't recall if it's weekly or

16   biweekly, to be honest.

17   BY MS. CHESLER:

18       Q    So either weekly or biweekly it's sent out by

19   the company, correct?

20       A    Normally by Wayne Smith, correct.

21       Q    It covers all Alta Dena facilities in

22   California; is that correct?

23       A    Correct.

24       Q    Does it cover all the locations you identified

25   for me earlier in California, including Swiss Dairy and

KARYN ABBOTT & ASSOCIATES

1   Heartland?

2           MS. BONN:  Object.  Outside the scope.

3           THE WITNESS:  Correct.

4   BY MS. CHESLER:

5       Q    And you receive this when it goes out, correct?

6       A    Correct.

7       Q    Who else receives this when the company sends

8   it out?

9       A    It should be everybody on the distribution

10   list from supervisors to managers.  I don't know the

11   exact names of everybody.

12       Q    Can you tell me what this report shows, not

13   this one in particular, but generally what these

14   categories mean and what kind of information the company

15   gleans from this?

16       A    It's the same thing as we just discussed.

17   Instead of showing you the recap on top, now it's

18   giving you have the breakdown per driver, clock-in

19   duration, tells you how long, the date, trip, tells you

20   his pretrip.  It tells you how long he was actually

21   logged on in the pretrip under XATA, morning yard time,

22   and it just goes into detail by driver.

23       Q    Are these posted anywhere for drivers to see?

24       A    Yeah.  The bottom piece we do post at times

25   out on the board in the drivers' room.

1       A       Yes, this is all populated from XATA, correct.

2       Q       Am I correct that meals are logged into XATA as

3    a delay?

4       A       That's correct.

5       Q       Then why do they not come up under delay time?

6       A       That I wouldn't know.  You would have to ask

7    Wayne, because I don't know what he includes only or

8    how he pulls his reports to get that number.

9       Q       So then you don't know one way or another if

10   the meal period is included on the delay time; is that

11   right?

12      A       I know the meal period is not, but I don't

13   know what he includes; what else.  He told us when we

14   asked him about time, he said this is customer delays

15   and this is plant delays.

16      Q       What did you ask?

17      A       We asked Wayne that question.

18      Q       What question?

19      A       I said we asked Wayne, "Does this include

20   breaks and meals?"  And he said, "No.  Only plant

21   delays or customer delays."

22      Q       The clock-in duration; do you see that?

23      A       Yes.

24      Q       And the trip end duration?

25      A       Yes.

1    management reports get posted, don't worry, your meal

2    rest/breaks have been factored into this equation and

3    are not counted towards the time?

4        A    Are not counted towards what time?

5        Q    The time in the yard management report.

6        A    Yeah.  They wouldn't be counted in the yard

7    time.

8        Q    My question is:  Are you aware of the company

9    taking any steps to inform any driver between 2008 and

10   the present that it's not factored -- that the meal and

11   rest breaks are not factored into the yard management

12   report?

13       A    No.

14       Q    Are there any incentives to managers or the

15   drivers themselves to hit certain goals?

16            MS. BONN:  Object to form.

17            MS. CHESLER:  Between 2008 and the present.

18            THE WITNESS:  Incentives for managers?

19   BY MS. CHESLER:

20       Q    Sure, we'll start with managers.

21       A    No.

22       Q    Does anyone in the company review the time

23   management of drivers and review supervisors as to that

24   performance in any way, shape, or form?

25            MS. BONN:  Object to form.  Object.  Outside

                    KARYN ABBOTT & ASSOCIATES

1    do, and come back with suggestions.

2         Q     Ultimately, suggestions to improve time

3    efficiency, correct?

4         A     To improve costs, correct.

5         Q     Time efficiency being a factor of cost,

6    correct?

7         A     Correct.

8         Q     And that's something that Wayne Smith and Nick

9    Van Hoogmoed stressed to the supervisors, correct?

10        A     Correct.

11        Q     Something you heard or supervisors of drivers

12   heard quite often from Van Hoogmoed and Smith was

13   improve time, improve time, improve time, correct?

14        A     Correct.

15        Q     And supervisor compensation is in some way tied

16   to performance of meeting efficiency goals; is that

17   correct?

18             MS. BONN:  Object to form.  Object.  Outside

19   the scope.

20             You can answer in your individual capacity.

21             THE WITNESS:  I'm sorry.  When you say

22   supervisor compensation, what do you mean?

23   BY MS. CHESLER:

24        Q     Bonuses, advancement in the company --

25             MS. BONN:  Object to form.  Object.  Outside

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 72
PAGE 257

```
 1       Q    Am I right that the people in the company

 2   between 2008 to the present that sort of were in charge

 3   of efficiency with respect to drivers, at the top of

 4   that pyramid would be either Nick Van Hoogmoed or Wayne

 5   Smith?

 6            MS. BONN:   Object to form.   Object.   Outside

 7   the scope.

 8            You can answer as an individual.

 9            THE WITNESS:   From what time frame did you

10   say?

11   BY MS. CHESLER:

12       Q    2008 to the present.

13       A    I don't recall when Wayne Smith and Nick

14   started, to be honest with you.

15       Q    They both worked at the same time?

16       A    They almost came in at the same time.

17       Q    And they perform the same function essentially?

18       A    No.

19       Q    Does one report to the other?

20       A    No.

21       Q    What do they do exactly?

22       A    Nick Van Hoogmoed is what we call the market

23   general manager, and Wayne Smith is the distribution

24   regional -- distribution regional director.

25       Q    Wayne Smith is the distribution regional
```

KARYN ABBOTT & ASSOCIATES

1    director?

2        A    Yes.

3        Q    So he's in charge of what region?

4        A    The southwest region.

5        Q    For Alta Dena, Swiss, and everybody you

6    mentioned?

7        A    Plus Berkeley Farms, Hawaii, Meadow Gold, Las

8    Vegas, yeah.

9        Q    What was Nick?

10       A    Market general manager.

11       Q    Market general manager.  What area was he

12   charged with?

13       A    The ones that I mentioned earlier, the

14   Riverside, Heartland, Swiss.

15       Q    So everyone in California?

16       A    Correct.

17       Q    Also, look at fuel management on this form.

18   That's something that gets measured, correct?

19       A    Correct.

20       Q    The goal is to keep fuel management down?

21       A    Correct.

22       Q    Is that the reason for the one mile -- half

23   mile or mile limit --

24       A    The mile radius.

25       Q    -- on the lunches?

KARYN ABBOTT & ASSOCIATES

```
 1      A     Yeah.

 2      Q     But not all?

 3      A     Some might say, "No.  Move your truck out of

 4  the way or park across the street."  It depends on the

 5  customer.

 6      Q     How big are the trucks these guys are driving?

 7      A     My wholesale drive 28-foot trucks, two axles.

 8      Q     So I'm correct it's not the easiest thing to

 9  find parking for it, correct?

10      A     Yeah.  I mean they're not that big.  It's not

11  a 45-foot trailer.

12      Q     Has anyone ever done this that you're

13  aware of, left the truck somewhere and called to be

14  picked up?

15      A     I think I've had one or two guys that called

16  and said, "Is it okay to leave it?"

17            I said, "As long as it's safe and you don't

18  get towed," you know.

19      Q     Which guys are those?

20      A     Oh, if I can recall, I'm going to say probably

21  Bernie Nunez did it once.  I don't recall when.

22  But the other individual -- I don't recall who the

23  other guy was.  It doesn't happen all the time, but it

24  does happen.

25      Q     Other than Bernie Nunez and one other employee
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 75
PAGE 260

1    you can't remember, are you aware of anyone else who has

2    done this?

3        A    No, I can't.

4        Q    I read somewhere that you're supposed to keep

5    the truck within a certain mile distance of yourself.

6    Am I wrong on that, according to company policy?

7        A    The truck is supposed to stay, I think it

8    says, within a mile radius of your route.

9        Q    No, no.  I thought, and correct me if I'm

10   wrong, there was a company policy that requires the

11   driver to say within a certain radius of the truck.

12       A    I don't recall.

13       Q    Do you know that one way or another?

14       A    I don't know, no.

15       Q    Did I hear you say if a driver is going to do

16   this, they're supposed to first get permission from the

17   supervisor; is that right?

18           MS. BONN:  Object to form.

19           THE WITNESS:  That would be the process.  If

20   you're going to leave the truck unattended, that way we

21   don't to get a phone call saying, "Your truck is

22   abandoned and nobody is around."

23   BY MS. CHESLER:

24       Q    Why would you get a phone call saying, "Your

25   truck is abandoned and nobody is around"?

KARYN ABBOTT & ASSOCIATES

1      A     Because customers calls all the time when they

2   see trucks parked in areas, you know.  It's happened.

3   We've gotten calls before when guys are in the front of

4   the store.

5      Q     So are drivers not supposed to leave trucks

6   unattended?

7            MS. BONN:  Object to form.

8            THE WITNESS:  Drivers can leave.  If they go

9   on break or lunch, they can leave their truck as long

10  as they lock it.

11  BY MS. CHESLER:

12     Q     Turn to the next page, 17228.  Time management

13  is the first major component listed on the driver's

14  scorecard; is that correct?

15     A     Yes.

16     Q     It's considered a major component of the

17  driver's scorecard, correct?

18     A     Correct.

19     Q     Are these scorecards then filled out and

20  communicated to the individual drivers?

21     A     These scorecards are populated by XATA.

22     Q     Then what happens to them?

23     A     Then once a month, we print them.  It's a

24  maybe ten-minute brief discussion/overview with the

25  driver.

KARYN ABBOTT & ASSOCIATES

1      Q    In that discussion, time management is

2    something that's reviewed, correct?

3      A    Correct.

4      Q    Prior to the scorecard, it's also something

5    that is reviewed, albeit not on this form, correct?

6      A    I believe it's something that was discussed on

7    the route ride, correct.

8      Q    If you turn to page 17245, do you see there is

9    actual trip hours and planned trip hours and then the

10   difference between them, correct?

11     A    Yes.

12     Q    Is 30 minutes deducted from that for meals?

13          MS. BONN:  Objection to form.

14          THE WITNESS:  I don't know.

15   BY MS. CHESLER:

16     Q    How is the scoring done?  Can you explain that

17   to me, the plus/minus?

18     A    The scoring.  The scoring on the whole card

19   or --

20     Q    Yes.  Sorry.

21     A    You know, I wouldn't be able to give you the

22   breakdown on that.  I don't know the scoring.  It's by

23   bucket, you know.

24     Q    Well, ultimately a score is put together based

25   on all the items in the scorecard, correct?

KARYN ABBOTT & ASSOCIATES

1    evaluations, correct?

2        A    Correct.

3        Q    And doing well on time was stressed, correct?

4            MS. BONN:  Object to form.

5            THE WITNESS:  It was a topic, correct.

6    BY MS. CHESLER:

7        Q    But it was stressed, correct?  It was

8    important?

9            MS. BONN:  Object.

10            THE WITNESS:  It's important, yeah.  It was a

11    topic, correct.

12    BY MS. CHESLER:

13        Q    And communicated to drivers that it's

14    important?

15        A    Correct.

16        Q    Then am I correct that with or without the

17    scorecard, from 2008 to the present, it has always been

18    communicated to drivers by the company that time

19    efficiency is important?

20            MS. BONN:  Object to form.

21            THE WITNESS:  Correct.

22    BY MS. CHESLER:

23        Q    The same with fuel management.  Fuel management

24    is important, correct?

25        A    That's correct.

1     Q     Do you see Mr. Smith says, "You should be using

2  this to monitor if breaks are being monitored each day"?

3     A     Yes.

4     Q     So Mr. Smith expected the supervisors to look

5  through XATA and see if drivers are logging breaks,

6  correct?

7     A     No.  I believe what drove this was when we got

8  away from the manual logs, because this is what took

9  the place on the manual log, before, you know, the

10  driver would jot down and put lunch on there on the log

11  so we could see it on the log.

12        When he was driving, we're like how do you

13  know now?  When you pull a log here, it doesn't show

14  you their breaks on the log.  You actually have to pull

15  the break report to see it.

16     Q     So Mr. Smith was telling supervisors you're

17  supposed to pull the break reports to see if they're

18  taking their breaks or logging their breaks?

19     A     He was just showing us how because this is

20  when it was first implemented, 2008.

21     Q     It says, "You should be using this to monitor

22  if breaks are being monitored each day."  So he's asking

23  supervisors -- let me try it an easier way.

24        Since the implementation of XATA, the company

25  practice was that supervisors would review some form of

KARYN ABBOTT & ASSOCIATES

1    report to see if drivers were logging their break

2    regularly, correct?

3        A    Prior to XATA?

4        Q    No, no.  Once XATA was implemented.

5        A    When XATA was first implemented, very shortly

6    after when we had Norma.  But when it first

7    implemented, it was like a spot check.  It wasn't a

8    daily thing.

9        Q    A spot check, company practice, correct?

10       A    Correct.

11       Q    A spot check, correct?

12       A    Correct.

13       Q    A spot check means how often?

14       A    Twice a week, you know, possibly three,

15   depending on how busy.

16       Q    Then did that increase at any point?

17       A    Yes.

18       Q    When did that increase?

19       A    For the Alta Dena City of Industry location,

20   when Norma joined us as the distribution supervisor

21   strictly in charge of XATA.

22       Q    When was that?

23       A    Well, I don't recall the exact date, to be

24   honest with you.

25       Q    Well, then, at a minimum, since XATA has been

KARYN ABBOTT & ASSOCIATES

1       A     When XATA first got implemented, yes.  This is

2    a delay report.

3       Q     So from 2008, whenever XATA got implemented,

4    until the present, the company's practice for all

5    drivers has been supervisor spot check at least two to

6    three times a week, the driver delay detail report to

7    monitor whether meal breaks and/or rest breaks have been

8    appropriately logged into XATA, correct?

9              MS. BONN:  Object to form.  Object.  Outside

10   the scope.

11             THE WITNESS:  Except for that time frame where

12   Norma was frequently doing XATA, she was doing it for

13   everybody, she was doing it daily.

14   BY MS. CHESLER:

15      Q     So somebody in the company, some management

16   level employee for the company was spot checking between

17   2008 to the present?

18      A     Yes.

19      Q     Two to three times a week reviewing the whole

20   prior, right, or just that day?

21             MS. BONN:  Object to form.

22             THE WITNESS:  That's current.

23   BY MS. CHESLER:

24      Q     When you say spot check a couple times a week,

25   I deposed Mr. Sanchez and Mr. Sanchez described the

KARYN ABBOTT & ASSOCIATES

```
 1    same.  A couple times a week, he would then pull all the

 2    driver delay reports since the last time he had spot

 3    checked, so that even though he was just now looking at

 4    a later date, he was looking at all days in between such

 5    that every day ultimately gets reviewed at some point.

 6        A    Correct.

 7        Q    Is that right?

 8        A    Correct.

 9        Q    That's the company's practice?

10        A    That's been the practice, correct.

11             MS. BONN:  Can we take a break?

12             MS. CHESLER:  Sure.

13                 (At which time a brief recess was

14             taken, following which Mr. McCaffrey

15             departed the proceedings.)

16    BY MS. CHESLER:

17        Q    How are you doing?

18        A    Good.

19        Q    Any reason why you can't continue to provide

20    your best testimony?

21        A    No.

22        Q    I'm just going to try to move a little quickly

23    through.

24             Amanda, just for the record, I know we had

25    previously talked about trying to knock out some of
```

KARYN ABBOTT & ASSOCIATES

1    these depos in one shot because Mr. Llamas is also a

2    witness to the individual claims, but --

3              MS. BONN:  My understanding is that we talked

4    about agreeing to postpone individual claims.  So my

5    thought is this is just his corporate rep on these

6    topics.

7              MS. CHESLER:  Perfect.

8              MS. BONN:  And then we can deal with his

9    individual depo and the individual topics down the

10   road.

11             MS. CHESLER:  Perfect.  I just wanted to make

12   sure we're on the same page and you were suddenly like

13   "Mr. Llamas is not coming back."

14             Sorry, Mr. Llamas.

15             MS. BONN:  In our view, this is not his

16   individual depo and these are not his individual

17   topics.

18             MS. CHESLER:  Right.  No problem.

19             So I'll hand you what we'll mark as Exhibit

20   69.

21                 (Deposition Exhibit 69 was marked

22             for identification by the reporter and

23             is bound separately.)

24   BY MS. CHESLER:

25      Q    Do you recognize this as a report Mr. Smith

KARYN ABBOTT & ASSOCIATES

1    sent you?

2        A    Yeah.  Yes.

3        Q    Attached it looks like we have an

4    Organizational Time Clock Report.  Do you see that?

5            MS. BONN:  You can look at the whole document,

6    if you want to.

7            THE WITNESS:  Oh, yes.  Yes.

8    BY MS. CHESLER:

9        Q    Again, is this -- strike that.

10           Mr. Smith or someone else in the company would

11   regularly send Organizational Time Clock Reports from

12   2008 to the present; is that correct?

13       A    This report, no, not recently.  This was more

14   for when we first started on XATA.

15       Q    When did this report stop being sent out

16   regularly?

17       A    I do not recall that, to be honest with you.

18       Q    Can you give me an approximation?

19       A    I'm going to say maybe a year and a half to

20   two years ago maybe.

21       Q    And am I correct this is yet another way to

22   manage time efficiently or review time efficiency?

23       A    Yes.

24       Q    I hand you what we'll mark Exhibit 70.

25               (Deposition Exhibit 70 was marked

KARYN ABBOTT & ASSOCIATES

EXHIBIT - W, PAGE 85
PAGE 270

```
 1              for identification by the reporter and
 2              is bound separately.)
 3    BY MS. CHESLER:
 4        Q     Who is Oscar Carrasco?
 5        A     Oscar Carrasco was the area manager prior to
 6    Basil Hernandez, my direct report.
 7        Q     Do you know what he meant by, "Joe, spare me
 8    the labor pains"?
 9        A     Yes.
10        Q     What did he mean?
11        A     Oscar, being sarcastic, in small words, "Don't
12    give me excuses," you know.  "Just show me pretty much
13    the improvements.  Just get it down.  Don't give me any
14    excuses," pretty much.
15        Q     Get what down?
16        A     The idle time.
17        Q     Why would he call it "labor pains"?
18        A     You know, I can't speak for him, but just
19    knowing his character, that was -- how can we put it --
20    I don't know how you'd put it.  I mean that's just --
21    he was just being sarcastic.  It was just being
22    sarcastic, me knowing him personally.
23        Q     Is that the type of comments he would make to
24    you often, "Spare me the labor pains"?
25        A     Honestly, no.
```

KARYN ABBOTT & ASSOCIATES

1     Q     Was he on you a lot as far as efficiency?

2           MS. BONN:  Object to the form.

3           THE WITNESS:  To be quite honest, no, he

4     wasn't on me a lot.

5     BY MS. CHESLER:

6     Q     But on you in general?

7           MS. BONN:  Object to form.

8           THE WITNESS:  In general, you know, just

9     enough to keep me interested, yes.

10    BY MS. CHESLER:

11    Q     What do you mean to keep you interested?

12    A     Enough to keep me going forward, to keep me

13    productive.

14    Q     Why is it important to keep idle time down?

15    A     Well, a couple reasons.  Idle time is fuel

16    savings.  But also now, you have to comply with the Air

17    Resource Board.  You can't idle more than five minutes.

18    So you don't want to get a citation from the state

19    either.

20    Q     I'll hand you what we'll mark as Exhibit 71.

21           (Deposition Exhibit 71 was marked

22           for identification by the reporter and

23           is bound separately.)

24    BY MS. CHESLER:

25    Q     Again, I just want to ask you general questions

KARYN ABBOTT & ASSOCIATES

1    to make sure I understand the report.

2        Is this another report THAT the company used

3    between 2008 to the present in monitoring and managing

4    efficiency?

5        A    This looks like an older report.  Yeah, this

6    is an older report, not something that we use

7    currently.

8        Q    When was this report used?  You can give me

9    approximate years.

10       A    Approximate years, I'm going to say, '08, '09.

11       Q    Okay.  Was this posted anywhere?

12       A    No, not this one.

13       Q    It says Top Performers and Bottom Performers.

14   Are those drivers or are those supervisors?

15       A    Those are drivers.

16       Q    And the bottom performers are drivers who

17   delivered less cases per hour; is that right?

18       A    Those are drivers, correct.

19       Q    The cases per hour, were they measured the same

20   way you told me, which is we take the time you clocked

21   in, we take the time you clocked out, and then we divide

22   it by how many cases you made during those times?

23       A    On this report, to be honest with you, I don't

24   recall what the formula is we used for the case per

25   hour on this one.  This could have been just maybe stop

KARYN ABBOTT & ASSOCIATES

1   time divided by cases or it could have been total hours

2   divided by it.  So I really don't know, to be honest

3   with you, on this report.

4        Q    But in any event, drivers that delivered more

5   cases per hour were considered better performers by the

6   company?

7        A    On the measurement aspect of it, yes.

8        Q    Then if you turn to the third page, 25902, it

9   says, "At the end of the day, a complete evaluation will

10  be provided to the driver that enables continued focus

11  required by driver on proper efficient work processes

12  and procedures that will improve their performance."  Do

13  you see that?

14       A    Yes.

15       Q    Was that a practice the company followed from

16  2008 through 2009?

17       A    To be honest with you, I don't remember if

18  this was part of the pre-work that the supervisor would

19  take on the ride along with the driver that day, and

20  then they would turn it all in together.  But I do

21  recall seeing something like this, yes.

22            MS. BONN:  Sorry, Natasha.  Is this supposed

23  to be a single complete report?  I am just looking and

24  the Bates numbers are not totally sequential.

25            MS. CHESLER:  I did pull pages.  What I

KARYN ABBOTT & ASSOCIATES

1   noticed was some of these charts continue longer, like

2   you see how it with goes A, B, C, D, E, F, G through O?

3          MS. BONN:  Okay.

4          MS. CHESLER:  But then some page would have

5   nothing on it.  So I did pull it if it had nothing on

6   it.

7          MS. BONN:  So I'm just going to object and

8   make clear for the record that this exhibit is a

9   compilation of different Bates number pages and it's

10  not representing the whole span of the Bates stamp

11  range of a full report.

12         MS. CHESLER:  I disagree, but I understand

13  your objection.

14     Q    I hand you what we'll mark as Exhibit 72.

15            (Deposition Exhibit 72 was marked

16            for identification by the reporter and

17            is bound separately.)

18  BY MS. CHESLER:

19     Q    You guys have a lot of reports.

20     A    Yes.

21     Q    Do you recognize this Driver Fuel Analysis

22  Report?

23     A    Yes.

24     Q    Am I correct in assuming that the company

25  monitors driver fuel in a different attempt to keep

KARYN ABBOTT & ASSOCIATES

1    costs down?

2        A    Yes.

3        Q    Any other reason for the driver fuel report?

4        A    No.

5        Q    I'll hand you what we'll mark as Exhibit 73.

6             (Deposition Exhibit 73 was marked

7             for identification by the reporter and

8             is bound separately.)

9    BY MS. CHESLER:

10       Q    Can you tell me what this is?

11       A    This is an available time report, driver log.

12       Q    What does "available time" mean?

13       A    Meaning a supervisor could go on there and

14   bring this report, you know, for tomorrow and say, you

15   know, "Okay.  I'm going to look at my guys working

16   tomorrow and make sure you have enough hours to work

17   tomorrow."

18       Q    Enough hours under the Department of

19   Transportation regulations?

20       A    Correct.

21       Q    So the concern is to make sure the company is

22   not exceeding the limit under the DOT regs, right?

23       A    Correct.

24       Q    And meal and rest breaks are counted towards

25   hours used for the Department of Transportation

1    regulations, correct?

2            MS. BONN:  Object to form.

3            THE WITNESS:  I'm sorry.  Repeat that.

4    BY MS. CHESLER:

5        Q    Sure.  The meal and rest breaks are included in

6    the hours worked for purposes of Department of

7    Transportation maximum drive hours, correct?

8            MS. BONN:  Object to form.

9            THE WITNESS:  Yes.  The means and breaks are

10   part of the hours of service for work hours.  But

11   during that time, they're relieved of their duty, but

12   it is part of the hours.

13   BY MS. CHESLER:

14       Q    For the DOT?

15       A    Correct.

16       Q    Such that if a driver takes meal and rest

17   breaks, they will have less available hours under the

18   DOT regs, correct?  There will be less available hours

19   on this report, correct?

20       A    Correct.

21       Q    And is this a report that the company regularly

22   ran and looked at from 2008 to the present?

23       A    You know, this is a report that was available

24   but not something we ran regularly because we really

25   didn't have a lot of guys working the threshold, you

1    the month.  But it was sometime in 2009.     Then the

2    law changed to where after 2009, everything was to be

3    taken on duty.  So now it's 16 hours on a clock,

4    period.  All hours of service are supposed to be on

5    duty if you're driving local.

6    BY MS. CHESLER:

7        Q    Well, at least since 2008 to the present, the

8    company has been concerned with complying with whatever

9    the DOT regs are as far as maximum available time,

10   correct?

11       A    Correct.

12       Q    From 2008 to the present, the company has done

13   some sort of monitoring to ensure drivers, when you

14   schedule a route, that they have enough hours available

15   to stay in compliance with the DOT regs, correct?

16       A    Correct.

17       Q    And what has the company's practice or policy

18   been with respect to counting the meal and rest breaks

19   toward the drive time, regardless of what the DOT either

20   said or didn't say?

21           MS. BONN:  Object to form.

22           THE WITNESS:  I'm sorry.  I don't understand

23   that question.

24   BY MS. CHESLER:

25       Q    In calculating drivers available time, what has

1      Q      You're north?

2      A      Yes.

3      Q      From 2008 to the present, am I correct the meal

4   period provided is an unpaid meal period?

5      A      From 2008 to current, that's correct.

6      Q      I hand you what we'll mark as Exhibit 74.

7             (Deposition Exhibit 74 was marked

8             for identification by the reporter and

9             is bound separately.)

10  BY MS. CHESLER:

11     Q      You received this E-mail from Mr. Rodriguez?

12     A      Yes.

13     Q      Am I correct that this is another E-mail to

14  encourage keeping time down?

15     A      Yes.

16     Q      What did you understand him to mean when he

17  said, "Continue to review total time expectation with

18  all drivers"?

19     A      Total time expectation is total time that the

20  route was expected to be done in, including the stops

21  and everything taken into consideration.

22     Q      Who determine the total route time expectation?

23     A      At this point, I believe this was -- let me

24  see -- not too long after we completed our master

25  reroute.  They actually did some time studies on all

KARYN ABBOTT & ASSOCIATES

1    can just run them again.  If the customer changes, we'd

2    have to look at them again.

3        Q    Let's say you're looking at it again.  What

4    factors are you taking into account to determine the

5    total route time to determine how long the driver's

6    schedule should take?

7        A    Customer accounts, how many customers on the

8    route, you know, for that week, for that month.  How

9    many deliveries that day, how many delays.  Did you

10   have any yard time delays?  Did you have any product

11   issues?

12       Q    What are the delays?

13       A    Delays can be anything, like I said, the yard,

14   waiting for product, or you get to the customer and

15   they're not ready for you, waiting for vendors, you

16   know, anything.

17       Q    Waiting for vendors.  What other delays other

18   than what you've mentioned?

19       A    Pretty much just those.

20       Q    Anything else other than what you just listed

21   for me that goes into analyzing what the total route

22   time expectation is on a driver's schedule?

23            MS. BONN:  Object to form.

24            THE WITNESS:  No.

25   \ \ \

1   BY MS. CHESLER:

2       Q    Now, looking at Exhibit 75, did you receive

3   this E-mail from Mr. Smith?

4       A    Yes.

5       Q    You see that he says, "Ensure your drivers are

6   reviewing their results by posting the charts on your

7   scoreboards."  What did you understand that to mean?

8       A    This is one of the reports they expect you --

9   some locations show yard time, which is one of the ones

10  you showed me.  You post it to show per driver your

11  yard time, you know, stuff they want you to show so the

12  drivers can see where we stand.

13      Q    So the yard management report is what was

14  supposed to be posted for drivers to see, correct?

15      A    Correct.

16      Q    Another effort to communicate the importance of

17  efficiency, correct?

18      A    Correct.

19      Q    I hand you what we'll mark as Exhibit 76.

20           (Deposition Exhibit 76 was marked

21           for identification by the reporter and

22           is bound separately.)

23  BY MS. CHESLER:

24      Q    Is this an E-mail you received from Wayne

25  Smith?

KARYN ABBOTT & ASSOCIATES

1      A     Yes.

2      Q     Is this yet another E-mail on encouraging to

3  try and keep efficiency improving?

4      A     On yard time.

5      Q     Just yard time?

6      A     Yes.  This is a yard management report.

7      Q     But another aspect of efficiency, correct?

8      A     Yes.

9      Q     Okay.  I'll hand you what we'll mark as Exhibit

10  77.

11             (Deposition Exhibit 77 was marked

12             for identification by the reporter and

13             is bound separately.)

14  BY MS. CHESLER:

15      Q     Another E-mail from Wayne Smith related to

16  efficiency, correct?

17      A     Yes, the same one, yard time report.

18      Q     Post the yard times for drivers to see,

19  correct?

20      A     Yes.

21      Q     I hand you what we'll mark as Exhibit 78.

22             (Deposition Exhibit 78 was marked

23             for identification by the reporter and

24             is bound separately.)

25  \ \ \

KARYN ABBOTT & ASSOCIATES

BY MS. CHESLER:

    Q    Another E-mail from Wayne Smith, correct?

    A    Yeah, another yard time report.

    Q    And he notes in the fourth paragraph, "Some markets/branches need to review their standards as they are continuing to report in positive weekly results against time, yet OT seems to still not be managed at market level."

    Does "OT" refer to overtime?

    A    Yes.

    Q    There was an effort to keep overtime down, correct?

    A    That's correct.

    Q    I'm handing you what we'll mark -- I don't seem to have copies of this, but if you don't mind sharing it, I'll let Carol mark my original.

    I'll just note for the record that it's documents bearing Alta Dena 2982, 2983, and then Alta Dena 881, 882, and then Alta Dena 1715 and 1716.

        (Deposition Exhibit 79 was marked

        for identification by the reporter and

        is bound separately.)

BY MS. CHESLER:

    Q    Joe, I just wanted to look at the first two pages, 2982 and 2983.  That is a Driver Trip Report,

1    correct?

2        A    Yes.

3        Q    Is that a report that the company regularly

4    generated from approximately 2008 to the present?

5        A    Not on a regular basis.  It's there if you

6    need to.

7        Q    When would it be generated?

8        A    If we ever -- if the route went into

9    checkpoint for some reason.  If the driver input a

10   wrong location, they would have to bring in to

11   checkpoint and fix it, print it to make sure it got

12   fixed.

13       Q    Something you could generate if a driver didn't

14   log a meal break, correct?

15           MS. BONN:  Object to form.

16           MS. CHESLER:  Well, strike that.

17       Q    Between the implementation of XATA sometime in

18   2008 to the present, this has been a report that the

19   company has been able to generate, correct?

20       A    Correct.

21       Q    Am I correct that it basically shows the

22   movement of the truck for the entire route, correct?

23       A    Correct.

24       Q    Am I correct that if we look at page 2983 at

25   the fifth line down, from 4-20-10 1:03 a.m. to 4-20-10

KARYN ABBOTT & ASSOCIATES

1    1:54 a.m., then location donut shop.

2         Am I correct in reading this to mean that from

3    1:03 a.m. to 1:54 a.m., the truck is moving, and at 1:54

4    a.m. it arrives at the donut shop; is that correct?

5         A    Okay.  So from here, 1:03 to 1:54, he's in

6    motion for roughly 40 miles an hour for 51 minutes.

7         Q    Correct?

8         A    Correct.

9         Q    Then you see it has 34 minutes for lunch; is

10   that correct?

11        A    Yes.

12        Q    Then am I correct in reading the report that

13   lunch would have started at 1:54 a.m. such that the next

14   entry is 2:32 a.m., back on?

15        A    When he started moving again.

16        Q    Yes.

17        A    Correct.

18        Q    So the lunch started after at 1:54 a.m.,

19   correct?

20        A    Correct.

21        Q    I just wanted to make sure I'm reading the

22   report correctly.

23        So "Motion Segment" means the truck is in

24   motion?

25        A    Correct.

KARYN ABBOTT & ASSOCIATES

1  Was there a difference in substance?

2      A     The time allotted, no.  It's pretty much the

3  same.

4      Q     In any event, as you explained to me earlier,

5  this wasn't the practice?

6      A     That's correct.  This was not the practice,

7  correct.

8      Q     It also says in here that you may be assigned

9  meal times by your manager or you may be allowed to

10  arrange your own time with your location manager's

11  consent.

12         That wasn't done for drivers, was it, between

13  2008 to the present?

14      A     No.

15      Q     And the same goes for breaks?

16      A     Correct.

17      Q     I'll show you what we'll mark as Exhibit 80.

18             (Deposition Exhibit 80 was marked

19             for identification by the reporter and

20             is bound separately.)

21  BY MS. CHESLER:

22      Q     Do you recognize this document?

23      A     Yes.

24      Q     What is it?

25      A     It's company policies for the distribution

KARYN ABBOTT & ASSOCIATES

1    drivers one on one.  It's a brief ten, fifteen-minute

2    meeting before they start their route.

3        Q    So you don't go into detail as to each policy.

4    It's just like "Here are the revised policies.  Review

5    them."

6             MS. BONN:  Object to form.

7             THE WITNESS:  No.

8    BY MS. CHESLER:

9        Q    Am I wrong?

10       A    No, you're not wrong.  We don't go into

11   detail.

12       Q    I asked you a double negative.

13            If you turn to the last page of the document,

14   item No. 37:  "Driver may not drive off route for any

15   reason.  Lunches must be taken within a one-half mile

16   radius of the drivers prescribed route."

17       A    Yes.

18       Q    That was the policy?

19       A    On here, yes.  SOP is a mile.

20       Q    Any other difference between that and the SOP?

21       A    No.

22       Q    Any other difference in the policy?

23       A    No.

24       Q    I'll hand you what we'll mark as Exhibit 81.

25               (Deposition Exhibit 81 was marked

1              for identification by the reporter and

2              is bound separately.)

3    BY MS. CHESLER:

4        Q    Am I correct that the attachment --

5              Well, you received this E-mail, correct?

6        A    Yes.

7        Q    Am I correct, then, that the attachment are the

8    distribution department policies and safety rules at

9    least as of 11-9-2011?  Is that correct?

10       A    That's correct.

11       Q    And it says Fresh Direct Dairy, so it applies

12   to the same people that Exhibit 80 applied to, correct?

13       A    Correct.

14            MS. BONN:  Object to form.  Object.  Outside

15   the scope.

16   BY MS. CHESLER:

17       Q    This would have been distributed to all

18   drivers, correct?

19       A    Correct.

20       Q    The same as Exhibit 80, sort of a general

21   handout, but no meeting to get into detail as to any of

22   the items on there, correct?

23       A    Correct.

24       Q    Then if you turn to the second to the last

25   page, which is 29638, we have similar language on item

KARYN ABBOTT & ASSOCIATES

1    35.  "Driver may not drive off route for any reason.

2    Lunches must be taken within a one-half mile radius of

3    the drivers prescribed route unless approved by

4    management."

5          That's what was communicated to all the drivers

6    at this time, correct?

7       A    Correct.

8       Q    No other information was provided as to that

9    item, correct?

10         MS. BONN:  Object to form.  Object.  Outside

11   the scope.

12         You can answer as an individual.

13         THE WITNESS:  Correct.

14   BY MS. CHESLER:

15      Q    Then I'll hand you what we'll mark as Exhibit

16   82.

17              (Deposition Exhibit 82 was marked

18         for identification by the reporter and

19         is bound separately.)

20   BY MS. CHESLER:

21      Q    Am I correct that this is sort of the same

22   drill for 2012, Fresh Dairy Direct, Distribution

23   Department, Policies and Safety Rules, and apply to the

24   same employees as Exhibits 80 and 81?

25      A    Yes.

KARYN ABBOTT & ASSOCIATES

251

1      Q      Communicated to employees in the same way.

2  Just a general handout, nothing specific on any line

3  items, correct?

4      A      Correct.

5      Q      If you turn to the second to the last page,

6  item 35 is still there.  "Driver may not drive off route

7  for any reason."  Do you see that?

8      A      Correct.

9      Q      "Lunches must be taken within a one-half mile

10  radius."  Do you see that?

11      A      Yes, correct.

12      Q      Nothing further was communicated to drivers

13  concerning this policy, correct?

14          MS. BONN:  Object to form.  Object.  Outside

15  the scope.

16          THE WITNESS:  Correct.

17  BY MS. CHESLER:

18      Q      I'll hand you what we'll mark as Exhibit 83.

19          (Deposition Exhibit 83 was marked

20          for identification by the reporter and

21          is bound separately.)

22  BY MS. CHESLER:

23      Q      This is the SOP that you referred to, correct?

24      A      Correct.

25      Q      And in fact that's December 2009, correct?

KARYN ABBOTT & ASSOCIATES

```
 1      A    Correct.

 2      Q    If you turn to page 3115, efficiency is on

 3  there as one of the main rules and responsibility,

 4  correct?

 5           MS. BONN:  Object to form.

 6           THE WITNESS:  Correct.

 7  BY MS. CHESLER:

 8      Q    For a driver, correct?

 9      A    Correct.

10      Q    If you turn to page 3121, it says, "Follow

11  delivery sequence for route."  Do you see that?

12      A    Yes.

13      Q    And that's been the company's policy from 2008

14  to the present for drivers?

15      A    Correct.

16           MS. BONN:  Object to form.

17  BY MS. CHESLER:

18      Q    And the practice, correct?

19           MS. BONN:  Object to form.

20           THE WITNESS:  Correct.

21  BY MS. CHESLER:

22      Q    If you turn to the second to the last page,

23  3125, it says, "Take all breaks and lunch hours in field

24  during workday."  What does that mean?

25      A    Take all breaks and lunch hours in field
```

1    during weekday.  That means before you would clock out.

2        Q    What is considered the field?

3        A    While you're out there on the route.

4        Q    Before you come back to Alta Dena?

5        A    Uh-huh.

6        Q    I'm sorry.  Is that distributed to drivers, the

7    Delivery Driver Standard Operating Procedures?

8        A    Yes.

9        Q    I hand you what we'll mark as Exhibit 84.

10            (Deposition Exhibit 84 was marked

11            for identification by the reporter and

12            is bound separately.)

13            MS. BONN:  Take a look over it.

14   BY MS. CHESLER:

15       Q    Is this also something that's distributed to

16   drivers?

17       A    No.  Just from looking at this, it looks like

18   this was part of the pre-work when putting the SOP book

19   together.

20       Q    Got it.  Okay.

21            Then I'll hand you what we'll mark as Exhibit

22   85.

23            (Deposition Exhibit 85 was marked

24            for identification by the reporter and

25            is bound separately.)

KARYN ABBOTT & ASSOCIATES

1    BY MS. CHESLER:

2        Q    Do you recognize this document?

3        A    I recognize it because I've seen it before

4    while meeting with my lawyers, but I don't believe I

5    ever received this document.

6        Q    Was this a policy that was distributed by the

7    company to drivers?

8        A    I do not recall that this policy went out.

9        Q    You don't know one way or the other?

10       A    During that time frame, I don't think this

11   went out to the drivers.

12       Q    Why do you say that?

13       A    Because I would have got copied on it.  They

14   would have sent it to me, and then between me and all

15   the supervisors, we would have passed it out to all the

16   drivers.

17       Q    Does it accurately reflect the company's policy

18   as of January 22, 2009 with respect to meal periods and

19   break periods?

20            MS. BONN:  Object to form.

21            I'm sorry.  Is this 85?

22            MS. CHESLER:  Yes.

23            THE WITNESS:  What was the question again?

24                (At which time the record was read

25                as follows:

KARYN ABBOTT & ASSOCIATES

```
 1              "Q     Does it accurately reflect
 2         the company's policy as of January 22,
 3         2009 with respect to meal periods and
 4         break periods?")
 5         THE WITNESS:  It reflects the policy as far as
 6    combining that's the practice.
 7    BY MS. CHESLER:
 8         Q     And the policy as well, correct?
 9         A     In 2009, it was 30 minutes, fifteen for every
10    four.  Fifteen minutes for every four hours, yes.
11         Q     So that reflected the policy as of
12    January 22, 2009 accurately?
13         MS. BONN:  Objection to form.
14         THE WITNESS:  Not word by word, but --
15    BY MS. CHESLER:
16         Q     Substance?
17         A     Yes.
18         MS. BONN:  Object to form.
19    BY MS. CHESLER:
20         Q     I'm sorry, was that yes?
21         A     Yes.
22         Q     Substantively, correct?
23         A     Correct.
24         Q     I'll hand you what we'll mark as Exhibit 86.
25              (Deposition Exhibit 86 was marked
```

KARYN ABBOTT & ASSOCIATES

1          for identification by the reporter and

2          is bound separately.)

3    BY MS. CHESLER:

4      Q    I've seen something similar to these for

5    various drivers.  Is this something the company sent out

6    to drivers at some point?

7      A    No, I don't think this ever made it to

8    drivers.  I believe this is prior to -- prior to XATA.

9          There was some sort of -- kind of like

10   something similar to like a scorecard that their

11   current manager was trying to implement, trying to get

12   all this information per route.  But I don't think this

13   ever made it out.  It was fully -- what's the word I'm

14   looking for?

15     Q    Prepared?

16     A    Yeah.  It wasn't fully implemented to the

17   drivers this occasion.  Because very shortly after XATA

18   came out towards the end of '08, this is just stuff

19   that was a lot of manual work, trying to get all the

20   information and plug it in.  It was something he wanted

21   to do almost like a scorecard per route to measure

22   productivity per route back before XATA.

23     Q    When you say "he," who is he?

24     A    Humberto Rodriguez.

25     Q    And it was done to measure productivity?

KARYN ABBOTT & ASSOCIATES

1      A    Correct.

2      Q    Any other reason?

3      A    No.

4      Q    I'll hand you what we'll mark next as Exhibit

5    87.

6              (Deposition Exhibit 87 was marked

7              for identification by the reporter and

8              is bound separately.)

9    BY MS. CHESLER:

10     Q    Have you ever seen this document before?

11     A    Yes.

12     Q    Is this a training that was done for

13   supervisors?

14     A    Yes.

15     Q    Was this training done for the drivers

16   themselves?

17     A    This training was done for drivers in January

18   of 2011.  If I flip through the pages and the language,

19   it's very similar to the training that we went to in

20   January 2011.

21     Q    Back up one second on the first page.

22     A    I saw the date.

23     Q    Is there any reason to dispute that's the right

24   date on this document?

25     A    I don't recall if this was a refresher course

KARYN ABBOTT & ASSOCIATES

1    for supervisors.  But just reading through the language

2    of it, this is something that looks very similar to

3    what we put out there in January 2011.

4        Q    Am I correct in understanding you to be saying

5    that in January 2011, the company conducted a training

6    for drivers regarding meal and rest breaks?

7        A    Yes.

8        Q    Where was that training?

9        A    At City of Industry, Alta Dena.

10       Q    Who attended that training?

11       A    I believe it was myself, one of my

12   supervisors -- I can't recall which one -- and I think

13   HR.  I think it was Susana at that time.

14       Q    Was there a sign-in sheet?

15       A    There was a sign-in sheet.  That's when they

16   signed the waivers and stuff.

17       Q    And drivers were required to attend?

18       A    Uh-huh.

19       Q    Was it just the City of Industry drivers?

20       A    Yes.

21       Q    Were there similar trainings done at other

22   locations?

23       A    I don't know.

24       Q    In implementing company policy, are you aware

25   between 2008 to 2012 of any other trainings conducted

KARYN ABBOTT & ASSOCIATES

1    for any drivers regarding meal and rest break other than

2    this one you've just identified for me?

3           MS. BONN:  Object to form.

4           THE WITNESS:  No.

5    BY MS. CHESLER:

6       Q    You're not aware of any?

7       A    No.

8       Q    If you turn to the second page, you see it

9    says, "The timing of the meal break is recommended

10   between the fourth and sixth hour of your shift.  If

11   customer service requires you to adjust your lunch time

12   you must take it before the tenth hour worked."

13   That was the policy as of 2012, correct?

14      A    As of June 2011 when we went under the CBA.

15      Q    Prior to June 2011, that may not have been the

16   written policy, but it was the practice, correct?

17          MS. BONN:  Object to form.

18          THE WITNESS:  Correct.

19   BY MS. CHESLER:

20      Q    And it was the practice from 2008 up until the

21   CBA coming into effect, correct?

22          MS. BONN:  Object to form.

23          THE WITNESS:  2008 up until -- before the

24   tenth hour?

25   \ \ \

KARYN ABBOTT & ASSOCIATES

```
 1            THE WITNESS:  Yes.  Meal breaks were taken
 2   based on practice 2008, when this came out, myself and
 3   the supervisors, even though this was not being
 4   implemented to distribution at this time, this is the
 5   time we started letting them know about the second and
 6   third potential lunch.
 7   BY MS. CHESLER:
 8      Q    Okay.  Just so I'm clear and I heard you right,
 9   this presentation was told didn't apply to distribute --
10            MS. BONN:  Object to form.
11   BY MS. CHESLER:
12      Q    -- at the time; is that correct?
13      A    Not in those exact words.  They just -- when
14   we expressed some concerns and said, "Does this include
15   distribution?"  They just said, "Keep doing what you're
16   doing, and we'll get back to you."
17      Q    And that was with respect to -- just so I'm
18   clear, in 2008, after this presentation came up, until
19   2011, regardless of what the written policy was, you
20   continued your prior practice of letting drivers take
21   lunch whenever --
22      A    At their discretion.
23      Q    At their own discretion based on their route,
24   correct?
25      A    Not based on their route.  Just at their
```

1  it with the driver.

2  BY MS. CHESLER:

3      Q     Address what?

4      A     Ask him, you know.  If he says, "I was

5  hungry," I say, "I understand."  If he was blocking the

6  dock, then you make suggestions, you know.  "Next time,

7  just pull out of the dock."

8      Q     Am I correct that the company expects the

9  driver to exercise reasonable discretion with the route

10  that's been given to him?  Correct?

11     A     I mean we don't look at the route, you know.

12  We just leave it to their discretion, you know.  From

13  experience, pretty much you manage your day.  So you're

14  going to be able to plan your own breaks and lunches,

15  you know, however you want.

16     Q     But your route is given to you precisely,

17  correct?

18     A     Yes.

19     Q     By the company, correct?

20     A     Yes.

21     Q     So you have to manage your day within the route

22  provided to you by the company, correct?

23         I can't decide to take my lunch at him in the

24  morning before I come to work, can I?  Is that my

25  choice?

KARYN ABBOTT & ASSOCIATES

1          MS. BONN:  Object to form.

2          THE WITNESS:  Well, that would not be your

3     lunch.  That would be breakfast before you go to work.

4     BY MS. CHESLER:

5      Q    Fine.  Can I take my meal before I report to

6     work and say I took my meal break?

7          MS. BONN:  Object to form.

8     BY MS. CHESLER:

9      Q    That's my choice.

10         MS. BONN:  Object to form.

11         THE WITNESS:  But you're not working.  You're

12    not on company time.

13    BY MS. CHESLER:

14     Q    Once I'm on company time, I'm also supposed to

15    also follow my route, right?

16     A    The sequence of the route.

17     Q    And the timing generally of the route, right?

18     A    There's windows in general that we put on

19    there, yeah.

20     Q    So the company expects the driver within the

21    overall boundary of his route and the overall boundary

22    of windows to negotiate his day within that to fit his

23    breaks in as he sees fit, correct?

24     A    As he pleases, yes.

25     Q    Within those limits, correct?

KARYN ABBOTT & ASSOCIATES

1    A    Yeah, that's been practice ever since I've

2   been with the company.

3    Q    Consistent with the meal break policy?

4        MS. BONN:  Object to form.

5        THE WITNESS:  With the first meal break, yes.

6   BY MS. CHESLER:

7    Q    I hand you what we'll mark as Exhibit 89.

8        (Deposition Exhibit 89 was marked

9        for identification by the reporter and

10       is bound separately.)

11       MS. BONN:  Natasha, how much longer are you

12  going to go?

13       MS. CHESLER:  I'm hoping no more than 20

14  minutes, a half hour.

15       MS. BONN:  That's fine.  I'd like to take one

16  more break at some point in the near future.

17       MS. CHESLER:  Okay.  There might actually be a

18  good time in about five minutes or so.

19       MS. BONN:  Great.

20  BY MS. CHESLER:

21   Q    Do you recognize this document?

22   A    Yeah.

23   Q    And what is it?

24   A    This is, I believe, what we rolled out in

25  February 2011.

KARYN ABBOTT & ASSOCIATES

1    Q    Was this presented to drivers?

2    A    Yes.

3    Q    Am I correct that prior -- after January 2011

4  and prior to the CBA taking effect, the general practice

5  for all employees did not comport with where it says,

6  "Policy requires you take the meal between the fourth

7  and sixth hour of your shift"?

8         MS. BONN:  Object to form.

9         What page are you on?

10        MS. CHESLER:  Sorry.  I'm on page 2.

11   Q    It says, "The timing of the meal break is

12  mandatory.  Policy requires you take it between the

13  fourth and sixth hour of your shift."

14        Notwithstanding this policy, that was not the

15  general practice for all drivers, correct?

16   A    For January 2011, after we implemented this,

17  until the CBA, we were trying to comply the best we can

18  to this policy, even the time in between the fourth and

19  sixth hour.

20   Q    But as a practical matter, is that what all

21  employees were doing?  Were all drivers taking the lunch

22  between the fourth and sixth hour?

23   A    Not all of them, no.

24   Q    And the ones that didn't, why not?

25   A    Because they either are stuck at a customer

KARYN ABBOTT & ASSOCIATES

1    accurate company policy, right?

2            MS. BONN:  Object to form.

3            THE WITNESS:  This looks like pieces from the

4    one you showed us earlier, the 35 -- part of company

5    policies.

6            MS. CHESLER:  This is a good time, if you want

7    to take a few minutes.

8            MS. BONN:  That's great.

9            (At which time a brief recess was taken.)

10   BY MS. CHESLER:

11       Q    How are you doing Joe?

12       A    Good.

13       Q    Did you do anything on the break that would

14   affect your ability to continue to provide your best

15   testimony?

16       A    No.

17       Q    Any reason you can't continue to provide your

18   best testimony?

19       A    No.

20       Q    I'll hand you what we'll mark as Exhibit 37 --

21   or what has been previously marked as Exhibit 37.  I'm

22   sorry, Amanda.  There is only one copy.

23            (Deposition Exhibit 37, having been

24            previously marked, is attached hereto.)

25   \ \ \

1   BY MS. CHESLER:

2       Q    Do you recognize this E-mail?

3       A    Yes.

4       Q    It's an E-mail that you sent?

5       A    Yes.

6       Q    Am I correct that as a team, you reviewed

7   reports monthly?

8       A    Correct.

9       Q    That was to keep -- one focus of those meetings

10  was efficiency, correct?

11      A    Correct.

12      Q    I'll hand you what we'll mark as Exhibit 91.

13              (Deposition Exhibit 91 was marked

14              for identification by the reporter and

15              is bound separately.)

16  BY MS. CHESLER:

17      Q    Do you recognize this document?

18      A    Yes.

19      Q    Am I correct that it is a recap on a meeting

20  that you attended in October 2009?

21      A    Yes.

22      Q    There's a mention of thanking supervisors in

23  the City of Industry who worked on rerouting routes.

24  It's sort of like about halfway down the first

25  paragraph.

KARYN ABBOTT & ASSOCIATES

1          "I am pleased to inform you that our overtime

2     has decreased a lot.  I want to take the time to thank

3     our supervisors that have taken the time to rerouted our

4     routes."

5          A     The first paragraph, right?

6          Q     Let me show you.  "I am pleased to inform you

7     that overtime..."

8          A     Oh, here we go, okay.  Yes.

9          Q     The routes were rerouted in an effort to

10    decrease overtime; is that correct?

11         A     Yes.

12         Q     Any other reason?

13         A     No.

14         Q     Based on my reading of at least the first

15    paragraph, for City of Industry, it looks like overtime

16    was a concern and keeping it down; is that correct?

17              MS. BONN:  Object to form.

18              THE WITNESS:  Yes.

19              MS. CHESLER:  I hand you what we'll mark as

20    Exhibit 92.

21                   (Deposition Exhibit 92 was marked

22                   for identification by the reporter and

23                   is bound separately.)

24    BY MS. CHESLER:

25         Q     Do you recognize this as the same thing,

KARYN ABBOTT & ASSOCIATES

1    basically a recap of a meeting that you attended

2    approximately January 2009?

3        A    Yes.

4        Q    If I take a quick look at the first page, City

5    of Industry, it looks like overtime is still a question

6    or at least the time drivers are putting into routes is

7    a question?

8            MS. BONN:  Object to form.

9            THE WITNESS:  Yes.

10   BY MS. CHESLER:

11       Q    It says, "We will be" -- it's sort of five

12   lines up from the bottom.  "We will be asking the

13   drivers" -- I think that means tough questions --

14   "making sure they understand what we are doing."  Is

15   that what you understand it to say?

16           MS. BONN:  Object to form.

17   BY MS. CHESLER:

18       Q    "Joe put out a memo saying we will be reviewing

19   the drivers hours each day."

20       A    Yes.

21       Q    Does that "Joe" refer to you?

22       A    Yes.

23       Q    Did you put out a memo?

24       A    I don't recall, to be honest with you, if I

25   did or if I did not.

KARYN ABBOTT & ASSOCIATES

```
 1      Q     What was the goal of the memos board supposed
 2   to be?
 3      A     Based on Beto's comment here, to create
 4   awareness on people working over 12 hours a day.
 5      Q     To create awareness to keep it down?
 6      A     Right.
 7      Q     Keep the time down?
 8      A     Correct.
 9      Q     I'll hand you what we'll mark as Exhibit 93.
10            (Deposition Exhibit 93 was marked
11            for identification by the reporter and
12            is bound separately.)
13   BY MS. CHESLER:
14      Q     Am I correct that these are meeting notes from
15   a meeting you attended in February of 2009?
16      A     Yes.
17      Q     If you will look at one, two, three, four,
18   five, six lines up from the bottom of the opening
19   paragraph, it says, "We have talked about reduction of
20   routes, compact the routes..."  Do you see that?
21      A     Yes.
22      Q     Did you discuss reduction of routes?
23      A     (Reading)  "We have talked about reduction of
24   routes, compact..."
25            I'm sorry.  What was the question again?
```

KARYN ABBOTT & ASSOCIATES

278

1      Q     What does "compact the routes" mean?

2            MS. BONN:  Object to form.

3            THE WITNESS:  I don't know, to be honest with

4      you.  I don't know in what sense was he trying to use

5      that word here.

6      BY MS. CHESLER:

7      Q     Is it correct to assume -- strike that.

8            Is it correct in this meeting, similar to other

9      meetings, the discussion was how to best time manage the

10     routes to keep time down to as low as possible?

11           MS. BONN:  Object to form.

12           THE WITNESS:  Yes.

13           MS. CHESLER:  I'll hand you what we'll mark as

14     Exhibit 94 and 95.

15                (Deposition Exhibits 94 and 95 were

16                marked for identification by the reporter

17                and are bound separately.)

18     BY MS. CHESLER:

19     Q     Basically, Mr. Llamas, or Joe, we've discussed

20     the various policies in place and practices in place for

21     drivers between 2008 to 2012.

22           These two policies have been produced but are

23     undated.  So I just wanted you to review both exhibits

24     and let me know if it changes any of your testimony with

25     respect to the policy or practice from 2008 to the

KARYN ABBOTT & ASSOCIATES

1     A    The days off?

2     Q    No, no.   Their schedule.   Like what time I'm

3   supposed to come into work, what time I'm supposed to

4   leave.

5     A    The start time schedule is based on your first

6   customer, what time he opens.

7          MS. CHESLER:   Amanda, I'll represent, the best

8   I can tell, and I made a pretty thorough search, these

9   are the only route sheets that were provided.   So I'm

10   not really clear where the rest of them are.

11     Q    You stand by your testimony earlier that it's

12   not possible to provide employees with a route that has

13   a built in time like here's when you can take lunch?

14          MS. BONN:   Object to form.

15          THE WITNESS:   What do you mean it's not

16   possible to provide?

17   BY MS. CHESLER:

18     Q    Well, you told me the company doesn't do that,

19   right?

20     A    Yeah.   We don't do it.

21     Q    And this exhibit doesn't change your testimony

22   as to that?

23     A    No.

24          MS. CHESLER:   I have nothing further.

25          MS. BONN:   If you're going to pass the

KARYN ABBOTT & ASSOCIATES

```
 1   STATE OF CALIFORNIA     )
                             )  SS.
 2   COUNTY OF LOS ANGELES   )

 3

 4

 5        I, CAROL LYNN COX, CSR 5128, a Certified

 6   Shorthand Reporter in and for the County of Los

 7   Angeles, State of California, do hereby certify;

 8        That JOSE LLAMAS, the witness named in the

 9   foregoing deposition, was, before the commencement of

10   the deposition, duly administered an oath in accordance

11   with CCP 2094;

12        That said deposition was taken down in

13   stenograph writing by me and thereafter transcribed

14   into typewriting under my direction.

15        I further certify that I am neither counsel

16   for nor related to any party to said action, nor in

17   anywise interested in the outcome thereof.

18        DATED THIS 29TH DAY OF JANUARY, 2013.

19

20

21            *Carol Lynn Cox*

22        CERTIFIED SHORTHAND REPORTER
              IN AND FOR THE COUNTY OF
23                  LOS ANGELES
               STATE OF CALIFORNIA
24

25
```

KARYN ABBOTT & ASSOCIATES

**EXHIBIT X**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MIGUEL DE LA CUEVA, on behalf of )
himself and those similarly )
situated, )
                      )
      Plaintiff, )
                      )
   vs. )
                      )
ALTA DENA CERTIFIED DAIRY, LLC, a )
Delaware Limited Liability )
Company, ALTA-DENA CERTIFIED )
DAIRY, INC., a Delaware )
Corporation, and DOES )
1 through 10, inclusive, )
                      )
    Defendants. )
                      )

**CERTIFIED COPY**

CASE NO.
CV 12-01804 GHK (CWx)

DEPOSITION OF

JOSE MARTINEZ

LOS ANGELES, CALIFORNIA

FEBRUARY 13, 2013

Reported by:
JULIA Y. GHEKIERE
CSR No. 12006/CLR
Job: 13-24189B

KARYN ABBOTT & ASSOCIATES
COURT REPORTERS
445 South Figueroa Street, 27th Floor
Los Angeles, California 90004-3612
Phone 213.749.1254 | Fax 213.749.0644

EXHIBIT X, PAGE 1

1    A    When I talked to them.  It was about two weeks
2 ago.

3    Q    Okay.  Are you paying any of her legal bills?

4    A    I'm sorry?

5    Q    Are you paying any of her bills to represent you
6 here today?

7    A    No, I'm not.

8    Q    Do you know who is?

9    A    That would be Alta Dena.

10   Q    So the company's paying for her to be your
11 lawyer?

12   A    I would think so.

13   Q    Okay.  Have you ever worked for Swiss too or
14 Swiss?

15   A    No.

16   Q    Have you ever worked for Heartland?

17   A    No.

18   Q    Do you have a set schedule?

19   A    Yes, I do.

20   Q    What's your schedule?

21   A    Well, I got my start time is 6:00 o'clock.

22   Q    6:00 a.m.?

23   A    6:00 a.m.

24   Q    And how long has your start time been 6:00 a.m.?

25   A    How long has it been like start time 6:00 a.m.?

9

**KARYN ABBOTT & ASSOCIATES**

EXHIBIT - X, PAGE 2
PAGE 313

1    Q    Yes?

2    A    Two weeks and before that it was 5:00 a.m.

3    Q    How long was your start time at 5:00 a.m.?

4    A    That was about, maybe, two weeks also.

5    Q    Okay.  What about prior to that?

6    A    It varies for two and a half years.

7    Q    Between what time and what time?

8    A    Between 3:30 in the morning and 5:30 in the

9  morning.

10   Q    And you said that was for about two and a half

11  years?

12   A    Yes.

13   Q    And what about prior to that?

14   A    Prior to that it was 4:00 o'clock.

15   Q    4:00 a.m.?

16   A    4:00 a.m.

17   Q    And how long was your start time then?

18   A    For about five years, easy five years.

19   Q    And when you said it varied from 3:30 to 5:30

20  for approximately two and a half years, were there

21  certain days that you started at a certain time?

22   A    Yes, it was depending because we used to go by

23  appointments.  They'll start you off at least two, two

24  half hours before your appointments.

25   Q    Okay.  Is there any particular day that you

                                                      10

KARYN ABBOTT & ASSOCIATES

```
 1  started at 3:30 versus 5:30?

 2      A    No, it just depend.  You would change day by

 3  day.

 4      Q    How would you -- or when would you find out what

 5  your start time was?  How far in advance?

 6      A    I would say about two hours prior to my shift.

 7      Q    You'd get a call or something?

 8      A    No, we had the schedule posted.  They would post

 9  the schedule for the following day, not on the weekend.

10  It was before you go home and then you would go check on

11  the schedule.

12      Q    I see.  So --

13      A    And about maybe 12:00 o'clock you can also call

14  and find out what your schedule was for the following

15  day.

16      Q    By 12:00 midnight you mean?

17      A    No, noon.

18      Q    Oh, by noon.  I see.

19           When did you usually finish when you worked

20  between 3:30 -- when you started between 3:30 and 5:30,

21  what was your usual end time?

22      A    My usual end time was between 1:30 in the

23  afternoon and 3:30 in the afternoon.

24      Q    Depending on when you started?

25      A    Correct.
```

                                                                11

**KARYN ABBOTT & ASSOCIATES**

1    Q    Okay.  And what about when you started at 4:00

2  a.m., when did you usually finish?

3    A    I was usually going home about 2:30.

4    Q    In the afternoon?

5    A    In the afternoon.

6    Q    Are you a route driver?  Are you a route driver?

7    A    Yes, I am.

8    Q    And how long have you been a route driver?

9    A    About 30 days.

10   Q    What about before that?

11   A    That was the two and a half years doing -- to

12 the warehouse delivery.  I would call it transportation.

13   Q    You were doing transport?

14   A    Yes.

15   Q    And while you were doing transport, that was

16 that two and a half year period?

17   A    Yes.

18   Q    And then before, were you doing some other type

19 of driving?

20   A    I had a route.

21   Q    You had a route?

22   A    Yes.

23   Q    So when you were starting at 4:00 a.m., about

24 five years ago -- or for about five years --

25   A    When I first started, I had a route.

                                                    12

**KARYN ABBOTT & ASSOCIATES**

EXHIBIT - X, PAGE 5
PAGE 316

```
 1     Q     Okay.  And that was in approximately, what, 2005
 2  to 2010?
 3     A     Yes, 2006 to 2010, something like that.
 4     Q     Okay.  So you were a route driver from about
 5  2006 order 2010 -- I know this is just an estimate so --
 6     A     Yeah, yeah.
 7     Q     Okay.  And then during that time period, you
 8  started at 4:00 a.m.; correct?
 9     A     Yes.
10     Q     And then from about 2010 to 2012 you were a
11  transport driver?
12     A     Yes.
13     Q     And you started from approximately 3:30 to 5:30
14  a.m., depending on the schedule?
15     A     Yes.
16     Q     And now you're back to being a route driver?
17     A     Yes, that's correct.
18     Q     Okay.  Thank you.
19           Do you know -- did your route ever have an
20  assigned route number to it or trip route, user I.D.?
21     A     Yes.
22     Q     Do you remember what those trip route, user
23  I.D.'s were?
24     A     You know what, I think the first one was just
25  called 60 -- 62, I'm sorry.
```

13

1  could to get there as quickly as you could?

2          MS. BONN:  Object to form.

3          THE WITNESS:  I can just, yes, to that.  I would

4  do the best I can to try to make it in decent time, in

5  between the time that I gave them.

6  BY MR. McCAFFREY:

7      Q    Right.  I mean, customer -- sorry, go ahead.

8      A    If I knew I wasn't going to be there in the next

9  two hours, I'm not going to tell them two hours, but

10 then, I'm going to put myself in a bad situation.  So I

11 still got to leave a window open for me.

12     Q    Fair enough.

13          Is satisfying the customer or meeting customer

14 expectation something you strive to do?

15     A    Yes.

16     Q    You understand that's important for you and the

17 company?

18     A    Yes.

19     Q    Have you ever been disciplined in any way for

20 not being timely with your deliveries or your drops?

21     A    No.

22     Q    Have you ever heard of any drivers that have

23 been?

24     A    No.

25     Q    Are you familiar with driver scorecard?

                                                      44

**KARYN ABBOTT & ASSOCIATES**

1    A    Yes.

2    Q    Okay.  And what do you understand the purpose of

3  the driver scorecard to be?

4    A    As far as I know, or what I believe, it's just

5  your performance.

6    Q    Okay.  But can you be any more --

7    A    But I don't I, being specifically to when I

8  asked the first time, and I asked the person who asked me

9  to sign it, I asked him, is this for me or against me?

10  And he always said, don't even worry about it.  We're not

11  going to use it against you, or anything, it's just to

12  let you know where you're at.

13    Q    Famous last words.

14        MS. BONN:  Object to form.

15        THE WITNESS:  And of course, you will never

16  get 200 percent.

17  BY MR. McCAFFREY:

18    Q    Right.  Do you now how the scores determined?

19    A    I think it breaks down into yard time, idle time

20  and delivery time, which delivery time we always going to

21  be off.

22    Q    Do you know whether delivery time, is that

23  measured against what the company's expectation is?

24    A    Yes.  As far as I understand it, when -- since

25  the XATA system came, a lot of people -- we had never got

45

**KARYN ABBOTT & ASSOCIATES**

1 some kind of meeting or informing to tell us exactly how

2 they work it.  They just said, oh, we doing your routes

3 from Texas.  So it's in the XATA system.  So when you get

4 to a stop, the XATA system is telling you whether you're

5 early or late.

6     Q    Okay.  So the XATA system is -- it's, like, I

7 expect you to get to stop A by, I don't know, 8:00

8 o'clock, throwing out a number?

9     A    It's estimated time and then actual time and

10 then it will tell you on time or late.

11    Q    And obviously, you want to either be on time or

12 early?

13    A    Yes, if it is possible, you want to be there on

14 time, yes, exactly, but the only -- I only seen that

15 about 20 percent of the time is that you're on time.  I'm

16 also on time to my first stop.

17    Q    Yeah, and then what?

18    A    And then it varies into late and early, but

19 mostly late.

20    Q    And --

21    A    That's that's how they --

22    Q    Do the scorecard?

23    A    Score cards.  And some of the things that they

24 use, because they break it down --

25    Q    Here I'll show it to you.  137.

                                                          46

**KARYN ABBOTT & ASSOCIATES**

1          (The aforementioned document was marked

2          Plaintiff's Exhibit No. 137 for

3          identification.)

4          MR. McCAFFREY:  So for the record, this is a

5   compilation of Mr. Martinez's score cards for the year

6   2012, based on defendants document production.  It should

7   be a 12-page document, one for each month.

8   BY MR. McCAFFREY:

9      Q    And I know you're just paging through it, Mr.

10  Martinez, but is this your signature on these pages?

11     A    That's what I'm checking, yes.

12     Q    Let me know when you're through.

13     A    Yes.

14     Q    Those are your signatures?

15     A    Yes.

16     Q    And do you see this scorecard in the format that

17  I've presented to you?

18     A    Yes.

19     Q    And does -- is it given to you pretty much

20  monthly?

21     A    Yes.

22     Q    And who gives it to you, Craig?

23     A    Craig and Carl Ramos or Vincent Beltran.

24     Q    Some supervisor?

25     A    Any of them three, not Joe Llamas.

47

1    Q    Joe is above them?

2    A    Joe is the main guy.

3    Q    Okay.  And in terms of the items on the

4 scorecard, do you -- so if I understood your testimony

5 right, XATA will tell you when you arrive, if you're,

6 like, on time or -- you know, how you're doing versus

7 what XATA thinks you should be doing?

8    A    Right.

9    Q    And is that what you understand to be, like --

10 see where it says, like, plan, drive hours plan versus

11 actual trip hours plan, versus actual -- looks like

12 you're right on the money, but is that your understanding

13 of how it works?

14    A    Yes.

15    Q    Okay.  And in terms of your -- you know, you're

16 on time percentage, route performance side, looks like

17 you got 100 percent?

18    A    Run time.

19    Q    Yes.  So for this --

20    A    January, last year.

21    Q    Yeah.  You're 100 percent.  So it looks like

22 you're doing well, but then, I guess, on the route

23 performance there's some difference between plan and

24 actual.  That must be some mistake with this.  I don't

25 know?

48

1        MS. BONN:   Object to form.

2   BY MR. McCAFFREY:

3        Q    Do you have any idea why the plan would be four

4   but you would do 57 on the route performance?

5        A    I don't see how measurements --

6        Q    Doesn't make a lot of sense; right?

7        A    No.

8        Q    Okay.  But in any event, you understand the

9   company, by giving you this scorecard, is, basically,

10  letting you know how your performance rates compared

11  to --

12       A    What's expected.

13       Q    What's expected?

14       A    Correct.

15       Q    Correct?

16       A    Correct.

17       Q    Then when you log your breaks in XATA, how do

18  you do it?

19       A    There's a -- there's a few steps that you got to

20  follow.

21       Q    And what are those steps?

22       A    There's a main menu, and then, you go into the

23  button that says stop, and then, you press stop and it's

24  going to start asking these questions like, what you you

25  doing?  Taking a delivery?  Are you breaking down?  You

                                                          49

1  factors?

2      A     90 percent of the time, I take the same, same,

3  same, same directions, unless I'm aware of some traffic

4  difficulties, then I try to reroute myself to the

5  following stop.

6      Q     And do you feel like it's within your discretion

7  to decide when you want to do that?

8      A     Yes.

9      Q     And when you're taking a different path or a

10  different direction, do you feel like you need to

11  get supervisor approval first or do you feel like you can

12  just do it?

13      A     No, I don't think I have to ask permission for

14  that as long as I'm heading to my -- as long as I'm

15  heading the right way to my stop.  I try not to pave the

16  wrong way because I don't like to be questioned.  I hate

17  all this paper, you know, you know, when they call you.

18  That's why I try to do everything like the way they want

19  you to do it.

20      Q     Showing you again Exhibit 137, it's a copy of

21  your driver scorecard.

22      A     Yes.

23      Q     In these meetings that you had with your

24  supervisor to go over your scorecard, did you ever leave

25  that meeting with the impression that company was trying

87

**KARYN ABBOTT & ASSOCIATES**

1  to pressure you to skip or short change your lunches or

2  breaks?

3           MR. McCAFFREY:  Objection.  Leading.

4           THE WITNESS:  I -- no, I saw it as an

5  overall thing, performance, more than anything it had to

6  do with lunches or breaks, or anything like that.  I

7  didn't see it that it has to be talking about time.  They

8  just talking about how you performing or your habits also

9  with your truck and how you do the route.

10 BY MS. BONN:

11    Q    And during these meetings to go over your driver

12 scorecard, did your supervisor ever mention anything at

13 all to you about your lunches or breaks?

14    A    No.

15    Q    Do you have any understanding about a policy at

16 Alta Dena for a second 30 minute lunch break?

17    A    Yes.

18    Q    And what's your understanding?

19    A    If you gonna -- it's the second lunch is after

20 12-hour period which can be taken -- if you know, that

21 you're going to pass your 12-hour, after your 10 hour

22 you're entitled to take your breaks, but it's without

23 pay.

24    Q    And do you tend to take second lunch breaks or

25 no?

                                                        88

**KARYN ABBOTT & ASSOCIATES**

1   STATE OF CALIFORNIA      ) ss

2

3        I, Julia Y. Ghekiere, CSR NO. 12006, do hearby

4   declare:

5

6        That, prior to being examined, the witness named

7   in the foregoing deposition was by me duly sworn;

8

9        That said deposition was taken down by me in

10  shorthand at the time and place therein named and

11  thereafter transcribed under my direction;

12

13       I further declare that I have no interest in the

14  event of the action.

15

16       I declare under penalty of perjury under the

17  laws of the State of California that the foregoing is

18  true and correct.

19

20       WITNESS my hand this 15th day of February, 2013.

21

22

23  _Julia Y Ghekiere_
    JULIA Y. GHEKIERE, CSR 12006/CLR

24

25

**EXHIBIT Y**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MIGUEL DE LA CUEVA, on behalf of himself and those similarly situated,

        Plaintiff,

    vs.

ALTA DENA CERTIFIED DAIRY, LLC, a Delaware Limited Liability Company, ALTA-DENA CERTIFIED DAIRY, INC., a Delaware Corporation, and DOES 1 through 10, inclusive,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CERTIFIED COPY**

CASE NO.
CV 12-01804 GHK (CWx)

DEPOSITION OF

HUMBERTO RODRIGUEZ

LOS ANGELES, CALIFORNIA

FEBRUARY 11, 2013

Reported by:
JULIA Y. GHEKIERE
CSR No. 12006/CLR
Job: 13-24187

KARYN ABBOTT & ASSOCIATES
COURT REPORTERS
EXHIBIT Ω PAGE 1
427 West Fifth Street, Suite 400
Los Angeles, California 90004
Phone 213.749.1234 / Fax 213.749.0644

```
 1      A     No, I did not.

 2      Q     What was your -- strike that.

 3            Did you have anything to do with this write-up

 4     that you reviewed in preparation for the deposition?

 5      A     I don't understand the question.

 6      Q     Fair enough.

 7            At the time that Mr. De la Cueva received this

 8     write-up for tying the twine on the door, were you acting

 9     as his supervisor or manager?

10      A     Yes.

11      Q     And which one?

12      A     Manager.

13      Q     Manager, okay.

14      A     Yes.

15      Q     And in fact, what was your -- let's just assume

16     this was 2009, what was your job in 2009?

17      A     Manager, distribution manager.

18      Q     For?

19      A     Alta Dena Dairy.

20      Q     And how long did you hold that position?

21      A     2005 through 2010.

22      Q     And when in 2010 did you leave?

23      A     January, early January, I don't have the exact

24     date.

25      Q     Was Mr. De la Cueva still employed when you left
```

KARYN ABBOTT & ASSOCIATES

```
 1   BY MR. McCAFFREY:

 2       Q    Were they a demanding client?

 3            MS. BONN:  Object to form.

 4            THE WITNESS:  No.

 5   BY MR. McCAFFREY:

 6       Q    What happens if you did not meet the delivery

 7   windows that Wal Mart set?

 8       A    One, they could reject the delivery; two, we

 9   would have to reschedule, create additional work for the

10   company; three, they could find a different vendor that

11   would meet those delivery windows.

12       Q    Fair to say that any of those three alternatives

13   are not good for Alta Dena?

14       A    It depends who you ask.

15       Q    Well, who in Alta Dena could possibly think it's

16   good to have any of those three alternatives occur?

17       A    There are people that think that.

18       Q    Like who?

19       A    I don't know specific names but there are people

20   that think that.

21       Q    Who were you thinking of?

22       A    There would be people that wouldn't want that

23   business because of the restrictions.

24       Q    What restrictions?

25       A    Pricing and competition.
```

KARYN ABBOTT & ASSOCIATES

1    recollection that's -- there was also detail sheets that

2    the drivers would fill out which would be a route

3    itinerary where they would document from stop to stop.

4    BY MR. McCAFFREY:

5        Q    As part of XATA or something separate?

6        A    It would be separate from XATA.

7        Q    Prior to XATA or while XATA was going on?

8        A    Prior, prior to XATA.

9        Q    So once XATA started, XATA was the sole source

10   of what the driver was doing and when they were doing it;

11   correct?

12            MS. BONN:  Object to form.

13            THE WITNESS:  It wasn't the sole source.  It was

14   a main tool that we used to monitor the drivers activity.

15   BY MR. McCAFFREY:

16       Q    Was there any other source for determining

17   whether or not the driver took a meal break other than

18   XATA when XATA started?

19       A    Conversations with the drivers, follow-up by

20   supervisors.

21       Q    Anything else?

22       A    No.

23       Q    And did Alta Dena in any way schedule a driver

24   for a 30-minute meal break?

25       A    I do not recall.

KARYN ABBOTT & ASSOCIATES

1    for the day?

2         A    Itinerary?

3         Q    Itinerary.

4         A    Okay.

5         Q    Did Alta Dena ever put on that itinerary, at

6    this particular time, you will take your 30-minute lunch

7    break?

8         A    I don't recall.

9         Q    Okay.  Did Alta Dena ever put on that itinerary,

10   at this particular time, you will take one of your rest

11   breaks?

12        A    I don't recall that.

13        Q    Okay.  If I understood you correctly, there were

14   times when drivers would return between routes, like

15   route 1 and route 2 or route A and route B and have an

16   opportunity to go to the cafeteria and eat a meal?

17        A    Uh-huh.

18        Q    Yes?

19        A    Yes.

20        Q    Okay.  But whether that occurred within the

21   first -- or what portion of their schedule that occurred

22   in was subject to whatever the route had dictated;

23   correct?

24             MS. BONN:  Object to form.

25             THE WITNESS:  To my knowledge, the drivers that

KARYN ABBOTT & ASSOCIATES

1    were doing that were taking their lunches within the

2    five-to-six hour rule.

3    BY MR. McCAFFREY:

4        Q    Did the supervisor or manager ever assign an

5    actual time in the manifest for meal break?

6        A    I do not recall.

7        Q    Did the supervisor or manager ever assign an

8    actual time in a driver's schedule for a meal break?

9        A    There was times that this would be done to meet

10   the route requirements.

11       Q    What do you mean by that?

12       A    Depending on the route requirements, the

13   supervisor would give instructions to the driver to take

14   lunch at a particular point in the route.

15       Q    Okay.  So there are verbal instructions given by

16   the supervisor?

17       A    Yes.

18       Q    Was there ever any manifest or itinerary that

19   came out was in writing; correct?

20       A    I do not recall.

21       Q    Oh, you don't remember if it was the driver was

22   just told what to do, wasn't give an actual piece of

23   paper with his route?

24       A    Back to the question of when the driver was

25   instructed by the supervisor, I don't recall if there was

KARYN ABBOTT & ASSOCIATES

```
 1   a paper given to him.

 2           Are you asking a separate question about back to

 3   the itinerary, that's a different --

 4       Q    Fair enough.  We'll get to both questions.

 5           In terms of the supervisor telling the driver to

 6   take a break at this particular time, do you have any

 7   specific examples of that occurring?

 8       A    Yeah, when the driver would go -- perfect

 9   example would be --

10       Q    No, no, who?  What?  When?  Where?

11           MS. BONN:  Object to form.

12           THE WITNESS:  Richard White driver, lunch

13   between first and second trip CDC Fullerton daily route.

14   That would be an example.

15   BY MR. McCAFFREY:

16       Q    And who was his supervisor?

17       A    It would be Roger Barajas.

18       Q    And what was Mr. -- I take it the driver --

19   there were three different scheduled times for drivers

20   per day?

21           MS. BONN:  Object to form.

22           THE WITNESS:  I don't understand your question.

23   BY MR. McCAFFREY:

24       Q    Three different shifts?

25       A    What do you define as a shift?
```

KARYN ABBOTT & ASSOCIATES

1  A  That was the time that he would come back from

2 his first trip.

3  Q  But how do you know Mr. Barajas assigned him a

4 meal break at that time?

5  A  Conversation with him.

6  Q  With who?

7  A  With Mr. Barajas.

8  Q  And how many times did you have a conversation

9 with Mr. Barajas about Mr. White?

10  A  I don't recall the exact amount of number of

11 times.

12  Q  Is it true that Mr. Barajas is deceased?

13  A  Yes, he is.

14  Q  And when did he pass away?

15  A  I don't remember the day.

16  Q  Well, generally?

17  A  Three years ago.

18  Q  Three years ago, meaning 2000 --

19  A  Actually, no.  Let me think.  I don't recall,

20 but I believe that it was 2009 when he passed away.

21  Q  Can you be any more specific as to when it in

22 2009?

23  A  No, I don't recall.

24  Q  What time of year?

25  A  I don't recall.

KARYN ABBOTT & ASSOCIATES

1    Q    Did you attend his funeral?

2    A    I did.

3    Q    Did a lot of people who worked at Alta Dena

4  attend his funeral?

5    A    They did.

6    Q    May he rest in peace.

7    A    Yes.

8    Q    Can you think of any other examples of a driver

9  who was assigned a meal break other than what you've

10 testified to?

11   A    Not at this time.

12   Q    Do you know if Jesse Sanchez ever assigned a

13 particular time for a meal break for any of the

14 drivers that he supervised?

15   A    I do not and I do not have a specifics.

16   Q    At one point you were distributed a -- strike

17 that.

18        Did you ever instruct any of your supervisors to

19 assign a particular time for a meal break to the drivers?

20   A    What I instructed the supervisors is to make

21 sure that the drivers took their lunch and their breaks.

22 The supervisors were in charged of looking at the route

23 needs and requirements.  So I did not give specific,

24 other than the breaks needed to be taken within the first

25 half of their day schedule work, second break needed to

KARYN ABBOTT & ASSOCIATES

1    be taken on the second half and a lunch in the middle.

2       Q    And did people tell you that that wasn't

3    possible?

4       A    No.

5       Q    You never got any pushback on whether or not

6    that was possible?

7       A    I got feedback on it and most of our drivers

8    were able to meet those requirements.

9       Q    Well, wasn't there a list of drivers who were

10   unable to take meal or rest breaks that you would receive

11   on a regular basis?

12          MS. BONN:  Object to form.

13          THE WITNESS:  There was a -- there was a report

14   -- if you referring to the report that comes off of XATA

15   for those who did not log in meals or breaks.  Whenever

16   conversations were had, many of the drivers would state

17   that they were not able to log off.

18   BY MR. McCAFFREY:

19      Q    Okay.  So you did get feedback that they were

20   not able to take their breaks?

21          MS. BONN:  Object to form.

22          THE WITNESS:  That they were not able to log it

23   off.

24   BY MR. McCAFFREY:

25      Q    So what do you mean -- you drawing some

KARYN ABBOTT & ASSOCIATES

1       Q    So what would need to be rearranged -- what does

2   Alta Dena complaining about, here about rearranging

3   anything?  If Alta Dena had already scheduled people to

4   take -- drivers to take their breaks, then how could it

5   have any impact to continue to do that?

6            MS. BONN:  Object to form.

7            THE WITNESS:  Some of the drivers -- some of the

8   drivers were combining possibly their lunch and breaks.

9   BY MR. McCAFFREY:

10      Q    Wasn't that what Alta Dena policy told them they

11  could do?

12      A    They were instructed to take their first

13  15-minute break at the beginning of their first half.

14      Q    Weren't they actually instructed to combine the

15  breaks?

16      A    I don't believe they were instructed.

17      Q    Weren't they issued a memo by you on January

18  22nd, 2009 to that effect?

19      A    I don't recall.

20      Q    Have you ever seen Exhibit 85 before?

21      A    Yeah, I have seen this.

22      Q    And you issued this memo; correct?

23           MS. BONN:  Object to form.

24           THE WITNESS:  Actually this particular memo

25  never went out.

KARYN ABBOTT & ASSOCIATES

1          (The aforementioned document was previously

2    marked Plaintiff's Exhibit No. 85 for identification.)

3    BY MR. McCAFFREY:

4        Q    Oh, it never went out?

5        A    No.

6        Q    Is this consistent with the driver -- strike

7    that.

8             Did you prepare this memo?

9        A    No, I believe this memo was prepared by the XATA

10   administrative assistant at the time.

11       Q    It says from Beto Rodriguez --

12       A    It does.

13       Q    -- the distribution manager, that is you;

14   correct?

15       A    That is me.

16       Q    So someone else prepared it for you to send out

17   to all drivers; correct?

18       A    Yes, to the best of my recollection.

19       Q    But you're saying it did not go out?

20       A    No.

21       Q    Why didn't it go out?

22       A    I don't recall at this time the reason why it

23   didn't go out.

24       Q    Did some policy actually -- strike that.

25            Did some memorandum, such as Exhibit 85, get

KARYN ABBOTT & ASSOCIATES

1  (Reading):  Alta Dena does not currently input specific

2  time for driver meal and rest breaks as parameters in

3  this territory planner router program."

4        Do you see that statement?

5  A    Uh-huh.

6  Q    Yes?

7  A    I do see that statement, yes.

8  Q    And you know what territory planner is; correct?

9  A    No, I do not.

10  Q    You have no idea what territory planner is?

11  A    It was part of XATA that was going to

12  implemented.  I was not there when that particular phase

13  of XATA was implemented.

14  Q    Okay.  So it's your testimony that territory

15  planner was not used until after you left in January of

16  2010?

17  A    Correct.

18  Q    Okay.  Prior to you leaving in January, 2010,

19  would you agree, however, with the statement that the

20  Alta Dena did not input any specific time window for

21  driver meal or rest breaks in its routing of the drivers?

22  A    I do not recall inputting breaks.

23  Q    Was there any policy or practice at Alta Dena,

24  that you're aware of, that applied to all the different

25  locations; Industry -- City of Industry; right, San

KARYN ABBOTT & ASSOCIATES

1    Diego, there's a third one too; right?

2        A    Yes, there's a third one.

3        Q    Which is the third one?

4        A    Highland.

5        Q    Highland.

6             Was there any practice at any of those places

7    that you're aware of that have any specific time window

8    inputted for driver meal or rest breaks?

9        A    I do not --

10            MS. BONN:  Object to form.

11            THE WITNESS:  -- recall.

12   BY MR. McCAFFREY:

13       Q    Were the three different locations subject to

14   the same requirements with respect to meal and rest

15   breaks while you were there?

16            MS. BONN:  Object to form.

17            THE WITNESS:  Yes.

18   BY MR. McCAFFREY:

19       Q    I'll hand you what we'll -- or what's been

20   previously identified -- were you in charge of all three

21   locations when you were distribution manager?

22       A    All three location reported into me, yes.

23       Q    Okay.  Just to be clear, how long -- for what

24   period of time did that occur?

25       A    2005 through 2010.

 1      were you the distribution manager?

 2              MS. BONN:  Object to form.

 3              THE WITNESS:  I don't recall.

 4      BY MR. McCAFFREY:

 5          Q    And just to make sure I'm clear now that we've

 6      had a chance to look at Exhibit 113, from 2005 to 2010

 7      did the company schedule drivers for lunch between four

 8      to six hours of their shift?

 9              MS. BONN:  Object to form.

10              THE WITNESS:  I don't recall.

11      BY MR. McCAFFREY:

12          Q    Try it one more time because maybe I missed --

13      the tense might have shifted.

14              From 2005 to 2010 as you were working as the

15      distribution manager in charge of Industry, Highland and

16      San Diego, did the company specifically schedule drivers

17      for a meal break within the first six hours of

18      their shift?

19          A    I don't recall.

20          Q    Okay.  Between 2005 and 2010, did the company

21      specifically schedule drivers for a rest break?

22          A    I don't recall.

23          Q    And you're familiar with XATA reports; right?

24          A    Yes.

25          Q    Okay.  I'll hand you what has been identified as

1      Q    Do you know if Dean Foods had the same policies

2   for Alta Dena as it did for Heartland?

3           MS. BONN:  Object to form.

4           THE WITNESS:  I do not know that.

5   BY MR. McCAFFREY:

6      Q    Who would be the person, based on your

7   experience, that would know that?

8           MS. BONN:  Object to form.

9           THE WITNESS:  Probably human resources would be

10  able to answer that question.

11  BY MR. McCAFFREY:

12     Q    Anyone in particular?

13     A    Susana Correa might be able to answer those

14  questions.

15     Q    And then turning back to the driver trip report,

16  Exhibit 106, as one of the -- see if you can help me

17  understand how this is -- how to read this.

18          At the very first page of Exhibit 106 there's --

19  activity appears from March 2nd, 2009; correct?

20     A    Yes.

21     Q    Okay.  If I'm reading it right, this is for Mr.

22  De la Cueva; correct?

23     A    Yes.

24     Q    And it looks like he -- the very first entry he

25  says "clock in" activity at least?

KARYN ABBOTT & ASSOCIATES

EXHIBIT - Y, PAGE 16
PAGE 342

```
 1    point 2 miles.  I don't know if that's an average mile

 2    per hour, 39; is that correct?

 3            MS. BONN:  Object to form.

 4            THE WITNESS:  Not sure what that -- if that's

 5    what it is.

 6    BY MR. McCAFFREY:

 7        Q    Okay.  But the duration is 4 hours and 41

 8    minutes, according to page 1 of Exhibit 106; correct?

 9            MS. BONN:  Object to form.

10            THE WITNESS:  On this form, that's what it says,

11    yes.

12    BY MR. McCAFFREY:

13        Q    Okay.  And do you know how -- I mean, do you

14    have an understanding how XATA works based on your

15    experience working at Alta Dena?

16        A    To the best of my recollection, yes.

17        Q    Is it fair to say that -- well, actually strike

18    that.

19            How would the 4 hour and 41 minute motion

20    segment be captured in XATA?  What did Mr. De la Cueva do

21    to make sure that that was -- or what did he do to have

22    that duration for his motion segment?

23            MS. BONN:  Object to form.

24            THE WITNESS:  To the best of my understanding,

25    the XATA unit detects motion and begins to record.
```

KARYN ABBOTT & ASSOCIATES

99

```
 1              MR. McCAFFREY:  Oh, automatically?

 2              THE WITNESS:  Uh-huh.

 3              MR. McCAFFREY:  Yes?

 4              THE WITNESS:  Yes.

 5    BY MR. McCAFFREY:

 6        Q    Okay.  So does he doesn't hit a button, like --

 7    does he hit a button that says, like, start trip?

 8        A    He can but also the unit will pick up motion and

 9    begin to record it.

10        Q    Okay.  And then, that -- if I'm looking at the

11    times right, it's from 7:10 p.m. to 11:51 p.m., which is,

12    basically, 4 hours and 41 minutes; correct?

13        A    Correct.

14        Q    And then below the motion segment there are

15    other events with durations on page 1 of Exhibit 106,

16    including delay, driver working at plant 20 minutes, 4

17    minute drop unknown.

18              Do you see those?

19        A    Uh-huh.

20        Q    Yes?

21        A    Yes.

22        Q    Are those part of the motion segment?

23        A    Excuse me?

24        Q    Do you know if those are part of the motion

25    segment time?
```

KARYN ABBOTT & ASSOCIATES

1    help me with that too, but I think if you turn to page 2

2    -- actually, excuse me, page 3, he clocks out at 6:17

3    a.m., if I have it right, on March the 3rd, 2009?

4        A    Keep adding that up, then.  So when you look at

5    the totals and you're looking at on duty time, 3 hours

6    and 59 minutes --

7        Q    Uh-huh.

8        A    -- that adds up to on duty time.  And when you

9    look at the 9:59 drive time, that adds up to drive time.

10       Q    So does that mean he worked almost 15 hours that

11   day?

12       A    According to this, yes, it would be 14 hours.

13       Q    Excuse me, 14?

14       A    Yeah, just shy of --

15       Q    Just shy of 14 --

16       A    -- 2 minutes to be exact of 14 hours.

17       Q    So then, in reading the XATA reports, the duty

18   -- so then, just going back to my -- well, strike that.

19   I apologize.

20            In reading the XATA reports, that's how you can

21   look at it on a daily basis you add the drive plus the

22   duty time and that should be your hours worked?

23       A    Correct.

24       Q    Okay.  And then, in trying to figure out within

25   the day, the activities and the time, things spent to do

KARYN ABBOTT & ASSOCIATES

1    whatever, the motion segment is time actually moving, the

2    truck is actually moving?

3        A    Yes.

4        Q    Okay.  And that, obviously, is independent of

5    things like delay or drop or inspection or hook or break

6    or whatever; correct?

7        A    Repeat that.

8        Q    Sure.  The motion segment time is independent of

9    these other activities that are identified, such as,

10   delay, drop, inspection, hook, et cetera?

11       A    Yes.

12       Q    Okay.  So then the only thing -- here's the --

13   when I add up -- I don't know how -- so, like, on page 1

14   of Exhibit 106, it looks like after his long motion

15   segment -- sorry to characterize it as long, but it seems

16   to be long, 4 hours and 41 minutes, it ends at 11:51

17   p.m., according to this XATA report; correct?

18       A    Yes.

19       Q    Okay.  And then he has another motion segment at

20   the top of page 2 that begins at 12:07 a.m.?

21       A    Yes.

22       Q    But there's -- and this is what I added up, like

23   66 minutes of activities between -- or at least,

24   according to the XATA report, between 11:51 p.m and 12:07

25   a.m., but there's only 16 minutes?

KARYN ABBOTT & ASSOCIATES

EXHIBIT - Y, PAGE 20
PAGE 346

1      Q    Yes?

2      A    If you guys are going to whisper, is that normal

3   for you guys to whisper?

4      Q    Yeah, usually we talk louder.

5      A    Just making sure.  It's just -- I think it's

6   kind of rude.

7      Q    It's not to be rude.  She helps me figure out

8   what to ask you.

9      A    It's just, you know, if she would ask the

10   question, then I can answer the question, I guess, you

11   don't necessarily need to.

12          MS. CHESLER:  We're not allowed to both ask you

13   questions much as I would like to.

14          THE WITNESS:  Okay.  Very good.  There you go.

15   I'm learning.

16          So was there other people that are able to make

17   adjustments to XATA?  Yes.

18   BY MR. McCAFFREY:

19      Q    Who?

20      A    It would be the XATA administrator.

21      Q    And who was that?

22      A    At the time it was -- the supervisors did most

23   of the reviews of the documents.  So it would be Joe or

24   -- who else would review in XATA?

25      Q    Joe, meaning Joe Llamas?

KARYN ABBOTT & ASSOCIATES

EXHIBIT - Y, PAGE 21
PAGE 347

1     A     Joe Llamas.

2     Q     Anyone else you can think of?

3     A     No, that was mainly who would be reviewing the

4  documents.

5     Q     And who would have access to make input into the

6  XATA?

7     A     Adjustments.

8     Q     Adjustment?

9     A     Yes.

10     Q     Are you aware of any electronic data or metadata

11  or printout that would show who made what inputs?

12     A     No.

13     Q     Is there any way of looking at Exhibit 106 which

14  is just this hard copy you have in front of you, to tell

15  whether or not it was a manual or an automatic input?

16     A     No.

17     Q     But you do know that in terms of what happens in

18  XATA, the motion segment part is automatic, that's truck

19  moving?

20     A     Yes.

21     Q     So that's the one thing we can count on barring

22  some sort of electronic or automated issue, but there's

23  no real human element to motion segment?

24          MS. BONN:  Object to form.

25          MR. McCAFFREY:  Correct?

KARYN ABBOTT & ASSOCIATES

```
 1            THE WITNESS:  No, it's --
 2    BY MR. McCAFFREY:
 3        Q     To put it another way, XATA automatically --
 4        A     To the best -- I understand the question.
 5        Q     Make sure it's clear.  Let's try again.
 6              To the best of your understanding, the one thing
 7    that's absolutely automated in XATA is "truck moving."
 8    So the motion segment is going to be an automatic timing
 9    by the XATA software based on when the truck was actually
10    moving?
11        A     No.
12        Q     Oh, darn.
13        A     There are times that if the satellite unit went
14    out, we would have to make adjustments to the log book
15    which included how much time the driver would be driving.
16        Q     And fair enough.  There's always, sort of, let's
17    say exceptional circumstances.
18        A     Yes.
19        Q     But generally speaking, if everything's working
20    properly, the one automatic timing feature of XATA is the
21    truck moving.  So the motion segment is an automatic
22    timing thing?
23        A     If everything's working properly, yes.
24        Q     No human error?
25        A     No human error or no satellite misfunction, the
```

KARYN ABBOTT & ASSOCIATES

1    XATA would pick up motion.

2        Q    There's no human error aspect of that because

3    the XATA unit just picks up when the truck is moving;

4    correct?

5        A    Yes.

6        Q    Okay.  Human error comes in with these other

7    entries that appear in this Exhibit 106 in the sense

8    that, like, the person has to actually input how many

9    minutes it took him to do a "driver working in plant" or

10   "drop" or "inspection"; correct?

11       A    Correct.

12       Q    Or for that matter, take a break?

13       A    Yes.

14       Q    That's all inputted by human, so subject to

15   human mistakes?

16       A    Yes.

17       Q    And do you have any explanation at all as to why

18   at page 2 it appears that there's an entry for a delay

19   meals, near the bottom, for 31 minutes; that there would

20   be that entry yet Mr. De la Cueva would written up for

21   not logging a meal break as reflected in Exhibit 12?

22            MS. BONN:  Object to form.

23            THE WITNESS:  No, I do not know why that would

24   be.

25   BY MR. McCAFFREY:

KARYN ABBOTT & ASSOCIATES

```
 1      Q    And then in terms of the timing of when he took
 2   his break, or alleged -- you know, has the break entered
 3   here on page 2, Exhibit 106 --
 4           (Ms. Chesler left the proceedings.)
 5   BY MR. McCAFFREY:
 6      Q    Can you tell is that after the motion segment of
 7   4 hours and 54 minutes?
 8      A    According to this report, that's when he logged
 9   it.
10      Q    After the motion segment?
11      A    It appears that way in this report, yes.
12      Q    So then sometime after 6:03 a.m., based on this
13   report, Exhibit 106?
14      A    Based on the driver's input, yes, I would say
15   that's when he logged in.  Whether that's when he
16   actually took the break or not, only he knows.
17      Q    Okay.  But based on this report, he took his
18   break sometime after --
19           MS. BONN:  Object to form.
20           THE WITNESS:  That's when he logged it.
21   BY MR. McCAFFREY:
22      Q    He logged it sometime after 6:03 a.m. on March
23   3rd, 2009?
24      A    Yes.
25           (Ms. Chesler joined the proceedings.)
                 o
```

KARYN ABBOTT & ASSOCIATES

```
 1   BY MR. McCAFFREY:

 2      Q    I have one more -- this has been previously

 3   identified as -- is this the first two pages, though,

 4   okay.  So we'll make this 115, the first two pages of

 5   Exhibit 105, this is like a 40 page document.

 6           (The aforementioned document was marked

 7   Plaintiff's Exhibit No. 115 for identification.)

 8   BY MR. McCAFFREY:

 9      Q    So for the record this something called a driver

10   break report.

11           Are you familiar with this printout, Mr.

12   Rodriguez?

13      A    I don't remember this report.

14      Q    Okay.  Do you have any explanation why the break

15   that is reflected on page 2 of Exhibit 106 does not show

16   up in Exhibit 115 or the first page of Exhibit 105?

17      A    You're correlating report, page 2, to back to

18   the XATA report --

19      Q    Correlating Exhibit 115, page 1 and 2?

20      A    Page 2 and 2.

21      Q    To page 2 of Exhibit 106, the XATA report?

22      A    Okay.  Page 2.  Okay.

23      Q    Because remember, page 2 at the bottom or near

24   the bottom is a 31 delayed meal entry --

25      A    Okay.
```

KARYN ABBOTT & ASSOCIATES

1    Q    -- yet there's no break report or no break

2    indicated on the driver break report reflected in Exhibit

3    115 and my question for you is do you have any

4    explanation as to why that would be?

5         MS. BONN:   Object to form.

6         THE WITNESS:   During my time with XATA Net,

7    there were occasions when manual adjustments would be

8    made and if they were not done correctly, they would not

9    reflect on some reports.   I don't have a

10   logical explanation without researching more this report

11   as to why that delay does not appear here.

12   BY MR. McCAFFREY:

13   Q    Meaning the delay that shows up in Exhibit 106,

14   page 2, why doesn't it show up in Exhibit 106?

15   A    Correct.   It could have been --

16   Q    Can you be any more specific about how it could

17   happen?

18   A    Yes.

19   Q    Okay.

20   A    Driver failed to log his lunch.   He was then

21   asked by the supervisor why he failed to take his lunch.

22   Driver then says, I didn't log it.   Supervisor then makes

23   an adjustment to the logs to reflect that he did, in

24   fact, take a lunch.

25   Q    But the logs meaning the XATA logs?

KARYN ABBOTT & ASSOCIATES

1      A      Correct.

2      Q      But why would that not show up in Exhibit 115?

3      A      Because if that was done incorrectly on the XATA

4  system, it might not register on the actual driver break

5  report.

6      Q      And who -- is there any way to track and figure

7  out who actually made the entry for that meal break?

8             MS. BONN:  Object to form.

9             THE WITNESS:  Yes, by looking at the

10 XATA report, you can see if that was a manual input by

11 the driver or by a supervisor.

12 BY MR. McCAFFREY:

13     Q      And you can see when it was made?

14     A      I don't remember the answer to that question.

15     Q      But you can see who did it?

16     A      Uh-huh.

17     Q      Yes?

18     A      Yes.

19     Q      Okay.  Well, actually, I have one more

20 questions.

21             Do you have any explanation why, if the XATA

22 report reflects nearly 14 hours of work, Mr. De la Cueva

23 only got paid for eleven and a half --

24             MS. BONN:  Object to form.

25             MR. McCAFFREY:  -- on March 2nd?

KARYN ABBOTT & ASSOCIATES

1   from different customers because of situations that

2   either the driver or the receiver or there was an

3   indifference that could not be resolved where we did have

4   to shift some drivers.

5          I don't recall if Mr. De la Cueva was ever

6   reassigned from one route to the other and if he was,

7   what the specific reason for the reassignment was.

8       Q   Thank you.  Now I'll hand you what's been

9   previously identified at Exhibit 33 and just ask if this

10  refreshes your memory at all as to any circumstances

11  giving rise to reassigning Mr. De la Cueva or not

12  assigning Mr. De la Cueva to any particular clients?

13      A   Yeah, I don't recall what the urgency of not

14  sending Mr. De la Cueva would be at the time.

15         (The aforementioned document was previously

16  marked Plaintiff's Exhibit No. 33 for identification.)

17  BY MR. McCAFFREY:

18      Q   Okay.  I'll hand you what we'll identify as

19  Exhibit 116.  I'll just identify it for the record while

20  you review it.  It's a three-page document Bates labeled

21  5226 to 5228.

22         (The aforementioned document was marked

23  Plaintiff's Exhibit No. 116 for identification.)

24  BY MR. McCAFFREY:

25      Q   Do you remember this exchange, Mr. Rodriguez?

KARYN ABBOTT & ASSOCIATES

1      A     Looking at it, I recall what this is.

2      Q     And what's your recollection?

3      A     It's an email in which a list of drivers that

4   needed correction on their logs was provided.

5      Q     And this is correction on their logs with

6   respect to meal and rest break logging in and out?

7            MS. BONN:  Object to form.

8            THE WITNESS:  I don't know the specifics of what

9   the corrections were.

10  BY MR. McCAFFREY:

11     Q     And in that first email or -- I shouldn't say

12  first, but the email that appears in the first email,

13  Exhibit 116, the top of page 1 appears to be from Joe

14  Llamas to you; correct?

15     A     I don't believe that would be the first email.

16  I believe the first email is --

17     Q     At the bottom?

18     A     /EP.

19     Q     Right.  I'm mean -- but I'm just saying --

20     A     Just want to be clear what you mean by "first

21  email."

22     Q     -- at the top, the email appears as the first

23  email.

24     A     Okay.

25     Q     The very first one we see as page 1 of Exhibit

KARYN ABBOTT & ASSOCIATES

1  116 but you're absolutely right.  But the one that begins

2  with "Beto"?

3      A    Yes.

4      Q    You already have a recollection as to what Mr.

5  Llamas was referring to when he says (reading):   "The

6  write-ups were put on hold for John Keith"?

7      A    Yes.

8      Q    What does he refer to there?

9      A    The write-ups were corrective actions that the

10  supervisors were instructed to carry out if drivers

11  failed to follow their proper procedures on XATA.

12      Q    Including for logging meal and/or rest breaks?

13      A    For failing to.

14      Q    For failing to log a meal or rest break?

15      A    Uh-huh.

16      Q    Yes?

17      A    Yes.

18      Q    And that's consistent with what we saw on, like,

19  Exhibit 12 for Mr. De la Cueva on March 2nd, 2009, the

20  write-up I showed you a little while ago?

21          MS. BONN:  Object to form.

22          MR. McCAFFREY:  Let me try again.

23  BY MR. McCAFFREY:

24      Q    Is it fair to say that -- I'm reading this to

25  say that, like, there was a time when people -- managers

KARYN ABBOTT & ASSOCIATES

1    the list, the best of my recollection, it was a matter of

2    how we were doing the write-ups and how we were executing

3    them.

4        Q    Can you be any more specific --

5        A    That's the best --

6        Q    -- was there something in particular about how

7    you were doing the -- how the company was doing the

8    write-ups that was causing questions?

9        A    What I remember is that during this time the

10   company made a huge effort to make ensure that the morale

11   of the department was always uphold.  I know that we

12   worked really hard to ensure that communication was clear

13   to the drivers.  We worked diligently with all --

14   specifically, human resources and our general manager, to

15   ensure that drivers were treated with the outmost

16   respect.

17          So I don't remember the specifics, but I can

18   make an assumption that by the number of drivers that are

19   here that were not comfortable that that many drivers

20   would be making mistakes.  So they probably wanted to

21   address and ensure that if the drivers were making

22   mistake, that if that was the case, why would so many

23   drivers be making mistakes.

24       Q    So the number of drivers that appear on the

25   second and third pages of Exhibit 116 you consider that

KARYN ABBOTT & ASSOCIATES

1   or -9.

2       Q    So as of the time of this email you already knew

3   that there was at least a couple different campaigns that

4   had come and went?

5       A    Yes.

6       Q    Was Mr. De la Cueva at all vocal about wanting

7   to have a union?

8       A    I don't know that.

9       Q    Did he share his opinions or thoughts with you

10  at all as to whether or not he wanted a union?

11      A    We were not allowed to discuss union issues with

12  the employees.  So I don't recall him expressing his

13  particular preference on whether he wanted to be a union

14  member or not.

15      Q    Did you have a list of those drivers that you

16  thought were pro union?

17           MS. BONN:  Object to form.

18           THE WITNESS:  No.

19  BY MR. McCAFFREY:

20      Q    Were you concerned with the number of hours of

21  overtime that drivers worked?

22           MS. BONN:  Object to form.

23           THE WITNESS:  Yes.

24  BY MR. McCAFFREY:

25      Q    And why were you concerned with the number of

KARYN ABBOTT & ASSOCIATES

EXHIBIT - Y, PAGE 33
PAGE 359

```
1        Q    I'll hand you what we'll identify as Exhibit
2   118, sorry, hand you what we'll identify as Exhibit 60.
3             (The aforementioned document was previously
4   marked Plaintiff's Exhibit No. 60 for identification.)
5   BY MR. McCAFFREY:
6        Q    Do you recall receiving emails, such as the one
7   that's reflected in Exhibit 60?
8        A    Yes.
9        Q    Is it fair to say that the email speaks for
10  itself insofar as it's a report of drivers who did not
11  either take or -- take a lunch or take a less than 30
12  minute lunch?
13            MS. BONN:  Object to form.
14            THE WITNESS:  It can also speak that the driver
15  failed to login and correctly.
16  BY MR. McCAFFREY:
17       Q    Do you have an idea why Norma Jimenez thought it
18  was drivers who did not take a lunch or were taking less
19  than 30 minutes when she wrote this email on June 25th,
20  2009?
21       A    I do not know.
22       Q    How often did you receive a report, such as the
23  one that's attached to Exhibit 60?
24       A    I don't recall.
25       Q    Did you do anything to help Ms. Jimenez correct
```

KARYN ABBOTT & ASSOCIATES

1    a similar subject.

2           Do you recall any further discuss with Ms.

3    Jimenez or Mr. Carroll or Mr. Binks and Mr. Llamas about

4    the meal break issue?

5       A    No, I do not.

6       Q    Did you realize that the attachments that she

7    was sending effected San Diego, Highland and City of

8    Industry?

9       A    Yes.

10      Q    Who at City of Industry was your point person

11   for discussing the issue raised by Ms. Jimenez in these

12   emails?

13      A    The supervisors.

14      Q    Meaning Mr. Sanchez; correct?

15      A    Yes, Mr. Sanchez, Mr. Widlund, Mr. Barajas, Mr.

16   Llamas.

17      Q    Do you have any explanation as to why she just

18   keeps addressing these emails to Matt and Randy as

19   opposed to one of those from City of Industry?

20      A    I would imagine it's because she was able to

21   communicate directly with the supervisors in the City of

22   Industry.

23      Q    Because that's where she was located?

24      A    That's correct.

25      Q    At some point did these emails -- or did these

KARYN ABBOTT & ASSOCIATES

1    emails ever stop coming?

2        A    Yes.

3        Q    When did they stop?

4        A    I don't recall.

5        Q    Why do you say that they did stop?  Because you

6    left?

7        A    No.  Because training got better, drivers

8    started to document the time that they were taking off

9    better.

10        Q    They started to log their breaks in XATA?

11        A    More accurately.

12        Q    Did you ever hear while you were working as the

13    distribution manager, that the drivers were logging

14    breaks, even though they didn't take them?

15            MS. BONN:  Object to form.

16            THE WITNESS:  No.

17    BY MR. McCAFFREY:

18        Q    Did you ever hear that drivers were not logging

19    breaks even though they were taking them?

20        A    There was people that were written up, I

21    believe, for taking breaks and not logging them.

22        Q    All the drivers that are identified on Exhibit

23    60, 61 and 62, is it your belief that each one of those

24    drivers actually took a break but did not log it into

25    XATA?

KARYN ABBOTT & ASSOCIATES

1          MS. BONN:  Object to form.

2          THE WITNESS:  Yes.

3   BY MR. McCAFFREY:

4      Q    So you're absolutely certain that every

5   single instance of a driver not logging a break was

6   simply just the human error of the driver not logging the

7   break?

8          MS. BONN:  Object to form.

9          MR. McCAFFREY:  As opposed to the driver didn't

10  actually take they break?

11         THE WITNESS:  Based on the information that we

12  provided the drivers, it would be my assumption that,

13  yes, they were clear in what they needed to do.  So yes,

14  I would trust my driver to follow the directions that

15  they were given to, as far as their lunch and breaks.

16  BY MR. McCAFFREY:

17     Q    Right.  But it seems like if I'm understanding

18  it right your testimony is, basically, if the driver

19  didn't log it, that's driver error because they

20  definitely took it; correct?

21     A    Are you saying that the driver didn't take it?

22     Q    That's the next question.

23         Do you have any --

24     A    I don't have any knowledge of a driver not

25  taking their lunch and breaks.

KARYN ABBOTT & ASSOCIATES

1    can talk the same thing.

2        Q    Well, let's start with what's your definition of

3    route?

4        A    My route is a wholesale route that has multiple

5    stops.  Tractor trailer routes have one or two stops,

6    individual, independent, any types of another and a relay

7    driver has facilities.

8        Q    So a route refers to the concept of

9    having multiple stops along the way?

10       A    That's what I referred to, yes.

11       Q    As opposed to one long trip where you go and

12   drop it off and bring it back?

13       A    Correct.

14       Q    Or going to a facility to do the relay?

15       A    Correct.

16       Q    Okay.  And so when you write this email, it's

17   Exhibit 74, you're just talking about routes or are you

18   talking all the drivers?

19       A    When I refer to --

20       Q    Yard time?

21       A    Yes.  (Reading):  "Hello team, good job in

22   managing XATA yard time."

23       Q    Does that go for --

24       A    That goes for everybody.  All drivers have yard

25   time.

KARYN ABBOTT & ASSOCIATES

1      Q    Okay.  And is the expectation what you

2  just explained?

3      A    Yes.

4      Q    They collect the paperwork, do their

5  pre-inspection --

6      A    Yeah, the expectation was that a driver would be

7  able to come in and leave the yard in half an hour.

8      Q    Regardless whether it was a wholesale,

9  tractor trailer or relay?

10     A    Yes.

11     Q    And then when say (reading):  "Continue to

12 review total route time with all drivers," is that

13 applying to all drivers as you write in the email?

14     A    Uh-huh, yes.

15     Q    Okay.  So route time expectation in the way

16 you're using in this email is for all the drivers that

17 you described, whether they were doing wholesale, tractor

18 trailer or relay?

19     A    Yes.

20     Q    And now using the word "route," as you did in

21 this email, does the route time that the company has

22 allocated for the route include the yard time?

23     A    Yes.

24     Q    And then why did you write -- when you

25 say (reading):  "Total time for the route is what

KARYN ABBOTT & ASSOCIATES

1    determines what we pay our drivers in how they perform

2    versus budget."

3           What did you mean by that?

4       A    We have a budget that is pre-approved at the

5    beginning of the year and we, as a company, are measured

6    how we perform versus that budget.

7       Q    Is was there any -- or was there any line item

8    in the budget for overtime compensation for drivers?

9       A    Yes.

10      Q    Do you remember how much?

11      A    No.

12      Q    Was there any line items in the budget

13   for premium pay for missed meal or rest breaks for the

14   drivers?

15      A    I don't recall.

16           MR. McCAFFREY:   Okay.   Let's take a break.

17           (A recess was taken.)

18   BY MR. McCAFFREY:

19      Q    Just so I'm clear on the -- kind of talking

20   about the definition of routes --

21      A    Right.   Back to 74?

22      Q    Yeah.   But if I understood your testimony

23   correctly, with respect to 74, you were talking about all

24   the drivers whether they were wholesale, tractor trailer

25   or relay; correct?

KARYN ABBOTT & ASSOCIATES

```
 1   route.  It's like a paperboy.  You're going to go do your
 2   delivery.  That's your route.  But -- okay.
 3           When we were talking earlier about whether or
 4   not the company, while you were there from 2005 to 2010,
 5   ever built in a line item in the route for the meal or
 6   rest break, were we on the same page that that was
 7   talking about for all drivers?
 8       A    Yes.
 9       Q    Whether you call it a stop or a relay or --
10       A    Right.  Whatever.
11       Q    You understand what I'm asking?
12       A    I understand what you're asking.
13       Q    And so just to circle this off, once and for
14   all, it is true that while you were the
15   distribution manager from 2005 to 2010 that the company
16   did not build in a specific time in any of its drivers
17   routes in the very generic sense, for a meal and/or rest
18   break; correct?
19       A    That is incorrect.
20       Q    Okay.  What is incorrect about that?
21       A    Whenever we did route expectations, two breaks
22   and a lunch was included on that route, time expectation.
23       Q    So when the company said that they cannot do a
24   specific -- well, strike that.
25           You're saying you built it in with the
```

KARYN ABBOTT & ASSOCIATES

1    functioning as the distribution manager?

2        A    Yes.

3        Q    And on how many occasions did you do that?

4        A    I don't recall the exact number but there was

5    couple times where we went through reroutings.

6        Q    If you did a rerouting, you would assist in how

7    to do a reroute?  Is that what you're saying?

8        A    Supervisors would determine the routes.  I would

9    be involved with the approval of the routes.

10       Q    And this is if we're going to change the basic

11   direction the way we want the driver to go?

12       A    Yes, or to possibly meet customer needs.

13       Q    And then generally speaking, once that route was

14   established, that was what was used for that customer

15   unless and until it was changed?

16       A    Or unless the driver found a better way of

17   running it which many times was the case.

18       Q    Because of traffic or whatever?

19       A    Experience.  The drivers knew the report that

20   they had with the receives, many difference reasons.

21       Q    Okay.  If the driver was going to change the

22   route, did they need to formulate -- get approval?

23       A    Yes, they would communicate with the supervisor

24   and many times they would be able to sequence it on the

25   computer system so that the tickets would printout in

KARYN ABBOTT & ASSOCIATES

192

1   when putting the routes, incorporating the half an hour

2   lunch and the two, 15 minutes breaks, half an hour for

3   the yard, half an hour at the end of it and the number of

4   stops that were in between.

5        Q    Okay.  So your testimony is that the company

6   built in an extra hour in the driver's day?

7        A    I wouldn't call it extra.

8        Q    What would you call it?

9        A    I would call it that you had an hour of yard

10  time and you had a half an hour lunch and two 15 minute

11  breaks.  That's what I would call it.

12       Q    And you know this for a fact that they did this;

13  that the supervisors built this into the routes?

14       A    Those was the guidelines, yes.

15       Q    When you say the guidelines, you mean the

16  company's guidelines?

17       A    Yes.

18       Q    And those guidelines applied to City of Industry

19  Highland --

20       A    And San Diego.

21       Q    -- and San Diego?

22       A    Yes.

23       Q    Did you ultimately approve all the routes for

24  those three location for 2005 to 2010?

25       A    No.

KARYN ABBOTT & ASSOCIATES

1     Q    Who did?

2     A    Highland, it would be Randy Binks and San Diego

3  would have been Matt Carroll.  Industry would have been

4  me.

5     Q   Okay.  Did they -- or was there any -- strike

6  that.  I'll withdraw that.

7        Do you have any explanation why Mr. Llamas

8  testified that he did not add 30 minutes for a meal or

9  rest break and/or 15 minutes for rest breaks when he was

10  creating routes?

11       MS. BONN:  Object to form.

12       THE WITNESS:  No.

13  BY MR. McCAFFREY:

14     Q   So you dispute that testimony?

15       MS. BONN:  Object to form.

16       THE WITNESS:  No.  You asked me a question if I

17  had knowledge, and I do not have any knowledge.

18  BY MR. McCAFFREY:

19     Q   Okay.  But do you have any explanation why Mr.

20  Llamas --

21     A   No, I don't have an explanation why we would

22  have said that.

23     Q   Did you ever obtain the driver's authorization

24  to deduct 30 minutes from their pay?

25       MS. BONN:  Object to form.

KARYN ABBOTT & ASSOCIATES

1    at City of Industry or Highland or San Diego, to

2    communicate to the drivers that they could ask for a

3    reversal of the 30 minute automatic reduction?

4        A    I do not recall.

5        Q    Was there anything distributed to the drivers in

6    writing from 2005 to 2010 at City of Industry, Highland

7    or San Diego, that provided to them notice that they

8    could seek a reversal of the 30 minute automatic deduct

9    if they didn't get the 30 minute duty free meal break?

10       A    I do not recall.

11       Q    I'm handing you what's been previously

12   identified as Exhibit 91.

13       A    Thank you.

14            (The aforementioned document was previously

15   marked Plaintiff's Exhibit No. 91 for identification.)

16   BY MR. McCAFFREY:

17       Q    This is an email from Josephina Contreras to

18   numerous recipients, the subject is a recap of meeting

19   for 10/9/08.

20   BY MR. McCAFFREY:

21       Q    Did you prepare the notes that are attached to

22   Exhibit 91?

23       A    No, I believe that this would have been notes

24   that were taken during our distribution meeting.

25       Q    Do you know who took the notes or who prepared

KARYN ABBOTT & ASSOCIATES

1      for those extra hours?

2          A     Yes.

3          Q     Okay.  So the company definitely wants to avoid

4      that; correct?  Because the goal is to have zero double

5      time; correct?

6          A     There was double time that was budgeted in as

7      part of the overtime.  So the objective was to try to hit

8      our goals.

9          Q     But when you -- this is where I guess we're just

10     having a problem all day but it's going to be fine, when

11     and if we do this later, but when you write (reading):

12     "Our goal as a team is to have zero double time", isn't

13     that saying that the goal is to have zero double time?

14         A     To strive.

15         Q     So that was the goal for the company; correct?

16         A     The goal for our department was to strive not to

17     have any of our employees have to work more than 12

18     hours.

19         Q     Okay.  Isn't it also true that all overtime

20     needed to be justified?

21         A     Yes, it needed to be understood and explained

22     why there was overtime.

23         Q     And in fact, you were commenting that the

24     company was improving because the last period that you

25     looked at 160 hours of double time is was down to 40;

KARYN ABBOTT & ASSOCIATES

1    correct?

2        A    Correct.

3        Q    Okay.  And if a driver was going to run more

4    than 12 hours in a day, he needed to be sat down and

5    counseled; correct?

6        A    Yes.

7        Q    Okay.  Is it true that the 30 minute automatic

8    deduct kicked in only when the driver exceeded his

9    regular schedule?

10           MS. BONN:  Object to form.

11   BY MR. McCAFFREY:

12       Q    I.e., when the driver went beyond eight in the

13   day or 10 in the day and those triggered

14   overtime obligations on behalf of the company?

15           MS. BONN:  Object to form.

16           THE WITNESS:  Not sure I understand the

17   question.

18   BY MR. McCAFFREY:

19       Q    Do you know when the 30 minute automatic deduct

20   kicked in?  Was it everyday?

21       A    I don't know.

22       Q    Do you recall the routes being changed in or

23   around October 2008 so the drivers would work less than

24   12 hours in any one day?

25       A    I don't recall the specifics.

KARYN ABBOTT & ASSOCIATES

210

1    Q    Were routes ever changed from 2005 to 2010 to

2    address any of the meal and/or rest break issues that

3    were raised by Ms. Jimenez in Exhibit 60, 61 or 62?

4    A    I'm sorry, you're talking about the email from

5    Norma Jimenez which was sent in 2009?

6    Q    Yes.  In the fall of 2008 you did route

7    readjustments to make sure drivers didn't work more than

8    12 in a day; correct?

9    A    Yes.

10    Q    Were there any route readjustments made in 2009

11    in response to Ms. Jimenez's emails that we see as

12    Exhibit 60, 61 or 62?

13    A    No, I don't recall.

14    Q    Did you ever tell any driver that they could not

15    stop and take a break?

16    A    No.

17    Q    Did you ever tell any driver that if they were

18    late to a delivery, then there would be no more work for

19    them?

20    A    No.

21    Q    Did you ever tell a driver that if they were

22    late for a delivery that the company would lose the

23    customer and if customer would cancel the order?

24    A    No.

25    Q    Do you know who Luis Vasquez is?

KARYN ABBOTT & ASSOCIATES

1      Q      Did anyone, once XATA was instituted, did anyone

2  monitor through XATA the whereabouts of the truck, who

3  was back at the plant?

4      A      Yes, the supervisors.

5      Q      And is it fair to say that supervisors could see

6  where every truck was at any given point in time using

7  XATA?

8      A      Normally, yes.

9      Q      Unless XATA was down?

10     A      Correct.

11     Q      But generally XATA allowed the supervisors to

12 see where each and every truck was at any given point in

13 time?

14     A      Normally, yes.

15     Q      And is that something that's shown on, like, a

16 map so you can see each truck by an identifying number or

17 did you have to go line by line?

18     A      Normally you would be able to identify it on the

19 screen.

20     Q      So you could see where the whole fleet was for

21 lack of a better if the screen was up and running using

22 XATA?

23     A      If everything was working properly, yes.

24     Q      And generally speaking, everything was working

25 properly?

KARYN ABBOTT & ASSOCIATES

1    XATA headquarters and get help.

2        Q    Like an outside vendor?

3        A    XATA was an outside vendor.

4        Q    Okay.  Did you think XATA was a good tracking

5    system?

6            MS. BONN:  Object to form.

7            THE WITNESS:  I wouldn't necessarily call XATA a

8    tracking system.  XATA was a system put in place to help

9    the drivers.  One of the things that XATA did was the

10   driver log book, it helped the drivers a lot with that.

11   The XATA also helped us with things like idle time.  So

12   it was a good system to put in our vehicles for many

13   difference reasons.

14   BY MR. McCAFFREY:

15       Q    Was it only for the drivers benefit, XATA?

16       A    No, I think it was not only for the drivers, but

17   it was also for better of the company.

18       Q    Wasn't the whole point of XATA to help improve

19   the company's efficiency and productivity?

20           MS. BONN:  Object to form.

21           THE WITNESS:  As a company we were always

22   looking to make sure that we were the safest fleet and

23   that we deliver our products in the most efficient way.

24   XATA was just a component of the many different things we

25   did for our drivers to help them.

KARYN ABBOTT & ASSOCIATES

1    Q    So ultimately is it fair to say that you had to

2    approve any change in routes?

3    A    No, there was different levels of route

4    involvement that I had.  If a -- if customer A wanted

5    their delivery before customer B, and customer B did not

6    have a problem with it, the supervisor could go ahead and

7    make a simple change like that.

8         At the time that I would be involved would be if

9    it impacted labor reduction, full-time employee reduction

10   or the reduction of routes or the additional routes.

11   Q    And the example you gave is where customer B

12   says I want to be first before customer A, are you

13   talking about on a permanent basis or are you talking

14   about a temporary or one-time switch?

15   A    Many times it depended on the customer's needs.

16   There were times when we had locations that would require

17   an earlier delivery because of construction so we would

18   accommodate them at the time.  Other times it was a

19   permanent because of their -- you had a some type of city

20   ordinance that would not allow you to go into that area

21   at that time so you would have to respect that.

22   Q    If it were a permanent change like that, is that

23   something that would go to -- or be brought to your

24   attention?

25   A    No.

KARYN ABBOTT & ASSOCIATES

1      Q     So the supervisor could make that change?

2      A     Yes.

3      Q     In terms of actually creating a route when you

4   took over in 2005 as distribution manager, there were

5   already routes in place for the locations that you were

6   in charge of; correct?

7      A     Correct.

8      Q     And I mean routes, I mean, in the whole global

9   sense that you did in that one email, Exhibit 74?

10     A     Okay.

11     Q     Okay.  Are you aware of those routes in the

12   global sense changing in any way in an attempt to address

13   any meal and/or rest break issues for the drivers?

14     A     No.

15     Q     Is it fair to say you are aware of the changes

16   to the routes from 2005 to 2010 to accommodate either

17   customer needs or labor reduction or reduction of routes

18   or other sort of structural changes at the company;

19   correct?

20     A     Or lack of customers or addition of customers.

21     Q     Volume of business?

22     A     Volume of business.

23     Q     So that's fair to say; correct?

24     A     Yes.

25     Q     Okay.  Are you aware of any differences or

KARYN ABBOTT & ASSOCIATES

1    changes that any supervisor made from 2005 to 2010 to any

2    route to address any meal and/or rest break issue that

3    the drivers were having?

4        A    No.

5        Q    Did you ever collaborate with Mr. Llamas to

6    create or change or compact the route in any way?

7        A    Yes, we worked together in different projects.

8    And my involvement varied depending on what the

9    circumstances of the changes needed at the time were.

10       Q    Can you be anymore specific?

11       A    No, because whenever we looked at routes, there

12   was always something driving it.  Again, it could have

13   been volume -- could have been gain or loss of volume.

14       Q    Reduction in force?  Or was that not an issue?

15   I don't mean to put --

16       A    When you say "reduction in force," if somebody

17   left?

18       Q    Yes, or I don't know, did the company have any

19   layoffs when were you plant manager or, excuse me,

20   distribution manager?

21       A    No.

22       Q    Okay.  So is it fair to say the main driving

23   force in any route re-evaling was volume, customer

24   volume?

25       A    The main driving force would be volume, yes.

KARYN ABBOTT & ASSOCIATES

 1   six times so I apologize for this --

 2         MS. BONN:  More than 40.

 3         MR. McCAFFREY:  I don't think it's 40, maybe 39,

 4   but here comes 40'.

 5   BY MR. McCAFFREY:

 6      Q    Were there any changes -- did you make any

 7   changes or instruct anyone to make any changes to any

 8   route that was in existence when you started in 2005 to

 9   address or allow drivers to take a meal and/or rest

10   break?

11         MS. BONN:  Object to form.

12         THE WITNESS:  And the way that you're asking the

13   question, the answer is, no.

14   BY MR. McCAFFREY:

15      Q    That makes me nervous.

16         Is there -- did you instruct any supervisors or

17   anyone beneath you to change any routes to make it easier

18   for drivers to take meal and/or rest breaks after you

19   became the distribution manager?

20      A    The drivers from the day that I -- from the day

21   that I took over, the drivers were instructed to take

22   their half an hour lunch and their two 15 minutes breaks.

23         Is there a specific complaint that you're

24   referring to as far as meal and breaks and when did that

25   happen?

KARYN ABBOTT & ASSOCIATES

1      Q    As a result of that, did you instruct anyone to

2   change any of your drivers routes?

3      A    I don't recall.

4      Q    Are you aware of any differences among your

5   subordinate employees when they created routes in the

6   allocation of time for meal and/or rest breaks?

7           Put it another way, you said that your

8   understanding was that each route had built into it 30

9   minutes for a meal and two 15 minute breaks for rest;

10  correct?  Are you aware of any differences among your

11  subordinates in creating routes in that regard?

12     A    I don't recall any differences.

13     Q    Meaning are you aware of any supervisor

14  allocating more time for meal and/or rest breaks in the

15  creation of a route?

16     A    I'm not aware.

17     Q    Is it your best testimony sitting here today

18  that if, in fact, the allocation was made for 30 minutes

19  of meal time and 15 times two for rest time that was a

20  consistent practice by your subordinates?

21     A    That's what they were instructed, yes.

22     Q    And that was an instruction that you gave them?

23     A    Yes.

24     Q    And that was uniform to them; correct?

25          MS. BONN:   Object to form.

KARYN ABBOTT & ASSOCIATES

```
 1              THE WITNESS:  To my knowledge.

 2   BY MR. McCAFFREY:

 3       Q    Meaning that your expectation was that for each

 4   of the locations for which you were responsible for, the

 5   subordinates were doing -- your subordinate supervisors

 6   were doing it the same way?

 7              MS. BONN:  Object to form.

 8              THE WITNESS:  To the best of my knowledge.

 9   BY MR. McCAFFREY:

10       Q    Okay.  Did you ever give any of your subordinate

11   employees any indicate that they could or should deviate

12   in any way from the instructions that you gave with

13   respect to building in a 30 minute time period for a meal

14   break or 30 minutes for a combined rest break?

15              MS. BONN:  Object to form.

16              THE WITNESS:  No.

17              MR. McCAFFREY:  Okay.  So those are yours.

18              I have nothing further at this point.  Do you

19   want to do the same stip?  Do you have any questions?

20              MS. BONN:  I have some questions.

21              MR. McCAFFREY:  Okay.

22                         EXAMINATION

23   BY MS. BONN:

24       Q    Mr. Rodriguez, can you look at Exhibit 116.

25   It's an email dated May 20, 2008 from Mr. Llamas to you.
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - Y, PAGE 56
PAGE 382

1    Q    And how were those?

2    A    I was not the most popular guy when I first

3    started but by the time I left, I believe that the

4    majority of the drivers knew that I was fair; that I was

5    compassionate towards them and there is a lot of good

6    relationships that I have with a lot of the drivers.

7    Q    When -- why did the drivers not like you when

8    you started?

9    A    I think because when people first meet me, they

10   have sense that I'm dry.

11   Q    Any other reasons?

12   A    No.

13   Q    If you could go back to Alta Dena, would you?

14   A    Absolutely.

15   Q    Or Dean Foods?

16   A    Absolutely.

17   Q    Did you ever assist any of your relatives in

18   getting employment at Alta Dena?

19   A    I did suggest to my brother to apply for

20   employment.

21   Q    Did he get the job?

22   A    Did he get the job when he applied?  Yes.

23   Q    What was his name?

24   A    What is his name?

25   Q    Yes?

KARYN ABBOTT & ASSOCIATES

STATE OF CALIFORNIA      ) ss

     I, Julia Y. Ghekiere, CSR NO. 12006, do hearby declare:

     That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn;

     That said deposition was taken down by me in shorthand at the time and place therein named and thereafter transcribed under my direction;

     I further declare that I have no interest in the event of the action.

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

     WITNESS my hand this 14th day of February, 2013.


_____
JULIA Y. GHEKIERE, CSR 12006/CLR


KARYN ABBOTT & ASSOCIATES

**EXHIBIT Z**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MIGUEL DE LA CUEVA, on behalf of himself and those similarly situated,

        Plaintiff,

    vs.

ALTA DENA CERTIFIED DAIRY, LLC, a Delaware Limited Liability Company, ALTA-DENA CERTIFIED DAIRY, INC., a Delaware Corporation, and DOES 1 through 10, inclusive,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CERTIFIED COPY**

CASE NO.
CV 12-01804 GHK (CWx)

VOLUME I

DEPOSITION OF JESSE SANCHEZ

LOS ANGELES, CALIFORNIA

NOVEMBER 7, 2012

Reported by:
JULIA Y. GHEKIERE
CSR No. 12006/CLR
Job:  12-22781



KARYN ABBOTT & ASSOCIATES
COURT REPORTERS
420 North McCadden Place
Los Angeles, California 90004
Phone 213.340.4234  Fax 323.342.0044

EXHIBIT L, PAGE 1
PAGE 385

```
 1            THE WITNESS:  Yes.
 2   BY MS. CHESLER:
 3       Q     What did you review?
 4       A     Just a few of the -- of a document -- documents
 5   that we were going -- that we might go over.
 6       Q     Do you remember anything about them?  What they
 7   were?
 8       A     No.
 9       Q     Do you remember if they were -- had to do with
10   Mr. De La Cueva or policies?  Write-ups?
11       A     Write-ups.  They were write-ups.  They were --
12   they were not my signature on them.  They just want to
13   make things clear, it wasn't my writing.
14       Q     Okay.  So you had not seen the documents before?
15       A     Right.
16       Q     Did you issue any write-ups to Mr. De La Cueva?
17       A     I did.
18       Q     Did you review those before your deposition?
19       A     Yes.
20       Q     Anything other than write-ups?
21       A     No.
22       Q     Policies?
23       A     No.
24       Q     You currently work for what company?
25       A     Dean Foods.
```

17

EXHIBIT - Z, PAGE 2
PAGE 386

```
 1      A     It's a place where you deliver and from there
 2 they -- they don't produce.   They just transfer the loads
 3 to the trucks.
 4      Q     And San Diego produces?
 5      A     No, actually, they don't either.   San Diego's
 6 just a regular cross dock also.
 7      Q     Cross dock?
 8      A     Yes.
 9      Q     City of Industry produces?
10      A     Yes.
11      Q     So you're producing -- is it dairy products?
12      A     Yes.
13      Q     And you're also transferring the dairy products
14 from the City of Industry; is that correct?
15      A     Yes.
16      Q     Are you only responsible for City of Industry
17 location?
18      A     Yes.
19      Q     So we have City of Industry and then San Diego
20 and Highland.
21            Are there any other locations?   Branches?
22      A     Lancaster.
23      Q     Okay.   What's in Lancaster?
24      A     Also a cross dock.
25      Q     Anything else?
```

                                                          21

**KARYN ABBOTT & ASSOCIATES**

1  A  No, not there.

2  Q  When you say "there," you mean City of Industry?

3  A  City of Industry, yes.

4  Q  And I'm assuming we're referring to, basically,

5 a department that oversees drivers; is that right?

6  A  Right --

7    MS. SRINIVASAN:  Object to the form.

8    THE WITNESS:  Yes.

9 BY MS. CHESLER:

10  Q  And is there a name for that department?

11  A  Distribution.

12  Q  During the three years that you reported to

13 Mr. Llamas, did that chain of command change in any way

14 to Beto, Keith to Shaeffer?

15  A  No.

16  Q  And I'm sorry, before Mr. Llamas, who did you

17 report to?

18  A  Roger Barajas.

19  Q  And how long was that for?

20  A  Actually, it was Ernie Medina, Ernie Medina.

21  Q  Okay.

22  A  And that was about three years.

23  Q  Okay.  And then, before him, was Roger Barajas?

24  A  Well, I was a driver then.

25  Q  Okay.

26

**KARYN ABBOTT & ASSOCIATES**

```
 1     A     No, that's it.

 2     Q     Have these been your duties -- your basic duties

 3 the entire time that you've been a supervisor?

 4     A     Yes.

 5     Q     No change in any way?

 6     A     No.

 7     Q     Is there any difference in you performing

 8 supervisory functions for the day shift versus the night

 9 shift, other than the time?

10     A     Yeah.

11     Q     Okay.

12     A     Yeah.

13     Q     Okay.  What's the difference?

14     A     The deliveries.  Drivers -- it's a lot easier at

15 night.  All you got to do is make sure the trailer gets

16 there, you know, no hurry, no pressure.

17     Q     What do you mean "no pressure"?

18     A     Well, as far as customers.  You know, we had no

19 customers at night.  There was no window, actually, as

20 far as during the day that I experienced when I was

21 there.  You had, you know, customer windows.

22     Q     Any other difference between day and night?

23     A     No.

24     Q     What do you mean by "customer window"?

25     A     You had time for -- places were closed and
```

36

**KARYN ABBOTT & ASSOCIATES**

1  opened, you know.  You had to make sure you got there

2  when they were open.

3      Q    I grew up in a manufacturing family so I kind of

4  remember a little bit of this.

5          Did you have customers that, basically, said --

6  you know, actually gave you a delivery window as opposed

7  to, this is our hours of open.  You have to deliver

8  between, like, X and Y?

9          MS. SRINIVASAN:  Object to the form.

10          THE WITNESS:  I -- no.  I can't remember if

11  they -- when I was -- as far as my experience, no.

12          MS. CHESLER:  Okay.

13  BY MS. CHESLER:

14      Q    But they did give you a customer window as far

15  as when they were opened for deliveries?

16      A    Yes.

17      Q    And when you refer to "customers," who are you

18  referring to?

19      A    All the customers that we have.  I mean --

20      Q    But you're not delivering to customers, are you?

21      A    At night, no.  You're talking about during the

22  day, my experience; right?

23      Q    Uh-huh.

24      A    Yeah.

25      Q    During the day you are delivering to customers?

37

**KARYN ABBOTT & ASSOCIATES**

1     Q     Have you ever heard the term "interactive
2  process"?
3     A     No.
4     Q     Other than the topics you've covered for me,
5  have you been trained on any other HR topic that you can
6  recall?
7           MS. SRINIVASAN:  Object to the form.
8           THE WITNESS:  Not that I recall now.
9  BY MS. CHESLER:
10    Q     How about the classification of employees,
11  exempt or nonexempt?  Do they train you on that?
12          MS. SRINIVASAN:  Object to the form.  Object as
13  to relevance.
14          THE WITNESS:  Yes.
15  BY MS. CHESLER:
16    Q     And what do they -- what was the contents of
17  that training?
18    A     Exempt are people that are punching in and
19  non-exempted are people that aren't.
20    Q     Okay.  Anything else?
21    A     No.
22    Q     How about overtime?  Do they train you on
23  overtime?
24    A     No.
25    Q     How about meal and rest breaks?  Do they train

                                                         68

**KARYN ABBOTT & ASSOCIATES**

1   you on meal and rest breaks?

2      A      Yes.

3      Q      And what do they tell you in that regard?

4      A      What the employees -- what they are allowed.

5      Q      And what is that?

6      A      Meal breaks, 30 minute and a 15 minute.

7      Q      I'm sorry?

8      A      A 30 minute lunch break and a 15 minute rest

9   break or a coffee break.

10     Q      Okay.  Is that per day?

11     A      Yes.

12     Q      One 30 minute meal break and one 15 minute rest

13  break; is that right?

14     A      Yes.  Actually, they get an hour now.  They get

15  an hour now.

16     Q      An hour lunch break now?

17     A      Yes.

18     Q      When did that change?

19     A      I think in 2011.  I'm pretty sure.  No, I'm not

20  sure, maybe 2011.

21     Q      Okay.  Prior to 2011 was it always a 30-minute

22  break?

23     A      Yes, 30 and 15.

24     Q      Did that apply to all drivers or only drivers

25  working a certain amount of hours?

69

**KARYN ABBOTT & ASSOCIATES**

1    on the road between the fourth and sixth hours, they take

2    the lunch break before the fourth hour?

3        A    Yes.

4        Q    Is that right?

5        A    Yes.

6        Q    Did you tell them to do that?

7        A    No, they do it on their own.

8        Q    But you're aware that that's what they do?

9        A    Yes.  Well, I don't know if they -- they log off

10   on it.  I don't know if they're really eating -- or I

11   don't know.

12       Q    Okay.  So that was my next question.

13            How are you aware that's what they do?

14       A    There's Xata.  We print out a lunch break report

15   on them and it will show.

16       Q    Do you print out the Xata lunch break reports?

17       A    Once a week, maybe.

18       Q    When did Xata start?

19       A    2010 I would say.

20       Q    Okay.  So let's back up just a minute.

21            So before 2010, how were you tracking meal

22   breaks?

23            MS. SRINIVASAN:  Object to the form.

24            THE WITNESS:  I wasn't really tracking them.  I

25   mean, just took it that the drivers took their breaks.

                                                              72

**KARYN ABBOTT & ASSOCIATES**

 1 his prior testimony.

 2 BY MS. CHESLER:

 3     Q     Do you know where they would go?

 4     A     No.

 5     Q     And when you're telling me that on the night

 6 shift they take the meal break before the fourth hour, is

 7 that all the time you've been on the night shift because

 8 I know there was a break --

 9          MS. SRINIVASAN:  Object to the form.  Misstates

10 his prior testimony.

11          THE WITNESS:  No, no.  They're -- they can --

12 night shift guys are real -- it's -- they can take it

13 whenever they want.  It didn't matter to me.  Say we had

14 a breakdown and they're sitting for their load, two hours

15 into their shift, say, hey, I'm going to be sitting here

16 for a while, can I just go ahead and take my lunch?  Go

17 ahead, you know.

18          So it didn't really matter.  It didn't have a

19 specific time, you know.  It -- some, hey I haven't had

20 dinner today.  I'm hungry now.  Can I go ahead and take

21 my break?  Oh, yeah.  Take it.

22 BY MS. CHESLER:

23     Q     Would they call you and ask you?

24     A     Yeah, if it's under, like, under the four hours,

25 something like that, yeah, they would.  They would say,

                                                          75

1  would it be okay?  Yeah, that's fine.

2      Q      Did you ever say "no"?

3      A      No.

4      Q      How often would it happen that someone would

5  call you earlier than the fourth hour and say they wanted

6  to take their lunch now?

7          MS. SRINIVASAN:  Object to the form.

8          THE WITNESS:  They didn't call me, not often at

9  all.

10  BY MS. CHESLER:

11      Q      Not often?

12      A      Huh-uh.

13      Q      Did you ever communicate to employees that that

14  was fine?  That if they needed -- if they had downtime

15  and they wanted to take lunch before the fourth hour that

16  that was okay?

17      A      Yeah.

18      Q      Yes?

19      A      Yes.

20      Q      And then, how about the 15 -minute break, am I

21  right that the entire time you were a supervisor drivers

22  working at least eight hours a day were entitled to one

23  15-minute rest break; is that right?

24      A      Right.

25      Q      When -- what if they were driving?  When could

76

EXHIBIT - Z, PAGE 11
PAGE 395

1   they take that break?

2       A      When they stopped, whenever they stopped.

3       Q      So are they supposed to pull over for that

4   break?

5       A      If they wanted to, yeah.

6       Q      Was there any company policy or practice?

7       A      No.

8       Q      Was there any instruction given that you should

9   pull over or you should park or --

10      A      No, as far as taking the break, no.

11      Q      When do they take that break?

12      A      Whenever they felt like it.  If they needed a

13  15-minute break, they took their 15-minute break.

14      Q      What if they didn't feel like they needed a

15  break?

16      A      They didn't want it; they didn't take it.

17      Q      Okay.  And that's what your, sort of,

18  instructions of the troops was?

19          MS. SRINIVASAN:  Object to the form.

20          THE WITNESS:  My instructions?

21          MS. CHESLER:  Yes.

22          THE WITNESS:  No, my instructions were for them

23  to take it.  I encouraged them to take it.  Driving at

24  night, yeah, you take your break and your lunch.

25          MS. CHESLER:  Okay.

77

**KARYN ABBOTT & ASSOCIATES**

1        THE WITNESS:  Yeah.  But as far as them -- I

2   have no idea if they didn't -- they didn't want it or

3   they didn't take it.  I have no idea.  Breaks are usually

4   not even logged in.

5   BY MS. CHESLER:

6       Q    Break -- I'm sorry?

7       A    Breaks are not even usually logged in.  They

8   take them whenever they want.

9       Q    Why are they not logged in?

10         MS. SRINIVASAN:  Object to the form.

11         THE WITNESS:  I don't even think it's required,

12  15 minute.

13  BY MS. CHESLER:

14      Q    And they're just entitled to the one, 15-minute

15  break; right?

16      A    Yes.

17      Q    At one interval?

18      A    30 minute, one 30 minute and one 15 minute.

19      Q    Okay.

20      A    Can they use it back to back?  Is that what

21  you're saying?  Can they use it as far as the 30 minute

22  and then, their 15 minute?

23         MS. SRINIVASAN:  Object.  There's no

24  question pending.

25         MS. CHESLER:  That's okay.  That was a fair

                                                          78

1  question.

2  BY MS. CHESLER:

3      Q     Yeah.  Can they team them up like that?  Can

4  they take 45 minutes for lunch and say, hey, I took my

5  30-minute meal and I tacked on my 15-minute lunch?

6      A     Yeah.

7      Q     They can?

8      A     Yes.

9      Q     So there's no company -- there's no company,

10  sort of, statement to the employees that this is when

11  you're supposed to take your rest?

12      A     No.

13      Q     I guess --

14      A     Not at night, no.

15      Q     No policy; right?

16          MS. SRINIVASAN:  Object to the form.

17          THE WITNESS:  No.

18          MS. CHESLER:  Am I right?

19          THE WITNESS:  Yes.

20          MS. CHESLER:  Okay.  I do that a lot.  I'll say,

21  no and then, you say, no, and then, it gets confusing.

22  But that's not your fault; that's my fault.

23  BY MS. CHESLER:

24      Q     Okay.  How about when you were on the day shift,

25  did you have any different directives you gave your

79

**KARYN ABBOTT & ASSOCIATES**

```
 1              MS. SRINIVASAN:  Object to the form.

 2              THE WITNESS:  No, delivering to customers.

 3  BY MS. CHESLER:

 4       Q     And who are the customers?

 5       A     It varies.

 6       Q     Places like Ralphs or --

 7       A     Yeah.

 8       Q     Grocery stores?

 9       A     Right.

10       Q     Yes?

11       A     Yes.

12       Q     So am I right that customers during the day,

13  distributors are Alta Dena facilities at night; is that

14  right?

15       A     Yes.

16       Q     No customers at night; correct?

17       A     Yes.

18       Q     And no Alta Dena facilities are distributors

19  during the day; correct?

20       A     Yes.

21              MS. SRINIVASAN:  Object to the form.

22              MS. CHESLER:  I'm with you.

23  BY MS. CHESLER:

24       Q     And then, a B driver is driving a smaller truck;

25  is that right?
```

90

**KARYN ABBOTT & ASSOCIATES**

1    A    Right.

2    Q    And where -- oh, sorry, I've got one more,

3 Exhibit 3.

4         What's a shuttle driver?

5    A    That's relay.  Shuttle's the same as rely.

6    Q    And for the record, Exhibit 3 is Bates ADCD1004

7 to 1005.

8         (The aforementioned document was marked

9         Plaintiff's Exhibit No. 3 for

10        identification and is attached hereto.)

11 BY MS. CHESLER:

12   Q    So have you ever seen this before?

13   A    No.

14        MS. SRINIVASAN:  Object to the form.

15 BY MS. CHESLER:

16   Q    Your understanding is that a shuttle driver is

17 the same as a relay driver; is that right?

18   A    Yes, yes.

19   Q    Any other understanding?

20   A    No.

21   Q    No different than what you've told me about the

22 relay driver so far; right?

23   A    Right.

24   Q    I'll hand you what we'll mark as Exhibit 4.  For

25 the record this is ADCD1096 to 1097.

                                                    91

**KARYN ABBOTT & ASSOCIATES**

```
 1              (The aforementioned document was marked
 2              Plaintiff's Exhibit No. 4 for
 3              identification and is attached hereto.)
 4  BY MS. CHESLER:
 5      Q    Have you ever seen this document before?
 6      A    No.
 7      Q    Are you aware of a delivery route driver?
 8      A    When I -- I'm aware when I drove.
 9      Q    How about since you've been a supervisor?
10      A    No.
11      Q    And then, I'll hand you what I'll mark as
12  Exhibit 5.
13              (The aforementioned document was marked
14              Plaintiff's Exhibit No. 5 for
15              identification and is attached hereto.)
16  BY MS. CHESLER:
17      Q    Have you ever seen this document before?
18      A    No.
19      Q    And you're understanding is that B driver drives
20  a bobtail which is a smaller truck; right?
21      A    Right.
22      Q    Where are those deliveries going to and from?
23      A    Those are strictly Coffee Bean's.
24      Q    Coffee Bean and Tea Leaf?
25      A    Yes.
```

92

**KARYN ABBOTT & ASSOCIATES**

EXHIBIT - Z, PAGE 17
PAGE 401

1  hours and -- so I'm not talking about schedule, I'm

2  talking about, you know, HR policies?

3          MS. SRINIVASAN:  Object to the form.

4          THE WITNESS:  I don't understand.  What do you

5  mean?

6          MS. CHESLER:  No problem.

7  BY MS. CHESLER:

8    Q    Are you aware of any HR policy that applies to

9  one type of driver as opposed to another?

10          MS. SRINIVASAN:  Object to the form --

11          THE WITNESS:  No.

12          MS. SRINIVASAN:  -- calls for speculation.

13  BY MS. CHESLER:

14    Q    So am I right, then, the essential function of a

15  relay driver is, basically, to deliver the product --

16  Alta Dena's product from one point to another in

17  California; correct?

18    A    Correct.

19          MS. SRINIVASAN:  Object to the form.

20  BY MS. CHESLER:

21    Q    Was Mr. De La Cueva able to perform the

22  essential functions of the job?

23    A    Yes.

24    Q    Was there ever a time when he was not able to

25  perform the essential functions of his job?

                                                        94

**KARYN ABBOTT & ASSOCIATES**

1    Q    The pre- and post-trip inspections?

2    A    Yes.

3    Q    Any other DOT requirements?

4    A    That I can think of, no.

5    Q    Can you briefly tell me -- and the pre- and

6 post-trip inspections apply to all drivers; route, relay

7 and class B?

8    A    Yes.

9    Q    And can you briefly tell me what the

10 pre-inspection is?

11    A    It's beginning of their shift they would inspect

12 the unit that they're going to be driving.

13    Q    And fill out a form or --

14    A    Yes.

15    Q    And what are they supposed to indicate on the

16 form?

17    A    If there's any defects.

18    Q    To the truck?

19    A    Yes.

20    Q    Anything else?

21    A    Damage.

22    Q    Anything else?

23    A    No.

24    Q    And what is the post-trip?

25    A    The same.

96

**KARYN ABBOTT & ASSOCIATES**

1    A    Yes.

2    Q    And that process we just talked about, recording

3 hours, punching in and punching out in Xata, same

4 regardless of whether you're a class A -- route, class A,

5 delivery -- sorry, class A --

6    A    Relay.

7    Q    Relay, route and B; right?

8         MS. SRINIVASAN:  Objection, calls for

9 speculation.

10        THE WITNESS:  Yes.

11 BY MS. CHESLER:

12    Q    How do drivers learn where they're supposed to

13 deliver?  Do they have a standing, like, you are always

14 going to Highland or you're always going -- or is it,

15 sort of, like, you get a new assignment every day?

16    A    No.  They were -- they knew where they were

17 going.

18    Q    They were assigned?

19    A    Yes.

20    Q    So then, is it right that certain drivers are

21 assigned to certain Alta Dena facilities or third-party

22 distributors; is that right?

23    A    Yes.

24        MS. SRINIVASAN:  Object to the form.

25 ///

                                                    101

**KARYN ABBOTT & ASSOCIATES**

1     A     I have no idea.

2           MS. SRINIVASAN:  Object to the form.

3           MS. CHESLER:  You don't know?

4           THE WITNESS:  No.

5  BY MS. CHESLER:

6     Q     Has your understanding of company policy

7  regarding meal and rest breaks, has it changed in any way

8  since the union came in?

9           MS. SRINIVASAN:  Object to the form.

10          THE WITNESS:  To my understanding, no.

11  BY MS. CHESLER:

12    Q     Have you changed the way you instruct your

13  employees regarding meal and rest breaks since the union?

14    A     No.

15    Q     Have you made any change in how you instruct

16  employees about meal and rest breaks at any time over the

17  past five years?

18          MS. SRINIVASAN:  Object to the form.

19          THE WITNESS:  No.

20  BY MS. CHESLER:

21    Q     Do you know who would know -- who at the company

22  would know whether the collective bargaining agreement

23  affects meal and rest breaks?

24    A     I wouldn't know.

25    Q     Did you know that Mr. De La Cueva was

                                                    109

```
 1              Plaintiff's Exhibit No. 11 for

 2              identification and is attached hereto.)

 3   BY MS. CHESLER:

 4      Q     Have you ever seen this document before?

 5      A     No.

 6      Q     Fair to say you know nothing about the accident

 7   referred to in Exhibit 11?

 8      A     Yes.

 9      Q     Hand you what we'll mark as Exhibit 12.

10              (The aforementioned document was marked

11              Plaintiff's Exhibit No. 12 for

12              identification and is attached hereto.)

13   BY MS. CHESLER:

14      Q     Have you ever seen this document before?

15      A     No.

16      Q     Fair to say that you know nothing about this

17   corrective action notice?

18      A     Yes.

19      Q     Did you ever talk to Miguel about failing to log

20   breaks into Xata?

21      A     Xata, no.

22      Q     Did you ever talk to any of your employees about

23   failing to log breaks in Xata, meal or rest?

24              MS. SRINIVASAN:  Object to the form.

25              THE WITNESS:  No.  That I can remember, no.
```

129

KARYN ABBOTT & ASSOCIATES

```
 1      Q    Do you check to see if the meal and rest break
 2 is there?
 3      A    No, I don't look for that.
 4      Q    If you notice that someone doesn't have a meal
 5 or rest break, what do you do?
 6      A    I wouldn't know.
 7      Q    You've never noticed that?
 8      A    No.  I wouldn't know through Xata.  That's not
 9 going to actually tell me the guy didn't take a brunch --
10 a lunch.
11      Q    Okay.
12      A    It's -- you would have to go into a separate
13 program for that.
14      Q    What program?
15      A    A lunch break program.
16      Q    Is that a Xata lunch break program?
17      A    Yes.
18      Q    Have you ever done that?
19      A    I have.
20      Q    You have?
21      A    Yes.
22      Q    Have you ever seen in the Xata lunch break
23 program that employees have not logged a meal or rest
24 break?
25      A    Only -- yes, yes.
```

131

```
 1     Q     How do you know that?

 2     A     He actually told me.  I asked him, what are you

 3 doing there so long?  It takes me 30 minutes.  I go, it

 4 shouldn't take you no 30 minutes to drop a trailer.

 5     Q     Got it.

 6     A     Yeah.

 7     Q     Why did you ask him why he was there for so

 8 long?

 9           MS. SRINIVASAN:  Object to the form.

10           THE WITNESS:  The time that he came back for a

11 second run.

12 BY MS. CHESLER:

13     Q     Okay.  So do you have a general idea of how long

14 it should take drivers --

15     A     Oh, yeah, yeah.  I ran that before.  I ran them

16 all, yeah.

17     Q     Let me finish my question.  That's something I

18 should have told you in the beginning is when people have

19 conversations normally we talk like that.  You know where

20 I'm going and I know what you're going to say, but the

21 transcript gets a little markey (sic) so you've got to

22 let me finish and I'm going to try and let you finish.

23           So you have a general idea of how long each of

24 your drivers should take to make their respective

25 deliveries; yes?
```

KARYN ABBOTT & ASSOCIATES

EXHIBIT - Z, PAGE 24
PAGE 408

1    A    Yes.

2         MS. SRINIVASAN:  Object to the form.

3  BY MS. CHESLER:

4    Q    How do you do that?

5    A    How do I --

6    Q    Figure out how long a trip should take?

7    A    Oh, it's time wise, by the distance that they

8  are going and coming back on.

9    Q    Do you run, like, through Mapquest to figure out

10 how many miles something is?

11        MS. SRINIVASAN:  Object to the form.

12        THE WITNESS:  No.

13 BY MS. CHESLER:

14   Q    Do you just, kind of, know how many miles places

15 are?

16   A    Yes.

17   Q    How do you factor in traffic?

18   A    I do.  It's -- there's traffic and I rely on the

19 drivers to communicate that to me.  You know, if there's

20 heavy traffic, they will.  Or if they have to take an

21 alternate route, they will.

22   Q    Are they supposed to report to you if there's

23 traffic?

24   A    Yes.

25   Q    Why is that?

165

**KARYN ABBOTT & ASSOCIATES**

1    A    That's part of their duty.  And it's -- yeah,

2  they say, hey, you know, I'm running this way because of

3  traffic or I'm in an accident or, you know, I'm going to

4  be late with that second -- I'm not going to be in the

5  yard like I am usually back on time.  Okay.

6    Q    Right.  Do you remember where -- when you

7  supervised Mr. De La Cueva, where he was assigned to

8  deliver?  I can't remember.

9    A    I can't remember, various places.

10   Q    So if someone's going to, let's say, the

11 Highland facility, like, how long do they have to do

12 that?

13   A    Same thing -- oh, the drop?

14   Q    From the time they leave the City of Industry,

15 what time do you kind of expect them back?

16        MS. SRINIVASAN:  Object to the form.

17        THE WITNESS:  Within a three hour.

18 BY MS. CHESLER:

19   Q    Within three hours?

20   A    Yeah.

21   Q    And so if someone comes later than three hours

22 that, sort of, raises flags for you to be, like --

23        MS. SRINIVASAN:  Object to the form.

24        THE WITNESS:  Yeah, if it's way more than three

25 hours, yes.  I -- you know, I factor in traffic, like you

166

1  Lancaster, San Fernando or Chatsworth?

2      A    No.

3      Q    How about San Fernando, then?  How long is that

4  route, approximately, both ways?

5      A    That's an hour -- let's say a good hour both

6  ways -- two hours also, San Fernando.

7      Q    Okay.  And how about Chatsworth?

8      A    Chatsworth is two and 30 because 15 minutes away

9  from there.

10     Q    Okay.  Is it important for you -- do you guys --

11  strike that.

12          Do you guys do any, sort of, tracking on how

13  long deliveries are taking?

14          MS. SRINIVASAN:  Object to the form.

15          THE WITNESS:  No.

16  BY MS. CHESLER:

17     Q    Do you produce any kind of reports, efficiency

18  type reports?

19     A    No, no.

20     Q    Are you concerned as a supervisor with

21  efficiency?

22     A    Yes.

23          MS. SRINIVASAN:  Object to the form.

24          THE WITNESS:  Yes.

25  ///

                                                        170

**KARYN ABBOTT & ASSOCIATES**

1           MS. SRINIVASAN:  Object to the form.

2           THE WITNESS:  I have no idea.

3 BY MS. CHESLER:

4      Q    You don't know one way or the other?

5      A    No.

6      Q    Was the hand truck needed to make the

7 deliveries?

8      A    On route drivers, yes.

9      Q    Did they get to keep the hand truck?

10     A    Yes, it's theirs.

11     Q    So it would become theirs?

12     A    Yes.

13     Q    Did you have the option to not have the

14 deduction but also still get a hand truck?

15     A    Yes.

16     Q    Okay.  Hand you what we'll mark as Exhibit 25.

17          (The aforementioned document was marked

18          Plaintiff's Exhibit No. 25 for

19          identification and is attached hereto.)

20 BY MS. CHESLER:

21     Q    Do you recognize this document?

22     A    Yes.

23     Q    What is it?

24     A    It's a route ride that I did -- that I performed

25 with Miguel.

173

```
 1     Q     What is a route ride?

 2     A     It's when you go out with the driver on his

 3  daily routine.  You go out there with him for the whole

 4  day.

 5     Q     And so what time did you start?

 6     A     7:00 p.m. looks like here.

 7     Q     And you did this on 4/19/2010; is that right?

 8     A     Yes.

 9     Q     Okay.  Does this refresh your recollection that

10  he was doing relays to San Fernando or not necessarily?

11     A     Yes.

12     Q     It says (reading):  "Idle time 5.2 percent."

13           What does that mean?

14     A     Idle time where he's letting the truck idle.

15     Q     So that's in stop but engine on; right?

16     A     Yes, yes.

17     Q     Is it considered idle if the engine's off?

18     A     No.

19     Q     And "MPG" is that miles per gallon?

20     A     Yes.

21     Q     Then we have meal break, is that -- what is

22  that?  Whether he takes his meal break?

23           MS. SRINIVASAN:  Object to the form.

24           THE WITNESS:  Where is that at?

25           MS. CHESLER:  Next to "MPG."  I'm just going
```

174

1  from left to right starting with the Xata line.

2  BY MS. CHESLER:

3     Q    What's supposed to be written there?

4     A    I'm lost here.

5     Q    That's okay.  So I'm on the first box.  See

6  where it says "preparation"?

7     A    Oh, I see what you're saying.

8     Q    Then we have "idle time," next to it "MPG" and

9  then to the right, I guess -- well, that actually says

10 "Unknown Driver Trips."

11          Do you see that?

12    A    Yes.

13    Q    What is unknown driver trips?

14    A    That's where -- the system will not

15 recognize Miguel so it's -- he's recognized.

16    Q    Got it.

17    A    Yeah.

18    Q    And then, it says "Meal/Break OT, BT."

19          What does that stand for?

20    A    That's on target and below target.

21    Q    And on target means what?

22    A    That he's taking his meal breaks.

23    Q    And what time?

24          MS. SRINIVASAN:  Object to the form.

25          THE WITNESS:  Whatever time he's -- prefers to

                                                    175

1  take it at his --

2  BY MS. CHESLER:

3      Q     At his discretion?

4      A     Yes.

5      Q     No requirement that it be taken at a specific

6  time?

7      A     No.

8      Q     So if his route permits him to take it at hour

9  two, that's okay?

10         MS. SRINIVASAN:  Object to the form.

11         THE WITNESS:  Yes, yes.

12  BY MS. CHESLER:

13     Q     And if his route permits him to take it at hour

14  seven, that's okay?

15     A     Yes.

16     Q     Okay.  Do you recall on this route at what point

17  he took the break?

18         MS. SRINIVASAN:  Object to the form.

19         THE WITNESS:  I don't remember, then, what time

20  he did or not.

21  BY MS. CHESLER:

22     Q     If it had been at hour seven, would you have

23  marked beyond target or would you still mark --

24     A     I would have told him -- if it was hour seven,

25  it's a little too late.

176

1      Q     Okay.  Where would you, sort of -- at what point

2  would you check off beyond target?

3      A     Between the fourth and sixth hour.

4      Q     Okay.  So anything past six, you would have

5  circled beyond target?

6      A     Yes --

7            MS. SRINIVASAN:  Object to the form.

8            THE WITNESS:  -- below.

9  BY MS. CHESLER:

10     Q     Sorry, below target?

11     A     Yes, yes.

12     Q     And as part of your route ride coaching

13  assessment, were you making sure he clocked out for the

14  meal break?

15     A     Yes.

16     Q     Do you recall where you guys went?

17           MS. SRINIVASAN:  Object to the form.

18           THE WITNESS:  I don't know -- no, I can't.

19  BY MS. CHESLER:

20     Q     Did you eat together?

21     A     I think we did.  I forget.  I might have bought

22  him lunch.  I don't know.  I usually do when I do this.

23  I often sit and buy him lunch, but I can't remember.

24     Q     That's nice of you.

25           Okay.  The next line has "violations."  I'm

                                                          177

**KARYN ABBOTT & ASSOCIATES**

1   sorry, just to make sure I got it, as part of your route

2   ride coaching assessment, would you also make sure that

3   he logged out in Xata for his meal break?

4        A    Yes.

5        Q    And if he failed to do that, would you have

6   noted that on this form?

7        A    Oh, yes.

8        Q    Okay.  Where would you note this on this form?

9        A    On the side or --

10       Q    Near the meal break part?

11       A    Back here, yes.

12       Q    "Back here," and you're referring to the second

13   page?

14       A    Yes.

15       Q    Okay.  "Violations" it says "none."

16            What violations does that refer to?

17       A    His missing punches, going into violation on

18   Xata.

19       Q    Okay.  "Violations Time," what does that refer

20   to?

21       A    Same thing as his -- his driving times not

22   over -- his 15 -- he's good on his 15 hours of drive

23   time.

24       Q    Okay.

25       A    So no violations there.

178

**KARYN ABBOTT & ASSOCIATES**

1  volume of their product wheeling into their stores.

2      Q    Okay.  So productivity is measured for the route

3  drivers?

4      A    For the route drivers, yeah.

5      Q    But not the relay drivers?

6      A    Yes.

7      Q    And then, I'm assuming that "Tardies" is late to

8  work?

9      A    Yes.

10     Q    And "Absences" is not at work?

11     A    Yes.

12     Q    And the "Route Expectation Hours for Day" is how

13  many hours he's supposed to be working that day?

14     A    Well, the route --

15     Q    Is that it?

16     A    Yeah, the eight hours.

17     Q    Okay.  Then there's "Beginning of Work Day

18  Kronos."  What is Kronos -- what is Kronos?

19     A    It's the time clock that keeps track of their

20  punch ins and punch outs.

21     Q    How long have you guys used Kronos?

22     A    I don't use it.  It's the manager that does

23  that.  I'm sure they've been using it since I was a

24  driver.

25     Q    Okay.  As long as you can remember?

                                                          180

**KARYN ABBOTT & ASSOCIATES**

```
 1     Q    On the document that's got 7042 at the bottom,
 2  page 2 of Exhibit 31, what's written here that he's put
 3  regarding Xata operations.  And you can review it if you
 4  need to.
 5          Is that all accurate?  Is that right?
 6          MS. SRINIVASAN:  Object to the form.
 7          THE WITNESS:  Appears to be.
 8  BY MS. CHESLER:
 9     Q    Okay.  If you look on line 18 an 19 it says
10  (reading):
11          "You have to log onto Xata and take no
12          less than a 30 minute lunch, truck has to
13          be off all the time of your lunch,
14          (bottom line) - truck has to be off all
15          the time that it is not moving."
16          Is that true?
17     A    That's true.
18     Q    Can the driver eat in the truck?
19     A    Yes.
20     Q    Are they told not to eat in the truck?
21     A    That, I don't know.
22     Q    Are they told to -- are they told they can leave
23  the truck?
24     A    Can leave it?
25     Q    Yes.
```

205

1    A    That, I don't know.

2    Q    I guess what I'm trying to figure out is, if you

3 know that employees are pulling over, turning it off and

4 eating in the truck, is that something they're supposed

5 to be doing or not?

6    A    They can.

7    Q    Okay.  Any requirement that they're supposed to

8 leave the vehicle to eat lunch?

9    A    No, lock it if they do, if they do leave it.

10   Q    Okay.

11   A    And have it in view.

12   Q    What do you mean "have it in view"?

13   A    Have it in view.  If they're going to, say, a

14 restaurant or to order some food, make sure they have the

15 truck in sight and it's locked while they're ordering.

16   Q    Okay.  Why do they have do have the truck in

17 sight?

18        MS. SRINIVASAN:  Object to the form.

19        THE WITNESS:  Security services or security

20 issues.

21 BY MS. CHESLER:

22   Q    Like some --

23   A    Just in case somebody's vandalizing it or, you

24 know, stealing.

25   Q    Okay.  So if they're going to pull over and park

206

KARYN ABBOTT & ASSOCIATES

EXHIBIT - Z, PAGE 36
PAGE 420

 1          MS. SRINIVASAN:  Object to the form.

 2          THE WITNESS:  No.  I don't tell my drivers that,

 3 no.

 4 BY MS. CHESLER:

 5    Q    Do you tell them anything as far as leaving the

 6 truck during lunch?

 7    A    No.

 8    Q    You don't?

 9    A    No, I don't.

10    Q    Okay.  I'll hand you what we'll mark as Exhibit

11 32.

12          (The aforementioned document was marked

13          Plaintiff's Exhibit No. 32 for

14          identification and is attached hereto.)

15 BY MS. CHESLER:

16    Q    Do you recall receiving this e-mail?

17    A    No.

18    Q    Do you have any idea what it's regarding?

19          MS. SRINIVASAN:  Object to the form.

20          THE WITNESS:  No.

21 BY MS. CHESLER:

22    Q    Anything that would refresh your recollection?

23    A    No, it's something about a violation, but it

24 doesn't actually say what or what kind of document or

25 anything.  What violation?  It doesn't say.  I have no

                                                      208

1  a few more.  I can't remember them right now.  There's --

2  I know they have them posted in the cafeteria and in our

3  distribution drivers room, the plant, by the time clock

4  there.

5      Q    Anywhere else it's posted?

6      A    That I remember, no.

7      Q    Anything else that's posted that you can recall?

8      A    Safety -- safety issues.  What to do and what

9  not to do, weight limits on the tractors and trailers.

10 Your pre- and post-trip form.  It's, like, huge.

11     Q    Okay.  And since we've been going for a while, I

12 just want to see if this has refreshed your recollection

13 at all.

14          Can you give me now your best estimate of when

15 you supervised Miguel?

16     A    I would say 2009, 2010.

17     Q    So approximately two years?

18     A    Yes.

19     Q    Did you ever do anything to -- while you were a

20 supervisor, to ensure that drivers got their meal breaks?

21          MS. SRINIVASAN:  Object to the form.

22          THE WITNESS:  What do you mean by "do anything"?

23 BY MS. CHESLER:

24     Q    Did you take any steps to ensure that drivers

25 were actually taking their meal breaks, as a supervisor?

228

**KARYN ABBOTT & ASSOCIATES**

1     A    As far as letting them know when they should

2 take or what they're allowed to take?  Yeah, they -- we

3 hand out -- I guess it's in their -- their policy.  It's

4 in the company policy.

5     Q    The handbook?

6     A    Yes.

7     Q    The meal and rest break is in the handbook?

8     A    Yes.  And then, I believe the safety classes

9 usually had that also at one time or another.

10    Q    Safety classes for drivers?

11    A    Yes.  We held them monthly.

12    Q    Monthly?

13    A    Yes.

14    Q    Okay.  Anything else?

15    A    That's what I can remember for now.

16    Q    Did you guys have an In-N-Out truck for one of

17 those safety meetings?

18    A    Yeah, we did.

19    Q    Thought I saw that.  Sounds good right about

20 now.

21         Did you personally ever do anything to ensure

22 that your drivers were getting their 30-minute breaks,

23 like, check their time cards?  Ask them?

24    A    I go over their meal breaks once in a while,

25 but, yeah, they know when to take them.  They're

                                                        229

**KARYN ABBOTT & ASSOCIATES**

1  getting a break?

2      A    Yes.

3      Q    And if you see anything less than 30 minutes, do

4  you then go talk to the employee?

5      A    Yes.

6      Q    Okay.  Do you do anything to ensure the

7  15-minute break?

8      A    To ensure it?

9      Q    Uh-huh, to make sure they're taking it?

10     A    That's up to them if they want to take it.

11     Q    Do you tell employees they're entitled to it?

12     A    Oh, yeah, yeah.  They know it.

13     Q    What do you say, you're entitled to one

14  15-minute break?

15     A    Now they get two.

16     Q    Now they get two 15-minutes breaks?

17     A    Yes.

18     Q    When did that change?

19     A    I think sometime in the middle of last year.

20     Q    So mid 2011?

21     A    Yes.

22     Q    And did you tell employees there's been a

23  change?

24     A    Yeah, there was a pamphlet that was handed out

25  to them.

231

```
 1      Q      A pamphlet?

 2      A      Yeah.

 3      Q      Okay.  And did you also have a discussion with

 4  employees?

 5      A      Yeah, some people, they were off, yeah.  I let

 6  them know that they're entitled to the hour break; two 15

 7  and 30 minute.

 8      Q      Oh, I see what you're saying.

 9             So it's an hour break total?

10      A      Yes.

11      Q      But the lunch stayed half an hour?

12      A      Yes.

13      Q      They just got an increased second break?

14      A      Right.

15      Q      But prior to 2011, it was one 15-minute break?

16      A      That I can recall, yeah.

17             MS. SRINIVASAN:  Object to the form.

18             THE WITNESS:  One 15 -- one 15 and one 30 meal.

19  BY MS. CHESLER:

20      Q      Got it.  I'm just talking about rest now?

21      A      Yes.

22      Q      Okay.  And that's what you told Mr. De La Cueva

23  when you were his supervisor?

24      A      Yes.

25             MS. SRINIVASAN:  Object to the form.
```

                                                              232

**KARYN ABBOTT & ASSOCIATES**

1  BY MS. CHESLER:

2     Q     Did you do anything to make sure they were

3  taking their one 15-minute break prior to 2011?

4     A     No, no.

5     Q     Did you ever give any instructions on when they

6  could take the one 15-minute break prior to 2011?

7     A     No.

8           MS. SRINIVASAN:  Object to the form.

9  BY MS. CHESLER:

10    Q     What is the company policy, prior to 2011, as to

11 when they can take the one 15-minute break?

12          MS. SRINIVASAN:  Object to the form.

13          THE WITNESS:  Policy is the first 15 -- or two

14 hours.

15 BY MS. CHESLER:

16    Q     After two hours of work?

17    A     Yes.

18    Q     And then, after 2011, when the policy changed to

19 two 15-minute breaks, what is the policy as to when those

20 can be taken?

21    A     They could have the -- they could box up the two

22 15 together if they want.

23    Q     Okay.

24    A     Or take the whole hour.

25    Q     As one hour?

                                                      233

```
1    A    As one hour, yeah.

2    Q    Any policy as to when it's supposed to be taken

3 or --

4    A    No, no, not that I -- well, actually, I think

5 there is the 30-minute before the six that they need to

6 take that 30 minute.

7    Q    Okay.

8    A    Yeah.  That's still in effect.

9    Q    And --

10   A    Anything after ten, they're entitled to another

11 30.

12   Q    Okay.

13   A    Yeah.

14   Q    And any policy with respect to the two

15 15-minute rest breaks, separate from the meal?

16   A    No, no.  I think that's every two hours -- or

17 two hours and then four after that.  I would think, yeah.

18   Q    After two hours and then after four?

19   A    Yeah, then another 15 after the fourth.

20   Q    Hour?

21   A    Yes.

22   Q    And then, the meal break sometime between the

23 fourth and sixth?

24   A    Yes.

25   Q    Okay.  So no break after sixth on?
```

234

1    A    Yes.

2         MS. SRINIVASAN:  Object to the form.

3         THE WITNESS:  If there's a tenth hour, then

4 you're entitled to another 30.

5 BY MS. CHESLER:

6    Q    Got it.  But if there's no tenth hour --

7    A    I'm sorry, the 12th, 12th is mandatory.  The

8 12th is mandatory.

9    Q    Okay.

10    A    12th is mandatory 30 no matter what.

11    Q    Okay.  If you're working between hours six and

12 eight, and you only work an eight-hour day, no more

13 breaks provided during that time; right?

14         MS. SRINIVASAN:  Object to the form.

15         THE WITNESS:  An eight-hour day?  No, you should

16 have taken your 30 and your 15 by then.

17 BY MS. CHESLER:

18    Q    Okay.  Prior to 2011, you should have taken your

19 30 and one 15 and then, after mid 2011, you should have

20 taken your 30 and your two 15; is that right?

21    A    Right.

22         MS. SRINIVASAN:  Object to the form.

23 BY MS. CHESLER:

24    Q    And when you were on the day shift, prior to

25 2011, was it also one 15 minute for the day shift?

235

1  similarly.

2  BY MS. CHESLER:

3      Q    So the other locations have a different policy?

4      A    I have no idea about theirs.

5      Q    Okay.  So do you know if they apply company wide

6  or you don't know?

7           MS. SRINIVASAN:  Object to the form.

8           THE WITNESS:  I have no idea.

9  BY MS. CHESLER:

10     Q    Okay.  But your -- when you tell employees

11 things like, you get one 15-minute break and one

12 30-minute lunch break, you're not making that up, someone

13 from Alta Dena is communicating that policy and you then

14 tell employees; is that right?

15          MS. SRINIVASAN:  Object to the form.

16          THE WITNESS:  Yes.

17 BY MS. CHESLER:

18     Q    I just want to make sure you're not some rogue

19 supervisor making up your own rules.

20     A    Oh, no, no.

21     Q    Okay.  Let me hand you what we'll mark as

22 Exhibit 52.  Let me know when you're ready.

23          (The aforementioned document was marked

24          Plaintiff's Exhibit No. 52 for

25          identification and is attached hereto.)

243

1 supposed to write "lunch" or "meal" or just make a line?

2    A    No, lunch, write lunch.

3    Q    They're supposed to write it down?

4    A    Yes.

5    Q    Were they supposed to write down rest breaks or

6 no?

7    A    If they took one break, yes.

8    Q    So on the daily log, they were supposed to

9 record a break?

10   A    Yes.

11   Q    But no breaks in Xata; right?

12   A    I'm remembering now, yeah, there is.  There is

13 an option for a break.  But as far as us requiring them

14 to take that -- that doesn't go back when you're on this.

15        There is a two 15-minute break.  I think I told

16 you it started in 2011.

17   Q    '11?

18   A    Yeah, it started in 2009.

19   Q    In 2009?

20   A    Yeah.

21   Q    How did you remember it started in 2009?

22   A    I'm going over this and I remember now.

23   Q    Okay.  But before 2009, they didn't get two

24 breaks?

25   A    It was -- yes, two 15-minute breaks.

256

**KARYN ABBOTT & ASSOCIATES**

1    Q    Started in 2009?

2    A    Well, it was still in effect then.

3    Q    When was it not in effect?

4    A    It was in effect, the two 15.

5    Q    When was it not?

6    A    Oh...

7    Q    You said it refreshed your memory that it

8 started in 2009?

9    A    It was continued.  It continued.

10    Q    It continued what?

11    A    The two breaks.

12    Q    From when?

13    A    I guess to 2010 is when I said it -- or 2011

14 when I said it was an hour that they got now.  So the 30

15 and the two 15 so...

16    Q    What was the change last year?

17    A    It was -- last year was the hour -- the two 15

18 plus the half hour.

19    Q    That was the change last year?

20    A    Yeah.

21    Q    Got it.  Okay.  Page 2 of Exhibit 57, this daily

22 route activity sheet, do you guys still use this after

23 Xata is implemented?

24    A    No.

25    Q    But you would use it before Xata?

257

**KARYN ABBOTT & ASSOCIATES**

1    A   Yes.

2    Q   Okay.  And just so I'm clear, I think we talked

3 about it earlier, but you definitely -- you never talked

4 to anyone about the decision to terminate Miguel's

5 employment?

6    A   Yes.

7    Q   Is it true that you never had any input

8 whatsoever to the decision to terminate Mr. De La Cueva's

9 employment?

10    A   That's correct.

11    MS. SRINIVASAN:  Object to the form.

12    MS. CHESLER:  Okay.  I think, Counsel, this

13 might be a good place to stop because I do have to get

14 going.  So that being said, we are going to conclude the

15 deposition for today.

16    MS. SRINIVASAN:  Before you do that, can I just

17 ask Mr. -- I think that -- I don't know if he has

18 anything further to clarify --

19    MS. CHESLER:  No, no, no, no.  You do that when

20 I'm done with the deposition.  I'm not going to sit here

21 and let you start doing question, answer.  I have to go.

22 I'm still taking the deposition.  When I'm done

23 questioning, if you have questions, you're more than free

24 to do so.

25    MS. SRINIVASAN:  Sure.

258

1  STATE OF CALIFORNIA      ) ss

2

3        I, Julia Y. Ghekiere, CSR NO. 12006, do hearby

4  declare:

5

6        That, prior to being examined, the witness named

7  in the foregoing deposition was by me duly sworn;

8

9        That said deposition was taken down by me in

10  shorthand at the time and place therein named and

11  thereafter transcribed under my direction;

12

13        I further declare that I have no interest in the

14  event of the action.

15

16        I declare under penalty of perjury under the

17  laws of the State of California that the foregoing is

18  true and correct.

19

20        WITNESS my hand this 20th day of NOVEMBER, 2012.

21

22

23  _____
    JULIA Y. GHEKIERE, CSR 12006/CLR

24

25

                                                    265

**KARYN ABBOTT & ASSOCIATES**